# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| T.F. by his next friend Tracy Keller; K.D. by his next friend Laura Ferenci; C.O. by her next friend Laura Ferenci; L.L. by his next friend Gerald Kegler; T.T. and M.T. by their next friend Dr. Caryn Zembrosky; T.M., T.E., and A.T. by their next friend James Dorsey; A.W. by his next friend Margaret Shulman; and I.W., D.W., and B.W. by their next friend Gloria Anderson, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:17-cv-01826-PAM-BRT |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| HENNEPIN COUNTY; Hennepin County Department of Human Services and Public Health; DAVID J. HOUGH, Hennepin County Administrator; JENNIFER DECUBELLIS, Hennepin County Deputy Administrator for Health and Human Services; JODI WENTLAND, Hennepin County Director of  Human Services; JANINE MOORE, Director, Hennepin County Child and Family Services; and EMILY  PIPER, Commissioner, Minnesota Department of Human Services, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Defendants. | ) ) ) ) ) ) ) ) ) ) ) | |

## INTRODUCTION

1.     This civil rights action seeks to defend the constitutional and statutory rights of two related classes of children who have suffered harm or the risk of harm caused by the systemic failures of Hennepin County and responsible Hennepin County and State of Minnesota officials ("Defendants") in implementing its child protection system.

2.     This case involves children who either are or will be the subject of reports of suspected child abuse or neglect made to Hennepin County, who are or will be under the protective supervision of, or in the custody of Hennepin County, or who are under the guardianship of the Commissioner of Human Services. Specifically, Hennepin County has regularly failed to investigate properly reports alleging these children have been abused or neglected; failed to provide appropriate services to the children and their families; failed to provide safe and appropriate foster care placements for the children; and, for children who cannot be returned to their homes, failed to secure safe, permanent homes.

3.     Defendants' failures have and will continue to jeopardize and compromise Plaintiffs' health and safety in violation of the United States Constitution, federal law, and state law.

4.     Indeed, it is the express and longstanding policy of the State of Minnesota (the "State") "to protect children whose health or welfare may be jeopardized through physical abuse, neglect, or sexual abuse." Minn. Stat. § 626.556. In furtherance of this policy, and in order to comply with the United States Constitution and federal law—

which vests vulnerable children with the right to be free from the risk of unnecessary harm—the State has created comprehensive regulatory schemes to identify and protect abused and neglected children, and has delegated to its counties the responsibility for implementing these laws.  In Hennepin County, the Hennepin County Department of Human Services and Public Health ("the Department") is assigned this responsibility.

5.     Hennepin County is failing to live up to its responsibilities, and Defendants have long been aware that its child protection system has devolved into a confusing, underfunded, and erratic system that inflicts harm on the children it serves on a widespread and measurable basis.

6.     A 2015 report documented many of these problems in Hennepin County, but little meaningful action has been taken.  Since 2015, Hennepin County has not significantly improved or expanded the services it offers to children still living at home, but has instead increased the number of children who are removed from their homes and the number of children who are legally available for adoption.  However, neither the number of safe and appropriate shelter care and foster care placements, nor the number of legally permanent adoptive homes for children, has been increased during this same time period. The above and other publicly available data suggests that, in many ways, Hennepin County's child protection system is among the most deficient child protection systems in the nation.  Specifically,

     a.     Hennepin County fails to employ a minimally adequate number of case workers; many case workers are not provided adequate training or support

necessary to carry out their responsibilities, and the turnover rate among child protection case workers is high;

b.      Hennepin County screens out, and fails to investigate or assess at all, far too many reports of alleged abuse and neglect for arbitrary reasons;

c.      The investigations and assessments it does conduct often are incomplete or not completed within required deadlines designed to protect the children who are the subjects of such reports;

d.      Many of the families who are investigated or assessed are only offered voluntary services, which are often inadequate to protect children or assist families;

e.      When it is necessary to remove children from their homes, children often languish in an over-taxed and improperly used emergency foster shelter care system that includes both institutional and home settings, and many children experience multiple destabilizing moves between foster homes;

f.      Many of the children who are returned to their homes from foster care are re-abused and re-enter the child protection system; and

g.      For children who are available for adoption, Hennepin County fails to find appropriate adoptive homes in a timely manner; many such children may remain as state wards for years or, in some cases, until they become legal adults and age out of the child protection system.

7.     Plaintiffs therefore bring this action seeking both declaratory and injunctive relief against the entities and officials responsible for violating their legal rights under federal and state law.

## PARTIES

### I.     Plaintiffs

8.     Plaintiff T.F. is a 12-year-old boy who is in the guardianship of the Minnesota Commissioner of Human Services ("the Commissioner"), on behalf of whom the Department is acting as the Commissioner's agent.  He appears through his next friend, Tracy Keller.

9.     Plaintiff K.D. is an 11-year-old boy who is in court-ordered out-of-home placement and is in the custody of the Department.  He appears through his next friend, Laura Ferenci.

10.     Plaintiff C.O. is a seven-year-old girl who is in court-ordered out-of-home placement and is in the custody of the Department.  She appears through her next friend, Laura Ferenci.

11.     Plaintiff L.L. is a 14-year-old boy who is in the guardianship of the Commissioner, on behalf of whom the Department is acting as the Commissioner's agent. He appears through his next friend, Gerald Kegler.

12.     Plaintiff T.T. is a 13-year-old girl who is in the guardianship of the Commissioner, on behalf of whom the Department is acting as the Commissioner's agent. She appears through her next friend, Dr. Caryn Zembrosky.

13.     Plaintiff M.T. is an 11-year-old girl who is in the guardianship of the Commissioner, on behalf of whom the Department is acting as the Commissioner's agent. She appears through her next friend, Dr. Caryn Zembrosky.

14.     Plaintiff T.M. is a 13-year-old boy who is in court-ordered out-of-home placement and is in the custody of the Department.  He appears through his next friend, James Dorsey.

15.     Plaintiff T.E. is a nine-year-old girl who is under protective supervision of the Department while on a trial home visit.  She appears through her next friend, James Dorsey.

16.     Plaintiff A.T. is a four-year-old girl who is under protective supervision of the Department while on a trial home visit.  She appears through her next friend, James Dorsey.

17.     Plaintiff A.W. is a 12-year-old boy who is under protective supervision of the Department while on a trial home visit.  He appears through his next friend, Margaret Shulman.

18.     Plaintiff I.W. is a 13-year-old girl who is in court-ordered out-of-home placement and is in the custody of the Department. She appears through her next friend, Gloria Anderson.

19.     Plaintiff D.W. is an 11-year-old girl who is in court-ordered out-of-home placement and is in the custody of the Department. She appears through her next friend, Gloria Anderson.

20.     Plaintiff B.W. is an eight-year-old boy who is in court-ordered out-of-home placement and is in the custody of the Department. He appears through his next friend, Gloria Anderson.

## II.     Defendants

21.     Defendant Hennepin County is a municipal entity created and authorized under the laws of the State of Minnesota.  It is authorized by law to maintain and ultimately is responsible for maintaining the Department, and its Children and Family Services ("CFS") division, which acts as Hennepin County's agent in the area of protecting the safety and welfare of children.

22.     Defendant David J. Hough is the Hennepin County Administrator and is sued herein solely in his official capacity.  He provides county-wide oversight to each of Hennepin County's departments, including the Department and CFS, and is responsible for ensuring that Hennepin County complies with its legal obligations.

23.     Defendant Jennifer DeCubellis is the Hennepin County Deputy Administrator for Health and Human Services and is sued herein solely in her official capacity.  She oversees CFS and is responsible for ensuring that Hennepin County complies with its legal obligations with respect to children whose families are being investigated and/or who have been removed from their homes.

24.     Defendant Jodi Wentland is the Hennepin County Director of Human Services and is sued herein solely in her official capacity.  Together with Ms. DeCubellis, she oversees CFS and is responsible for ensuring that Hennepin County complies with its

legal obligations with respect to children whose families are being investigated and/or who have been removed from their homes.

25.     Defendant Janine Moore is the Director of CFS and is sued herein solely in her official capacity.  She is responsible for CFS's policies, practices, and operations, and for ensuring that CFS and the private agencies with which it contracts comply with all applicable federal and state laws.

26.     Defendant Emily Piper is the Commissioner of the Minnesota Department of Human Services ("DHS") and is sued solely in her official capacity.  DHS provides oversight and technical training to all 87 county social services agencies, which are responsible under Minnesota law to operate local child protection programs.  Defendant Piper is responsible for the policies, practices, and operation of DHS, and for ensuring DHS's compliance with all applicable federal and state law.  She receives federal funding designated for state child protection programs, and is responsible for passing that funding through to each of the state's 87 counties and two tribes.  She also is the guardian of state wards, children as to whom parental rights have been terminated by the juvenile court. The responsible social services agency within each county is her agent with respect to state wards under her guardianship. Ms. Piper has recently been informed that Hennepin County has failed to meet any of the seven applicable performance measures required by the federal law under which federal funding for state child welfare programs is received.

## JURISDICTION AND VENUE

27.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

28.     The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

29.     The Court may exercise supplemental jurisdiction over the claims based on Minnesota law pursuant to 28 U.S.C. § 1367(a).

30.     This Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2002 and Rule 57 of the Federal Rules of Civil Procedure.

31.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b).

## CLASS ACTION ALLEGATIONS

32.     This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

33.      This action consists of two classes:

        a.      All children for whom Hennepin County has or will have legal responsibility and/or a special relationship in the context of the child protection system (the "Special Relationship Class"); and

        b.      All children who are or will be the subject of maltreatment reports made or referred to Hennepin County that are or should be investigated or assessed by Defendants pursuant to Minn. Stat. § 626.556 (the "Maltreatment Report Class").

9

34.     Each class is sufficiently numerous to make joinder impracticable.  The Special Relationship Class consists of at least 1,600 children who currently are in foster care placements or otherwise in the legal and/or physical custody of Hennepin County. The Maltreatment Report Class consists of thousands of children who have contact with the Hennepin County child protection system as the subjects of maltreatment reports made to Hennepin County that are inappropriately screened out, or inadequately investigated or assessed.

35.     The questions of fact and law raised by named Plaintiffs are common to and typical of those of each putative member of the classes whom they seek to represent.

36.     The named Plaintiffs rely on Defendants for investigative and foster care services in Hennepin County and wholly depend on the State and County Defendants for provision of those services.

37.     Defendants' long-standing and well-documented actions and inactions substantially depart from accepted professional judgment and constitute deliberate indifference to the harm, risk of harm, and violations of legal rights suffered by the named Plaintiffs and the classes they represent.

38.     Questions of fact common to the classes include:

a.      whether Defendants fail to protect the Special Relationship Class from physical, psychological, and emotional harm;

b.      whether Defendants fail to take reasonable steps to make it such that members of the Special Relationship Class who are returned to their parents do not re-enter foster care;

c.      whether Defendants fail to make sufficient efforts to place members of the Special Relationship Class in appropriate permanent homes within a reasonable period of time; and

d.      whether Defendants fail to conduct adequate investigations into reports of maltreatment of members of the Maltreatment Report Class.

39.    Questions of law common to the classes include:

a.      whether Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

b.      whether Defendants' systemic failures violate Plaintiffs' right to a permanent home and family under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

c.      whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997; and

d.      whether Defendants' systemic failures violate Plaintiffs' rights under Minnesota statutes and common law.

40.    The violations of law and resulting harms alleged by Plaintiffs are typical of the legal violations and harms and/or risk of harms experienced by all of the children in the classes.

41.    The named Plaintiffs will fairly and adequately protect the interests of the classes that they seek to represent.

42.     Defendants have acted or failed to act on grounds generally applicable to all members of the classes, necessitating class-wide declaratory and injunctive relief.

43.     Counsel for Plaintiffs know of no conflict among the class members.

44.     The named Plaintiffs are represented by the following attorneys, who are competent and experienced in class action litigation, child welfare litigation, and complex civil litigation:

   a.     Attorneys from Faegre Baker Daniels LLP, the largest law firm in the State of Minnesota, including James L. Volling, who served as a law clerk for Chief Justice Warren E. Burger of the United States Supreme Court, and who has extensive experience and expertise in complex litigation, including class actions, in state and federal courts throughout the United States;

   b.     Marcia Robinson Lowry, an attorney with A Better Childhood, Inc., a non-profit legal advocacy organization, who has extensive experience and expertise in federal child welfare class actions throughout the United States; and

   c.     Eric Hecker, an experienced civil rights litigator who has successfully represented plaintiffs in numerous class actions and in children's rights cases.

## **FACTS**

## I.      **The Plaintiff Children**

   **T.F.**

45.     T.F. is a 12-year-old boy who is in the guardianship of the Commissioner, on behalf of whom the Department is acting as the Commissioner's agent.  He has one

older sister who is 13 years old and two younger brothers who are five and seven years old, respectively.

46.     T.F. appears through his next friend, Tracy Keller.  Ms. Keller is the adoptive parent of T.F.'s biological older sister.  Ms. Keller has known T.F. for approximately two years.  She regularly sees T.F. when she facilitates visits for her adoptive daughter with T.F. and is familiar with both the family's background and T.F.'s current needs.  She is truly dedicated to T.F.'s best interests.

47.     When T.F. was five years old, Nicollet County's child protection hotline received a report alleging that T.F. and his siblings were being neglected and that his mother was using drugs.  The caller asserted that T.F. and his older sister would often miss school, and that when they were in school they would have matted, unkempt hair and had not been adequately fed. T.F., his older sister, and his younger brother were not removed from the home on the basis of this allegation.  Six months later, in December 2010, the county received another call asserting the same allegations.

48.     The children were adjudicated as Children in Need of Protection or Services by the Juvenile Court in Nicollet County on June 1, 2010.  In March 2011, the family moved and venue was transferred from Nicollet County to Hennepin County.  In January 2012, T.F. and his siblings were placed under protective supervision of the Department.  T.F.'s mother was ordered to follow a case plan that included testing negative for illegal substances, ensuring that the children attended school, and allowing the Department case worker to make monthly visits.

49.     In April 2012, after his mother failed a drug screen, the Department sought a change of disposition from "protective supervision" to "foster care placement" and removed T.F. and his siblings from his home.  T.F. and his older sister were placed in a shelter care facility, Shelter Care for Kids. After approximately a week in this shelter care facility, T.F. was hospitalized for approximately one week, then transferred to a different hospital. At the second hospital, he was diagnosed with A.D.H.D. and prescribed medication. He was discharged and moved to St. Joseph's shelter, then back to Shelter Care for Kids. Approximately a month after his initial hospitalization, he was again hospitalized after a behavioral outburst, and was, again, moved from the initial hospital to yet another hospital. He was then discharged directly from the hospital to his mother's care on a trial home visit. In total, during these two months in foster care, T.F. was placed in three different hospitals and two different shelters, and was moved between facilities six separate times.  He was in first grade at the time.

50.     In November 2012, when T.F. was seven years old, he and his siblings were again removed from his mother's care due to allegations of drug use and neglect. He and his siblings were placed with a paternal aunt for nearly six months, even though this aunt was not a licensed foster care resource. He and his siblings were then placed in a licensed foster home.

51.     After approximately five months in this foster placement, T.F. spent three weeks in shelter care, but was again returned to this foster home, and remained there for over two years. This home was not appropriate for T.F.'s needs. In June 2014, T.F.'s guardian ad litem submitted a court report, stating that she had observed T.F.'s foster

mother "screaming" at him, and noted that she was "unable to stay calm" around T.F. and that the two had a "toxic" relationship. She stated in unequivocal terms that the placement was both inappropriate for T.F., and that the foster parent was not a permanency option.  In November 2014, his guardian ad litem reiterated that this placement was not appropriate for his needs.

52.     On March 27, 2013, the Department filed a petition to terminate the parental rights of T.F.'s mother and father. In November 2013, T.F.'s mother and father voluntarily surrendered their parental rights.

53.     Upon information and belief, the Department made no effort to secure an adoptive home for him before or after terminating his mother's and father's parental rights, despite being aware that his foster parent was not appropriate or willing to adopt him.

54.     In February 2015, T.F. was removed from his foster home.  T.F. spent an entire year at St. Joseph's Residential Treatment Center.

55.     During his stay at St. Joseph's Residential Treatment Center, T.F. was restrained a total of 96 times by staff members. In the month of March 2015 alone, he was restrained 28 times.

56.     Since February 2016, T.F. has been in a Minnesota Intensive Therapeutic Home.  Due to his repeated moves and abuse, he is diagnosed with post-traumatic stress disorder, attention deficit disorder, oppositional defiant disorder, and a generalized conduct disorder.

57.     During the more than five years since T.F. came to the attention of the Department, Defendants repeatedly have violated his constitutional and statutory rights by failing to ensure that his case was adequately investigated; by failing to ensure that he would not re-enter care after returning him home; by failing to protect him from psychological and emotional harm; by failing to provide services to ensure his physical, psychological, and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards or of a meaningful, timely and appropriate plan to enable him to find a permanent home.  As a direct result of Defendants' actions and inactions, T.F. has suffered physical, emotional, and psychological harm, and continues to suffer emotional and psychological harm.

**K.D.**

58.     K.D. is an 11-year-old boy who is in court-ordered out-of-home placement and is in the custody of the Department. He has two younger brothers, ages six and three.

59.     K.D. appears through his next friend, Laura Ferenci, who is sincerely dedicated to his best interests. Ms. Ferenci is a former educator and longtime community advocate.  She has served as a volunteer guardian ad litem in Hennepin County Juvenile Court, and as a crisis interventionist for both Tubman Chrysalis Center for Women and Womenkind, as well as other teen and youth advocacy programs.

60.     K.D. has been known to Child Protective Services in three separate counties for virtually his entire life.  K.D. first came to the attention of Washington County Child Protective Services when he was only 14 months old. His mother was accused of cursing at him repeatedly and smacking him on the forearm, which caused

him to "fly" through the air. This report was sent to Family Assessment.  Family
Assessment closed the case in February 2008 because the family moved to Ramsey
County.

61.    The family then came to the attention of Ramsey County Child Protective
Services when K.D. was three, after his newborn brother tested positive for
Tetrahydrocannabinol (THC), a constituent of cannabis.  The case was sent to
Investigations, but closed without a determination being made and without services.

62.    Two years later, K.D., then six years old, again came to the attention of
Washington County Child Protective Services. According to the source who made the
report, K.D. stated that his mother was threatening to "shoot up" the house, and was
going to kill both K.D. and his grandmother. Documentation from this call states that
K.D. had been sexually abused, but does not name the perpetrator. No finding of
maltreatment was made, and the case was referred to child protective services in Ramsey
County because the family moved again. Ramsey County Child Protective Services
closed the case approximately three months after the initial report. It is unknown what, if
any, services were provided to the family.

63.    Approximately three months after this case was closed, another report was
made to Ramsey County Child Protective Services that K.D., still six years old, had been
locked outside by his mother and stepfather and was wearing only his underwear. He also
reported being hit and choked, and was observed to have a mark under his eye and on his
cheek. This case was sent to Family Assessment. The case was closed approximately
eight months later after "case management" services had been provided.

17

64.     Another report was made to Ramsey County Child Protective Services concerning the family approximately five months after the prior Family Assessment case. A staff member from K.D.'s school reported K.D. was threatening to hang himself. His mother did not immediately take him for a mental health evaluation, and instead sought to enroll him in a different school. The police attempted to do a safety and welfare check, but were unable to locate K.D. or his mother. The case was sent to Investigations, not Family Assessment, but was closed without any finding of maltreatment and without any services.

65.     A little over a year later, Ramsey County Child Protective Services again received a report from K.D.'s school, stating that the family was homeless and that K.D. was not attending school because they were sleeping in the car and did not have enough gas to both keep the car warm and transport K.D. to school. K.D.'s mother temporarily placed her children with another family through an informal arrangement.  This case was sent to Family Assessment, and no further services were provided.

66.     On November 18, 2015, Hennepin County Child Protective Services received a report that K.D. did not feel safe at home and that his mother told him to lie about what she does when he gets in trouble. The mother reported that K.D. was lying that she was "done" with him. This report was screened out, and the family received no services or follow up.

67.     Two days later, on November 20, 2015, an additional report from an unknown reporter was made that K.D. had again threatened suicide. After this report, the Department filed a CHIPS petition. K.D. briefly lived with a family friend, who was not a

licensed foster parent, and then entered foster care one month later.  Upon information and belief, he entered a shelter care facility at that time.

68.     After he had been in care for approximately one month, K.D. was assaulted by a girl at the shelter facility, which resulted in him receiving scratches and a bruise on his neck and head.

69.     After K.D. had been in care for two months, his mother admitted to the court that she had a history of domestic violence and mental health problems, and used marijuana to self-medicate.

70.     After approximately two months in foster care, K.D. was hospitalized in a psychiatric facility. Though he was assigned a guardian ad litem, she determined that she should not meet with him "without his mother present."  K.D. did not meet with his appointed guardian ad litem during his first three months in foster care.

71.     K.D. has been diagnosed with Disruptive Mood Regulation Disorder, ADHD, and PTSD.  He now has a history of hallucinating, hearing voices, and banging his head against the wall, in addition to other self-injurious behaviors, such as running out into traffic and setting fires.

72.     K.D. was not appointed an attorney until June 2016, nearly five months after he became eligible for appointment of counsel.

73.     K.D. recently had a neurological evaluation. His neurologist concluded that the "severe neglect" and "ongoing physical abuse" had altered K.D.'s brain chemistry.

74.     K.D.'s mother was arrested in July 2016 for assault in the 2nd degree involving the use of a dangerous weapon. She has engaged in services, including

19

domestic violence counseling, individual therapy, parenting classes, and random drug testing. The Department noted that in August she had a "false positive" for THC.

75.     In late January 2017, K.D. was returned to his mother's care on a trial home visit. In a therapy session with his mother approximately one month after this trial home visit had begun, K.D. stated that his mother did not love him and that she only cared about his brothers. His mother responded by threatening to kill herself. The therapist reported this to the Department, which determined that it was not possible for K.D. to remain in the home. K.D. was then hospitalized in a psychiatric facility, and then taken to a shelter for homeless youth. The next day, he was evaluated at a different psychiatric facility, where he stayed for approximately 10 days.  He resided at St. Joseph's Home for Children for approximately one month. Upon information and belief, he has now been moved to a separate residential treatment facility.

76.     K.D.'s guardian ad litem has recommended that his mother's parental rights be terminated and that he be placed in an adoptive home. No adoptive home has been located for K.D.

77.     K.D. was well-known to child protection authorities in two other Minnesota counties for approximately seven years before Hennepin County received a Maltreatment Report about him in 2015.  Since 2015, Defendants repeatedly have violated his constitutional and statutory rights by failing to properly investigate the initial maltreatment report on K.D.; by failing to protect him from psychological and emotional harm; by failing to provide services to ensure his physical, psychological, and emotional well-being; and by failing to find him an appropriate foster care placement consistent

with professional standards or provide a meaningful, timely, and appropriate plan for him to permanently return him home, or, if that were not possible, to find him another permanent home.  As a direct result of Defendants' actions and inactions, K.D. has suffered physical, emotional, and psychological harm, and continues to suffer emotional and psychological harm.

**C.O.**

78.    C.O. is a seven-year-old girl who is in court-ordered out-of-home placement and in the custody of the Department

79.    She appears through her next friend Laura Ferenci.  Ms. Ferenci is sincerely dedicated to C.O.'s best interests.

80.    Though C.O. has only been in court-ordered out-of-home placement for the past seven months, she has been known to the Department since she was three years old. She first came to the Department's attention in October 2013, when the Department received a report that C.O. had a small injury on her lip that occurred from her mother "flicking" her. This call was sent to Family Assessment. The mother reported that her lip had been injured when they were "play fighting." A month later, an additional report was received, again alleging that C.O.'s lip had been injured. This new case was referred for Family Assessment case management to address the mother's "untreated mental health issues, chronic homelessness, and deficits in parenting skills."  Upon information and belief, the mother did not make herself available to meet with the Family Assessment caseworker, and the Department closed the case after two months, even though the caseworker had never met with the mother or the child.

81.     In July 2014, when C.O. was four years old, the Department received a report from the Minneapolis Police Department that C.O.'s mother had contacted them and asked them to do a "health and welfare check" on C.O. The police found C.O. in a home with an unrelated disabled adult woman. They observed that the home was "filthy" and "infested with bed bugs."  During the course of the investigation, C.O.'s mother acknowledged that she had left C.O. in that home for a few days, and that she had contacted the police because she did not want to "use her last bus transfer" to go pick her child up.  The Department made a maltreatment finding against the mother for inadequate supervision but determined that "child protection services were not needed."

82.     In November 2015, the Department received another report that C.O. had been sexually abused by her grandmother's boyfriend. An investigation was opened, and the mother assured investigative worker that they were no longer residing with the alleged perpetrator. The mother did not have a fixed address to provide the caseworker, however, and stated they were staying "place to place."  C.O. herself was not interviewed about the sexual abuse allegations until more than two months later, in late January 2016. The perpetrator was criminally charged and subsequently incarcerated for twenty years as a result of what C.O. disclosed in that interview.

83.     In February 2016, the Department received a report alleging that C.O. had 20 unexcused absences from school. The Department did not make a finding of maltreatment against the mother for educational neglect, concluding that these absences were "primarily related to homelessness."

22

84.     In March 2016, the Department received an additional report that C.O. and her mother were homeless and had recently been discharged from a shelter. The reporter stated that C.O. and her mother were staying with her maternal grandfather, who the reporter believed had sexually molested C.O. in the past. This case was screened in for an investigation, but the Department did not make a finding of maltreatment.  Later that month, the case was transferred to a field worker, who was supposed to provide the family with services to address the mother's mental health and chronic homelessness, along with C.O.'s excessive school absences.

85.     Between March and early May 2016, the mother missed three appointments with the field worker and did not answer her phone. The field worker did not meet with C.O. during these months. No CHIPS petition was filed.  Upon information and belief, the Department did not request police assistance to help them to make contact with the family.

86.     In May 2016, the Department received a report from a staff member at C.O.'s school who had visited the home when she did not appear for school and heard sounds of C.O. screaming for help, which led them to be concerned that she was being physically abused. The caseworker made an unannounced visit to meet with the mother, who accused the caseworker of harassing her, and denied the allegations. The caseworker also met with C.O., who denied any physical abuse.

87.     Two days later, a school staff person made an additional report that C.O. had missed 38 days of school.  The caseworker made unsuccessful attempts for two more months to meet with C.O. and her mother before a CHIPS petition was filed in late June

2016. The court placed C.O. under protective supervision in her mother's home, and ordered a case plan which mandated that the mother provide adequate protection and supervision, ensure that C.O. attend school, provide safe and stable housing, participate in mental health services, and complete a parenting assessment. The mother engaged in no services and did not make herself available to the caseworker between June and August 2016.

88.     In August 2016, the caseworker was able to locate C.O., who was staying with her maternal grandfather. The maternal grandfather had both a child protective and domestic violence history, including a past allegation that he had sexually abused C.O.'s mother. Another full month later, on September 23, 2016, C.O. was court ordered into an out-of-home foster care placement.

89.     C.O. was placed in a shelter foster home, where she resided for approximately two and a half months. Upon information and belief, this foster family was unable to meet her behavioral needs, and used unapproved discipline techniques to manage her behavior. C.O. was then moved to a licensed foster home.

90.     C.O. currently displays a variety of serious behavioral concerns, including disruptive and aggressive behavior while in school. Her mother routinely misses visitation with her, which causes C.O. serious emotional distress. Upon information and belief, C.O. has been diagnosed with PTSD.

91.     During the more the three years that C.O. has been known to CPS, Defendants repeatedly have violated her constitutional and statutory rights by failing to ensure that her case was adequately investigated; by failing to protect her from physical,

psychological, and emotional harm; and by failing to provide services to ensure her physical, psychological, and emotional well-being.  As a direct result of Defendants' actions and inactions, C.O. has suffered physical, emotional, and psychological harm, and continues to suffer emotional and psychological harm.

**L.L.**

92.     L.L. is a fourteen-year-old boy who is under the guardianship of the Commissioner, on behalf of whom the Department is acting as the Commissioner's agent. He has been in foster care for more than six years, since he was eight years old.  He has two older sisters, one of whom is also in foster care.

93.     L.L. appears through his next friend, Gerald Kegler.

94.     Gerald Kegler served as a pastor in the Archdiocese of St. Paul and Minneapolis for fourteen years. He then worked in human resources at both the Hazelden Foundation and at the Professional Association of Treatment Homes, a non-profit which specializes in treatment foster care, adoption, and other home-based family services. He is truly dedicated to L.L.'s best interests.

95.     L.L. first entered foster care shortly after he was born, due to his biological mother's chemical dependency issues. His biological father was unknown, and his mother's parental rights were terminated when he was one year old.  Shortly thereafter, L.L. was adopted by his maternal great-aunt.

96.     When he was eight years old and his sister was eleven years old, his maternal great-aunt died, and both children re-entered foster care at that time, and again were placed under guardianship of the Commissioner.

97.     L.L. and his sister were first placed with family friends who were only interested in being foster parents and were not interested in adoption. Despite knowing that this home was not pre-adoptive, the Department did not begin to seek alternative homes for him and his sister until January 2012, approximately a year after they had re-entered foster care.

98.     L.L. remained in the family friend's foster home for approximately a year and half, until August 2013. At that point, he and his sister were moved to a pre-adoptive home, their second placement. After approximately one month, the family indicated that they could not meet his sister's behavioral needs, and she was moved to a residential treatment center for approximately seven months. She was then returned to the pre-adoptive placement. Upon information and belief, few supports were provided to the family once L.L.'s sister was returned to the pre-adoptive placement.

99.     After approximately a year in this pre-adoptive placement, the foster family determined that they could not adopt L.L. and his sister. They gave L.L. no notice of this decision—instead, they dropped L.L. off at school and never returned to pick him up. L.L. was 11 years old and in the 5th grade. He was taken straight from his school to St. Joseph's, his fourth placement.

100.    L.L. was then moved from St. Joseph's to a different shelter care facility and was separated from his sister. This was his fifth placement. He remained in this shelter facility for approximately 45 days.

101.     Shortly after this placement disrupted, L.L. was first appointed an attorney. He was, at that point, eleven-and-a-half years old and had been eligible for an attorney for a year and a half.

102.     While in shelter care, school staff at L.L.'s school noted a marked changed in L.L.'s behavior and ability to focus.

103.     L.L. was then moved to a different foster home in May 2014, his sixth placement. He and his sister were both placed in this home.

104.     A few months after being placed in this home, a stranger entered the foster home and allegedly sexually assaulted L.L.'s sister. Upon information and belief, the Department took no action upon learning of this assault.

105.     During the same month as this assault, L.L.'s biological mother was murdered in another state. Upon information and belief, the Department did not take any steps to ensure that the L.L. and his sister were informed of this fact until after her funeral had already taken place.

106.     In the summer of 2016, L.L. was removed from his sixth placement and returned to the family friends who had cared for him and his sister from 2011-2013. They were still not interested in adopting L.L.  L.L. was then moved to another home in March 2017.

107.     L.L. would still like to be in a permanent family of his own, but he was not assigned a child-specific adoption recruiter by the Department until he had been in foster care for over five years.

108.    During the nearly six years that L.L. has been under the guardianship of the Commissioner, Defendants have repeatedly violated his constitutional and statutory rights by failing to keep him free from emotional harm and failing to place him into a permanent home within a reasonable period of time. As a direct result of Defendants' actions and inactions, L.L. has suffered and continues to suffer irreparable harm and continues to be subjected to the lasting emotional damage that is a consequence of not knowing where he will grow up and of believing that there is no family he can call his own. Because of Defendants' actions and inactions, Plaintiff L.L. is being deprived of the opportunity for a childhood that is reasonably free from harm and that provides the opportunity for stability and healthy development.

**T.T. and M.T.**

109.    Plaintiffs T.T. and M.T. are sisters who are in the guardianship of the Commissioner, on behalf of whom the Department is acting as the Commissioner's agent. T.T. is a 13-year-old girl and M.T. is an 11-year-old girl.

110.    They appear in this action through their next friend, Dr. Caryn Zembrosky.

111.    Dr. Zembrosky is a licensed physician.  She served as a volunteer guardian ad litem in Hennepin County for three years, and represented the best interests of numerous children during that time.   She is truly dedicated to T.T.'s and M.T.'s best interests.

112.    T.T. and M.T. were removed from their biological parents' custody in 2011, when T.T. was seven years old and M.T. was six years old.  They were placed into

emergency protective custody due to allegations that they had been beaten with a belt by their mother, and that both girls had been sexually abused by her older brother.

113.   T.T. and M.T. were first placed in Shelter Care for Kids, which is a licensed emergency shelter that serves children ages three to eleven. T.T. was then moved to St. Joseph's Shelter Care after two days. The two girls spent approximately one month in these separate shelters before being placed with their adult half-sister. They only remained with their half-sister for approximately three weeks before again returning to separate shelter homes.

114.   In January 2012, after they had been in care for approximately two months, the two girls were placed into separate foster homes. After approximately eight months in separate placements, M.T. joined T.T. in her foster home. M.T. and T.T.'s parents' rights were terminated in January 2013.

115.   After they became freed for adoption, M.T. and T.T. remained in the same foster home, despite the fact that the foster parent expressed ambivalence about her willingness to adopt the girls. No concurrent plan was developed.  Fourteen months after they became freed for adoption, their foster parent signed an "intent to adopt" form. A few months later, in August 2014, she determined that she was having "cold feet," and in October 2014, she informed the Department that she did not want to adopt the girls.

116.   In addition to not being a pre-adoptive placement, their foster parent was unable to meet their needs, and the girls were repeatedly hospitalized for suicide attempts. In June 2013, when the girls had been in the same placement for nearly a year,

their guardian ad litem noted that the girls had rarely had contact because they had had so many repeated mental health hospitalizations.

117.    Upon information and belief, the girls' foster parent from 2013-2015 was unable to meet their mental health needs and would use physical punishment and threats to manage their behavior.  Their foster parent would remove the door from the girls' room, and would slap and hit the girls as punishment.

118.    Upon information and belief, when M.T. was approximately eight years old, she said that she began to hear voices that told her to harm herself or others.  She also said she experienced feelings of being watched and hunted.  Around the same time, she began to frequently throw up her meals and became dangerously underweight.

119.    When they were approximately nine and ten years old, the children were placed with a pre-adoptive family. After the girls were placed in their home, the family repeatedly contacted the Department to inform them that M.T. appeared to be in an actively psychotic state, and was seeing and hearing things that were not real.  The Department responded by telling the family that they just needed to be more strict with the girls.

120.    After three weeks, the pre-adoptive family informed the Department that they could not proceed with the adoption due to the lack of support and the lack of information that they had received regarding the children's extensive mental health needs. When the Department looked into returning the girls to their prior foster placement, they discovered that the home had numerous licensing violations and that the foster parent had told the girls to sabotage their adoptive placement so that they would be

returned to her care. Their guardian ad litem recommended not only that the girls not be returned to this placement, but that any future contact with this foster parent be supervised.

121.   After being removed from the pre-adoptive placement, both girls spent several months in St. Joseph's Shelter Care. M.T. currently resides in a different foster home, but T.T. has bounced between shelter care, group care facilities, and juvenile delinquency placements for the past year and a half. Upon information and belief, neither child is in a pre-adoptive placement.

122.   In February and early March 2017, the Department did not know T.T.'s whereabouts for several weeks. She was reported to have been with her biological father, who, on information and belief, the Department believes is a serious safety risk. When the Department located T.T., she was sent to an out-of-state residential treatment facility. She and M.T. have only been able to visit one another once since she was sent out of state.

123.   During the more than five years that T.T. and M.T. have been in the custody of Hennepin County, Defendants repeatedly have violated their constitutional and statutory rights by failing to protect them from psychological and emotional harm; by failing to provide services to ensure their physical, psychological, and emotional well-being, and by failing to ensure the provision of appropriate foster care placements consistent with professional standards or the provision of a meaningful, timely, and appropriate plan to enable them to find a permanent home.  As a direct result of

Defendants' actions and inactions, T.T. and M.T. have suffered and continue to suffer emotional and psychological harm.

**T.M., T.E., and A.T.**

124.    T.M., T.E., and A.T. are siblings who share the same mother but have different fathers. T.M. is a 13-year-old boy, T.E. is a nine-year-old girl, and A.T. is a four-year-old girl.  T.M. is in court-ordered out-of-home placement and is in the custody of the Department, and T.E. and A.T. are under the Department's protective supervision while on a trial home visit.

125.    They appear in this action through their next friend, James Dorsey.

126.    Mr. Dorsey is a prominent member of the Minneapolis legal community. In addition to a distinguished professional career as a business litigator, he has a prolific record of service to the community.  Over the course of 35 years, he has represented pro bono clients in a wide range of matters.  In addition to his long record of pro bono legal representation of low-income clients, he has also served as a volunteer guardian ad litem in Hennepin County Juvenile Court.  He has been an active leader of organizations dedicated to civil legal services and access to justice, international human rights and peace, criminal justice, and civic improvement. He has been the recipient of numerous awards for his service to the community.  He is truly dedicated to T.M.'s, T.E.'s and A.T.'s best interests.

127.    T.M.'s father is deceased, T.E.'s father is not involved in her care, and A.T.'s father is currently incarcerated.

128.    The three children first came to the attention of the Department in June 2014. The Department received a call alleging that T.M. (then age 10), T.E. (then age six), and A.T. (then age one) had witnessed their mother stab their maternal grandmother with a box cutter in her face and arms, and had poured gasoline on their floor while threatening to burn down the house.  The maternal grandmother was granted a Domestic Abuse No Contact Order as a result of this incident.  The Department opened the case for an investigation.

129.    One day later, the Department received an additional report that T.M. had attempted to commit suicide over the weekend and that the mother had beaten T.M. This additional call was screened out, but the allegations were shared with the caseworker conducting the investigation on the assault matter. The Department also reported the allegations to the police.

130.    During the investigation of the alleged assault against the children's maternal grandmother, the mother acknowledged that she had a history of serious mental health issues and had suffered "blackouts" in the past.  The Department made a finding of maltreatment against the mother, but did not remove the children from the home or file a CHIPS petition.  Instead, it transferred the case to a Child Protection Field Unit for ongoing services.

131.    In October 2014, while the family's previous case was still open, the Department received an additional call alleging that T.M. had attempted to commit suicide by cutting his arms. This call was again screened out, but reported to the caseworker who was working with the family and the police.

132.    The Department closed the family's case in November 2014. Upon closing the case, the caseworker noted that the mother "seemed to be very aware of her mental health needs," and was seeing a therapist and a psychiatrist.

133.    In February 2016, the Department received a new report that T.M. had been punched in the face by his stepfather and had a large bruise above his eye.  Five days later, the Department received another call making the same allegations. It screened out the duplicate call, but opened the first for an investigation. The case was closed almost immediately. The Department "advised" the mother that, if an additional incident happened, she would be held responsible, advised both the mother and stepfather on appropriate physical discipline, and referred the family for voluntary services through the Parent Support Outreach Program, a program run by DHS which provides voluntary services for families whose maltreatment cases were screened out but who have "factors that put children at potential risk."

134.    On August 3, 2016, the Department received a report that the mother had beaten T.M. This case was screened out because the reporter did not allege that the beatings had resulted in marks or bruises.

135.    On August 11, 2016, the Department received another call that the mother had beaten T.M. by hitting him in the face with a broken broomstick, and had threatened to beat T.E. and A.T.  The Department opened this case for investigation. During the investigation, the mother disclosed that she had been diagnosed at various times with bipolar disorder, schizophrenia, PTSD, depression, anxiety, and ADHD.  She also stated that T.M. was diagnosed with ADHD, Oppositional Defiant Disorder, and Binge Eating

34

Disorder. T.M. stated to the investigator that his mother had hit him with a broomstick, and that his mother and stepfather both hit him. T.E. told the investigating caseworker that her mother scratched her, pulled her hair, and hit her with objects, and that she was afraid to return to the home. The Department made a finding of maltreatment against the mother for her physical abuse of T.M. The children were not removed from the home. Instead, the Department again referred the case to a Child Protection Field Unit for services.

136.    Approximately three weeks later, on August 28, 2016, there were two separate calls to the police concerning the family within the same day. The first call stated that then-eight-year-old T.E. had run away from home because her mother had told her to leave. The second call stated that the mother had instructed T.M. to pour buckets of hot and cold water over T.E. as punishment. The police who responded to the call noted that the home was unsanitary and filled with garbage. The police were again called by an employee from a nearby restaurant, after he found T.E. alone in a park with wet clothes at 11:30 pm. As a result of these investigations, the children were removed from the home and put on an emergency 72-hour hold.

137.    On August 31, 2016, the Department filed a CHIPS petition, and the next day the court granted the petition and placed the children into foster care. The children were initially placed together with a relative in a foster care placement. Nine days later, T.M. and T.E. were moved to a shelter home and A.T. was moved to a separate shelter home.  Approximately two weeks later, the three children were moved again back to the foster care relative's home. A few days after the children were returned to the foster care

relative's home, the relative reported that the mother had threatened her and the children at church and disrupted the children's Sunday school. The mother was ordered by the court to both have no contact with the foster parent and to have only supervised contact with her children.

138.    The mother's case plan, as ordered by the court, directed her to maintain safe and suitable housing, undergo a mental health evaluation, complete a parenting assessment, complete a domestic violence/anger management program, complete in-home parenting education, and attend supervised visits with her children.  All of these services were to be provided by different agencies with which the Department contracts. Several of these county-contracted service providers noted that the mother presented as being under the influence of some substance when she appeared for services, and would lose consciousness or fall asleep.  One provider noted that she appeared "lethargic" with "drooping eyes, visible drowsiness, slurred speech, and an inability to maintain focus." While her visits were initially supervised in the mother's home, they were moved to an office environment due to the Department supervisor's concern that the visits were chaotic and involved verbal fighting between the mother and T.M.

139.    On December 12, 2016, T.M. was placed in St. Joseph's Shelter Home after his foster parents stated that they could no longer manage his behavior. T.M. remained at St. Joseph's Shelter Home for approximately three months, until March 9, 2016. While in shelter care, his behavior deteriorated significantly. T.M. would run away daily, and shelter staff suspected that he was selling drugs.

140.   Despite being 13 when he entered care, and thus entitled to an attorney, T.M. was not assigned an attorney until January 4, 2017, approximately four months after he first entered foster care.

141.   On February 16, 2017, the Department requested that T.E. and A.T. be returned to their mother's care on a trial home visit. They did so prior to obtaining a copy of the mother's psychological evaluation. Upon information and belief, they have still not obtained this document, despite the fact that the evaluation was completed in November. Five days after T.E. and A.T. were returned, on February 22, 2017, A.T. was again removed from the mother's care due to concerns about the mother's mental health. Upon information and belief, A.T. has now been returned to the mother's care. She and T.E. remain on a trial home visit.

142.   T.M. is currently temporarily staying with his grandparents, who, upon information and belief, are not licensable as foster parents.  He has run away repeatedly, and his caseworker believes that he is a danger to himself.

143.   Defendants repeatedly have violated these children's constitutional and statutory rights by failing to conduct an appropriate investigation when they have been reported for abuse or neglect; by failing to  protect them from psychological and emotional harm; by failing to provide services to ensure their physical, psychological, and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards; and by failing to develop or implement a meaningful, timely, and appropriate plan to enable them safely to return home, or if that were not possible, to find another permanent home for them.  As a direct

result of Defendants' actions and inactions, T.M, T.E., at A.T. have suffered and continue to suffer emotional and psychological harm.

**A.W.**

144.    A.W. is a twelve-year-old boy who is under the Department's protective supervision while on a trial home visit. He is one of four children, and has two older sisters, ages 19 and 14, and one younger brother, age seven.

145.    He appears in this action through his next friend, Margaret Shulman. Ms. Shulman is an attorney, and a former volunteer guardian ad litem in Hennepin County Juvenile Court.  She has been a longstanding, active supporter of many community organizations which promote human and civil rights, the arts, and children and families. She is truly dedicated to A.W.'s best interests.

146.    A.W. first came to the attention of the Department when he was nine years old, in October 2014. A caller alleged that A.W. had been left unsupervised with another nine-year-old child and that there had been sexual contact between the two children. The call further alleged that his mother was abusing drugs and alcohol, and had driven with A.W. and his siblings in the car while intoxicated, and that A.W.'s father had been in a violent altercation with A.W.'s mother while the children were in the home.

147.    A CHIPS petition was filed that same month, and the Hennepin County Juvenile Court ordered that A.W. and his siblings enter the protective supervision of the Department, while remaining in his mother's home. The terms of protective supervision included that his mother maintain sobriety and submit to random urinalyses.

148.    In June 2015, A.W. and his siblings were adjudicated to be children in need of protection and services, and the children remained under protective supervision in their mother's home. Their mother was ordered to follow a case plan, which included retaining adequate housing, maintaining sobriety, participating in family therapy, and completing a parenting assessment.

149.    A.W. was found to have a variety of aggressive behaviors and mental health issues and was working with a psychologist, psychiatrist, and mental health case manager to address these concerns.  Upon information and belief, all of these services were with providers that had contracted with the Department. Upon information and belief, all of A.W.'s mental health services were set up by his mother, with no involvement or assistance from the Department.

150.    On December 1, 2015, the Department received a report that A.W., then age 10, was sleeping outside on a porch rather than in his bedroom. The next day, A.W.'s mother tested positive for cocaine during a random urinalysis. Seven days later, the Department received an additional report that A.W. came to school on a Monday without a jacket, and appeared both dirty and hungry. The reporter alleged that A.W.'s mother had locked herself in her bedroom all weekend due to depression, and that A.W.'s father had failed to care for him and his siblings.  Two days later, the Department received a report from A.W.'s school that the staff had attempted to do a health and welfare check at A.W.'s home after A.W. did not come to school, and found the mother on the couch, but were unable to wake her. On December 24, 2015, Department made a finding of maltreatment against both A.W.'s mother and father. A.W. and his siblings were not

removed from the home. Upon information and belief, the Department took no action and provided the family with no additional services as a result of this string of reports.

151.    On January 29, 2016, A.W. reported at school that he was afraid to return home because he was worried that his father would give him a "whipping." The police were called to the home and conducted a child safety and welfare check, where A.W. was observed to be free of marks or bruises.

152.    At a February 2, 2016 court hearing, the Department requested that the children be removed from their parent's care and placed in out-of-home placement due to the mother's failure to maintain her sobriety, in addition to her failure to comply with other aspects of her case plan, including undergoing a parenting assessment and receiving individual therapy. The Department also noted that the father had complied with no aspects of his case plan. The guardian ad litem objected to the children's removal, noting that while the positive drug test was a concern, that A.W. was doing well and had all "green" behavior days at his day treatment program.

153.    The Department received an additional report on February 5, 2016, after police were again called to the home due to a report of domestic violence between A.W.'s mother and father. The police reported that the mother and father both appeared extremely intoxicated and that the home was messy and in poor condition. The children were not removed from the home. Two weeks later, the Department contacted the mother's drug counselor and learned that she had been both drinking and using painkillers for which she did not have a prescription.

40

154.    On February 19, 2016, the court granted the Department's request to change the status of the children from protective supervision to out-of-home placement. The children were removed again from the mother's home and sent to shelter intake. A.W.'s younger brother was sent to Ain Dah Young shelter and his 14-year-old older sister was sent to Harbor Hastings shelter. A.W. was sent to St. Joseph's Home for Children.

155.    A.W.'s siblings stayed in shelter care for approximately two weeks before being placed in foster care placement with a relative. A.W. remained at the shelter. Upon information and belief, while at the shelter, he stopped receiving the mental health services that he had been receiving while he had been with his mother.

156.    On March 16, 2016, the Department reported that approximately two weeks earlier, A.W. had become so agitated while at school that he was taken to a hospital emergency room for an evaluation. The Department reported that A.W. was on the waiting list for St. Joseph's day treatment program, and that his school was making a referral to a program with more behavioral supports.

157.    The Department failed to locate an adequate school placement for A.W., and he did not attend any school for the rest of the school year. After he had been in shelter care for over two months, in May 2016, the Department referred him for a foster care placement. It is unknown why he was not referred for a placement sooner.

158.    A.W. lingered at St. Joseph's for over 120 days. During that time, he did not receive mental health services, and did not attend school. His guardian ad litem noted that he was "isolated" while at St. Joseph's.

159.    At a court hearing on July 12, 2016, the Department requested that A.W. again be returned to his mother's physical custody under the Department's protective supervision. The Department acknowledged that it had been unable to meet A.W.'s educational needs, and had failed to find an appropriate foster placement for him. The Department stated that the mother, while not fully compliant with her case plan, was more capable of meeting A.W.'s needs than was the Department.

160.    A.W. remains at home under the Department's protective supervision while awaiting a placement.  His mental health has deteriorated significantly during his 120 days at St. Joseph's. Since returning to his mother, he has started fires in his home and has been in physical altercations with his siblings which resulted in him being hospitalized. A.W.'s mother has repeatedly sought assistance from the Department due to her concern that A.W. is a serious safety risk to himself and others in the home.

161.    On April 12, 2017, the court ordered the Department to find a safe and stable placement for A.W.  Upon information and belief, he will be unable to stay in his home due to his mental health issues and safety concerns.

162.    Defendants repeatedly have violated A.W.'s constitutional and statutory rights by failing to conduct an appropriate investigation when he was reported for abuse or neglect; by failing to  protect him from psychological and emotional harm; by failing to provide services to ensure his physical, psychological, and emotional well-being; by failing to ensure the provision of appropriate foster care placements consistent with professional standards; and by failing to develop or implement a meaningful, timely, and appropriate plan to enable him to safely return to his mother's care, or, if that were not

possible, to provide him with another permanent home. As a direct result of Defendants'
actions and inactions, A.W. has suffered and continues to suffer emotional and
psychological harm.

**I.W., D.W., and B.W.**

163.    I.W., D.W., and B.W. are siblings who share the same mother. I.W. and
D.W. have the same father as one another, and B.W. has a different father.

164.    Plaintiff I.W. is a 13-year-old girl who is in court-ordered out-of-home
placement and is in the custody of the Department.

165.    Plaintiff D.W. is an 11-year-old girl who is in court-ordered out-of-home
placement and is in the custody of the Department.

166.     Plaintiff B.W. is an eight-year-old boy who is in court-ordered out-of-
home placement and is in the custody of the Department.

167.    They appear in this action through their next friend, Gloria Anderson.

168.    Ms. Anderson is a former executive in the telecommunications field, having
held positions in Atlanta, Birmingham and New Orleans. She served as the Program
Coordinator for Everybody Wins! MN, an initiative to promote literacy in school age
children in St. Paul. She is also active in the Rondo community in St. Paul.

169.    I.W. was first the subject of a maltreatment report in July 2004, when she
was six months old. The Department received a call alleging that her father had
physically abused her mother in I.W.'s presence. The Department made a finding of
maltreatment against I.W.'s father, but took no further action.

170.    Approximately five months later, in January 2005, the Department received another maltreatment report alleging that I.W.'s father had punched her mother while her mother was holding the baby. In investigating that call, the Department learned that police had been called to the family home several times due to domestic violence concerns after the prior investigation was closed. The Department made a finding of maltreatment against both the mother and the father, but did not remove I.W. from the home. The case remained open and the family received visits from a child protection field worker.

171.    In April 2005, when I.W. was a little over a year old, the Department filed a CHIPS petition and sought to remove I.W. from the home and place her in foster care. Before I.W. could be removed, the mother absconded with her. The Department failed to locate I.W. or her mother for eight months. The Department only located the mother and I.W. after the mother went to the hospital to give birth to her second child, D.W., in late December 2005. The hospital contacted the Department, and the children were placed on a 72-hour police hold. They were then released to their maternal grandmother's care. The Department filed a CHIPS petition, alleging that both D.W. and I.W. were in need of protection. The children were adjudicated in need of protection or services in February 2006, and their mother was ordered to comply with a case plan which included maintaining sobriety and attending domestic abuse counseling.

172.    Approximately one year after they had entered foster care, the Department filed a petition to terminate the parental rights of I.W. and D.W.'s mother, due to her failure to comply with her case plan. In January 2008, approximately a year after the

termination petition was filed, the mother voluntarily transferred physical and legal custody of D.W. and I.W. to their maternal grandmother.

173.    In November 2008, the mother was incarcerated for assaulting the father of her children. In May 2009, while she was incarcerated, she gave birth to her third child, B.W.  At the mother's request, B.W. was placed in his maternal grandmother's home with his older sisters, and shortly thereafter the Department filed a CHIPS petition concerning the infant.  B.W. was adjudicated in need of protection or services in August 2009, and the court ordered the mother to comply with a case plan, which included maintaining her sobriety and completing a domestic violence prevention program.

174.    The mother was released from prison in September 2009. For several months, she complied with her case plan, maintaining her sobriety and attending a domestic violence prevention program. In January 2010, when he was approximately eight months old, B.W. was returned to his mother's care on a trial home visit. The Department continued protective supervision over the case for approximately four months, and closed the case in May 2010, a few days after B.W.'s first birthday.

175.    Two months after closing the case, in July 2010, the Department received two separate maltreatment reports that there was again domestic violence in the home. One maltreatment report alleged that the mother had fought with B.W.'s father and threatened him with a knife, and another alleged that the mother had thrown an object at the father and inadvertently struck B.W., who was then fifteen months old, in the head. This report was routed for a family assessment, and the mother and father were offered

voluntary services. The mother declined the services, and the case was closed with no further action.

176.    Two months later, in September 2010, the Department received another maltreatment report alleging that the mother had again threatened B.W.'s father with a knife. The father obtained an order for protection against the mother as a result of that incident, and the mother and B.W. moved out of the home. The Department did not remove B.W. from the mother's care.  The Department conducted periodic home visits with the mother in the period September 2010 to April 2011, at which time the case was closed.

177.    Approximately eight months later, in January 2012, the Department received a maltreatment report that B.W., then two years old, was being physically abused by his mother. A Department caseworker examined B.W. but concluded that there was no sign of physical injury to the child. The Department again offered the mother voluntary services, which she again declined. The case was closed.

178.    In November 2013, when B.W. was four years old, the Department received another maltreatment report, alleging that the mother was drinking excessively and was physically abusive towards B.W. During the investigation, B.W. disclosed that his mother and father hit him on his face and back, and he was found to have numerous bruises and a laceration on his head. In December 2013, in the aftermath of the maltreatment report, the mother submitted to drug testing and provided the Department multiple test results that were positive for both marijuana and cocaine. B.W. was removed from the home and again placed in foster care with his maternal grandmother. In

July 2014, the mother pled guilty to felony malicious punishment of a child, based on the gravity of the injuries inflicted on B.W.   The Department filed a petition to terminate the mother's parental rights to B.W.

179.   In December 2013, the Department had also received a maltreatment report that the maternal grandmother was observed in the home hitting I.W. and D.W. with a belt, and had left bruises and belt marks on the children. The grandmother and the children denied any abuse, and the Department closed the case with no further action. Despite this serious maltreatment report involving his sisters, two months later, in February 2014, the Department placed B.W. in the grandmother's home for foster care. Upon information and belief, the Department did not conduct any special assessment or provide additional oversight of the maternal grandmother's home at the time it placed B.W. in her care.

180.   In January 2015, the mother's parental rights to B.W. were involuntarily terminated by the juvenile court. The Department's permanency plan for B.W. was adoption by his grandmother, and he continued in pre-adoptive foster care placement in her home.

181.   That same month, in January 2015, the Department received a maltreatment report that B.W. was being abused by his uncle and maternal grandmother with a stick and a belt, and had received a black eye. The report also alleged that his sister I.W. was being sexually abused by her uncle in the grandmother's home, and that the grandmother was physically abusive towards both I.W. and D.W., and had punched I.W. in the head

and neck. The grandmother and the children denied the abuse allegations, and the Department closed the case in April 2015 with no further action.

182.    Despite the maltreatment reports received by the Department in 2013 and 2015 alleging serious abuse of I.W., D.W. and B.W. while in their grandmother's care, the permanency plan for B.W. was implemented, and he was adopted by his grandmother on November 21, 2015.

183.    Sixteen months later, in April 2017, the Department received a new maltreatment report that the grandmother had punched I.W. in the face, hit her with a belt, and thrown all of her clothing in the trash. When a child protection investigator interviewed I.W., she observed that I.W.'s eye was "completely swollen shut" and observed that there was red and blue bruising around her eye. I.W., B.W., and D.W. were all removed from the home as a result of the incident, and the Department filed a CHIPS petition against the grandmother. The grandmother has been criminally charged based on the allegations in the CHIPS petition.

184.    I.W. and D.W. have entered foster care for the second time, and eight-year-old B.W. is now in foster care for the third time. The children currently are placed together in foster care with a family friend. All of the children have been diagnosed with mental health conditions, including PTSD and emotional behavioral issues (B.W.); disrupted mood disorder (D.W.); and anxiety and depression (I.W.).

185.    The children's mother is once again involved in a CHIPS proceeding regarding her three older children and a case plan has been developed for her. In addition,

the mother is involved in a separate CHIPS proceeding commenced by the Department in

August 2016, immediately after she gave birth to twins.

186.    Defendants repeatedly have violated these children's constitutional and

statutory rights by failing to protect them from physical, psychological, and emotional

harm. I.W., D.W., and B.W. have all re-entered foster care after the Department placed

them in an unsafe home. The Department has failed to find any of these three children a

permanent, safe home.

## II.    Federal And State Requirements For Child Protection Systems

### A.    The United States Constitution, Federal Law and State Law Impose Certain Requirements for the Minnesota Child Welfare System.

187.    The Due Process Clause of the United States Constitution imposes an

affirmative obligation upon state and local child welfare officials to:

        a.      ensure that each child placed in foster care is free from the

foreseeable risk of physical, psychological, and emotion harms;

        b.      ensure that each child placed in foster care receives the services

necessary to ensure their physical, psychological, and emotional well-being;

        c.      provide each child placed in foster care with conditions, treatment,

and care consistent with the purpose and assumption of custody;

        d.      ensure that each child placed in foster care is not maintained in

custody longer than is necessary to accomplish the purpose of custody; and

        e.      provide each child placed in foster care with an appropriate

permanent home and family within a reasonable period of time.

188.   Federal law requires that state and local child welfare officials:

a.      Place each child in foster care in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

b.      Provide for each child placed in foster care a written case plan that includes a plan to provide safe, appropriate, and stable foster care placements and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

c.      Provide for each child placed in foster care, where reunification is not possible or appropriate, a written case plan that ensures the location of an appropriate adoptive or other permanent home for the child and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

d.      Provide for each child placed in foster care a written case plan that ensures the educational stability of the child while in foster care and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

e.      Maintain a case review system in which each child in foster care has a case plan designed to achieve safe, appropriate, and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

f.       Maintain a case review system in which the status of each child in foster care is reviewed every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan, and the projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C);

g.      Maintain a case review system that ensures that for each child in foster care for 15 of the most recent 22 months, the responsible child welfare agency files a petition to terminate the parental rights of the child's parents and concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(E); and

h.      Provide to each child in foster care quality services to protect his or her safety and health, 42 U.S.C. § 671(a)(22).

189.    The State has accepted responsibility for the safety and well-being of all Minnesota children who have been placed in foster care or who have been the subject of reports of alleged abuse or neglect.

190.    Minnesota is one of a few states that have adopted a county-administered, state-supervised model to operate its child protection system, thereby designating the counties as responsible for executing the system.   County social services or human services agencies serve as the local child welfare agency, and operate at a county level with significant autonomy.

191.    One such county is Hennepin County, which operates with such autonomy with respect to virtually all aspects of implementing the Hennepin County child protection system.

192.    The State has enacted a comprehensive statutory and regulatory scheme governing investigation of reports of alleged child abuse or neglect; removal of children

from their homes; supervision of children in foster care placements; termination of parental rights; and the securing of safe, legally permanent homes for children who cannot return to their homes.

193.    DHS is the state agency responsible for ensuring that each local child welfare agency, and the State as a whole, are in compliance with federal and state requirements.  DHS has adopted policies and practice standards for local child welfare agencies in carrying out their responsibilities under state and federal law to abused and neglected children.

194.    DHS, through its Children and Family Services Administration and Child Safety and Permanency Division, supervises the activities of the local child welfare agencies, and provides technical training and assistance to the counties.

195.    With respect to maltreatment reports, DHS is required by statute to perform periodic quality assurance reviews of local child welfare agency practices and report decisions, and to produce an annual report of the summary results of such reviews.  Minn. Stat. § 626.556(16).

### B.    Investigation of Reports of Abuse and Neglect

196.    The Reporting Maltreatment of Minors Act (Minn. Stat. § 626.556) requires professionals who are designated as mandated reporters and who have reason to believe that a child is being neglected or physically or sexually abused to report promptly such information to the local child welfare agency or to law enforcement.  Minn. Stat. § 626.556(3)(a).  Any other person may voluntarily make such a report to those same authorities.  Minn. Stat. § 626.556(3)(b).

197.    The local child welfare agency is primarily responsible for the assessment and investigation of reports of suspected child maltreatment.  In this case, the local child welfare agency for Hennepin County is the Department.

198.    Within 24 hours of receiving a report alleging neglect, physical abuse, or sexual abuse of a child, the Department must make a threshold decision to either "screen in" or "screen out" the report.

199.    When determining whether a report will be screened in or out, the Department is required to follow the current child maltreatment screening guidelines issued by the State Commissioner of Human Services.  The Department may not modify these screening guidelines without the prior approval of the Commissioner.   Minn. Stat. § 626.556(7)(a).

200.    For a report that contains allegations of sexual abuse or substantial child endangerment, the Department must conduct a face-to-face contact with the child who is the subject of the report and the child's primary caretaker within 24 hours, and it must be sufficient to complete a safety assessment and ensure the immediate safety of the child. Minn. Stat. § 626.556(10)(j).

201.    If a report is screened out, the allegations included in such a report will not be further assessed or investigated by the Department.  Minn. Stat. § 626.556(7)(b), (f).

202.    A screened out report may, however, be used to offer voluntary services to the subjects of the report, and to determine whether to conduct an investigation or family assessment of a subsequent report involving the same subjects.  Minn. Stat. § 626.556, Subd. 7(f).

203.    If the Department screens in a report, it is required to choose between whether to conduct an "investigation" or a "family assessment" "as appropriate to prevent or provide a remedy for child maltreatment."  Minn. Stat. § 626.556(10)(b).

204.    An investigation is a systematic, thorough inquiry that engages in "fact gathering related to the current safety of a child and the risk of subsequent maltreatment" and, upon completion, must include determinations regarding:  (a) whether child maltreatment occurred, and (b) whether child protective services are needed.  Minn. Stat. § 626.556(2)(e); Minn. Stat. § 626.556(10e)(c).

205.    A family assessment is a "comprehensive assessment of child safety, risk of subsequent child maltreatment, and family strengths and needs that is applied to a child maltreatment report that does not allege sexual abuse or substantial child endangerment."  Minn. Stat. § 626.556(2)(d).  The family assessment analyzes and must make a determination about:  (a) whether services are needed to address the safety of the child and other family members; and (b) the risk of subsequent maltreatment.  Minn. Stat. § 626.556(2)(a); Minn. Stat. § 626.556(10e)(b), 10(f).  It must also notify the parent or guardian of its determination. Id.  It does not include fact-finding or a determination as to whether child maltreatment occurred.

206.    In determining whether a family assessment is appropriate, the Department may consider issues of child safety, parent cooperation, and the need for an immediate response.  Minn. Stat. § 626.556(10)(b)(3).

207.    If the report involves sexual abuse or substantial child endangerment, or allegations of maltreatment of a child in a licensed facility or school, the agency is required to conduct an investigation.  Minn. Stat. § 626.556(10)(b)(1).

208.    If the report does not allege sexual abuse or substantial child endangerment, the agency may, but is not required to, provide a family assessment.  Minn. Stat. §§ 626.556(1)(b)(4) and (10)(b)(3).

209.    The Department may change its decision regarding the appropriate response to a report after it has initiated the response.  For example, if the Department begins a family assessment, but later determines that there is reason to believe that sexual abuse or substantial child endangerment or a serious threat to the child's safety exists, the Department must begin an immediate investigation.  Minn. Stat. § 626.556(10)(b)(2), (4).

210.    In conducting a family assessment or investigation, the Department must collect available and relevant information about the child and the alleged maltreatment, including but not limited to information about the existence of substance abuse or domestic violence, prior reports of maltreatment, the child's developmental functioning, the alleged offender's criminal history, and collateral source information such as medical records.  Minn. Stat. § 626.556(10)(i).

211.    If the alleged offender was not already interviewed as the primary caregiver, the Department is also required to "also conduct a face-to-face interview with the alleged offender in the early stages of the assessment or investigation."  Minn. Stat. § 626.556(10).

212.    When conducting an investigation that does not include allegations of sexual abuse or substantial child endangerment, the Department is required to make face-to-face contact with the alleged victim within five days of receiving the report. The Department is also required to see the alleged victim of any case that was screened for family assessment within five days.  Minn. Stat. § 626.556(10)(j).  The Department must complete its family assessment or investigation within 45 days of receipt of the report, unless the time is extended to allow the completion of a criminal investigation or receipt of expert information.  Minn. Stat. § 626.556(10e)(a).

213.    However, unless ordered by a court, participation in child protective services offered or provided by the Department after a family assessment or investigation of a report of child maltreatment is voluntary.  Minn. Stat. § 626.556 (10m)(a).

214.    When a case opened by the Department to provide child protective services is closed, the Department is required to document the outcome of the family assessment or investigation, including by describing the services provided and the removal or reduction of risk to the child, if it existed.  Minn. Stat. § 626.556(10 l).

215.    The Department is required to consult with the County Attorney to determine the appropriateness of filing a petition alleging the child is in need of protection or services, as defined under the Juvenile Protection Provisions of the State's Juvenile Court Act if:  (1) the family does not accept or comply with a plan for child protective services; (2) voluntary child protective services may not provide sufficient protection for the child; or (3) the family is not cooperating with an investigation or assessment.  Minn. Stat. § 626.556(10m)(b).

216.    If necessary in the course of an assessment or investigation, the Department may determine that a child should be taken into immediate custody for emergency protective care.  However, this can be done only pursuant to an ex parte order for emergency protective care issued by a juvenile court, which includes the court's individualized, explicit findings, based on a notarized statement or affidavit, that there are reasonable grounds to believe the child is in surroundings or conditions that endanger the child's health, safety, or welfare and that immediate responsibility for the child's care and custody be assumed by the local child welfare agency, and continuation of the child's care by the parent or legal guardian is contrary to the child's welfare.  In the alternative, a law enforcement officer may take a child into immediate custody for protective care when the child is found in surroundings or circumstances which the officer reasonably believes will endanger the child's health or welfare.  Minn. Stat. § 260C. 175, Subd.1 (a) and (b)(ii).

## C.    CHIPS and Permanency Proceedings

217.    Minn. Stat.  §§ 260C.001-260C.521, the Juvenile Protection Provisions of the Juvenile Court Act (the "Juvenile Protection Act"), govern juvenile protection proceedings, including Child in Need of Protection or Services ("CHIPS") matters and permanency matters ("Permanency"), which includes termination of parental rights matters, and post-termination of parental rights and adoption matters.  Post-termination matters include a review of the local child welfare agency's reasonable efforts to finalize an adoption for the child.

218.    Under the Juvenile Protection Act, the term "responsible social services agency" is used to describe the county agency that has responsibility for public child welfare and child protection services.

219.    The Department is the responsible social services agency for Hennepin County.

220.    The Rules of Juvenile Protection Procedure ("JUVP") govern the procedure for juvenile protection proceedings in the juvenile courts in Minnesota.

221.    The Minnesota Legislature has determined that the paramount consideration in all juvenile protection proceedings is the health, safety, and best interests of the child.  Minn. Stat.  § 260C.001, Subds. 1 and 2(a).

222.    Minn. Stat. §260C.001, Subd. 2(b) sets forth the broad purposes and specific goals of Minnesota laws relating to juvenile protection proceedings.

223.    CHIPS and certain Permanency matters are required to be adjudicated within specific timelines.  These requirements ensure that children do not remain in foster care indefinitely, and that permanent homes for children who cannot return to their parents are secured in a timely manner.

224.    "Day One" of the timeline for proceedings is the day the child enters court-ordered foster care, either pursuant to an order for emergency protective care, or as a disposition after the child has been adjudicated to be a Child in Need of Protection or Services, whichever occurs earliest.

225.    By Day 180, the juvenile court must hold a Permanency Progress Review hearing for any child who remains in foster care after having been removed from their

home.  The purpose of this hearing is to review permanency planning for the child, and to set direction of the case for the next six months.

226.    By Day 335, for any child who still remains in foster care, a permanency petition must be filed, marking the initiation of the permanency matter.  The permanency petition preferably seeks a termination of parental rights, or transfer of permanent legal and physical custody of a child to a suitable relative.

227.    By Day 365, the Admit/Deny hearing on the permanency petition must be held, and the trial on that petition must commence no later than Day 425, approximately 15 months after the child entered foster care.

### i.    CHIPS Matters

228.    If the social services agency, in consultation with the County Attorney, determines that it is appropriate to file a CHIPS petition alleging that a child is in need of protection or services, or if any reputable person who has knowledge of the child believes that the child is in need of protection or services, the petition is filed in the juvenile court of the county in which the child is found, the child resides, or the county in which the conditions giving rise to the child's need for protection or services arises.

229.    Unlike most other counties in Minnesota, Hennepin County has a dedicated juvenile court bench, currently consisting of eight judges, who generally rotate through the assignment for two-year periods.

230.    A child who has been taken into immediate custody for emergency protective care, during a family assessment or investigation or otherwise, is to be taken to a shelter care facility, defined as a "physically unrestricting facility, such as, but not

limited to, a hospital, a group home, or licensed facility for foster care, used for the temporary care of a child pending court action."  Minn. Stat. § 260C.007, Subd. 30.

231.    In Hennepin County, children who are taken into immediate custody for emergency protective care usually are transported to St. Joseph's Home for Children ("St. Joseph's"), a 24-hour emergency shelter for children ages birth to 17.

232.    The parents or guardian of a child taken into immediate custody by a police officer for emergency protective care must be notified as soon as possible, and also be told that they may request that the child be placed with a relative or designated caregiver instead of a shelter facility.

233.    Unless there is reason to believe that the child's health and welfare would be immediately endangered, the child must be released to the parent(s), guardian, or other suitable relative.

234.    The parents of a child taken into immediate custody pursuant to a court order must also be provided a written notice of the action, the time and date of the emergency protective care ("EPC") hearing to be held within 72 hours, and the name and contact information of the social services agency.

235.    Within 72 hours of being taken into emergency protective care either by a police officer or by order of the court, the child must be released, unless the juvenile court has commenced an EPC hearing to determine whether the child should be returned home or placed in protective care.  JUVP 30.01, Subd. 1.

236.    At the EPC hearing, the court advises the parents of the possible consequences of the CHIPS proceedings, and that failure to appear at future hearings can

result in an adjudication by the court that the child is in need of protection or services and an order transferring permanent legal and physical custody of the child to another individual.

237.    The court must appoint a guardian ad litem for a child who is alleged to be in need of protection or services.  The guardian ad litem serves as an independent advocate for the child's best interests, and is a party to the proceedings.  Minn. Stat. § 260C.163, Subd. 5 (a).  Children have the right to effective assistance of counsel in juvenile protection proceedings.  Minn. Stat. § 260C.163, Subd. 3 (a).  For a child age 10 or over who desires counsel, but is unable to afford it, the court must appoint a public defender.   Minn. Stat. § 260C.163, Subd. 3 (b), and Minn. Stat. § 611.14 (4).  For children who are not represented by counsel, the court must determine the child's preferences regarding the proceedings, if the child is of sufficient age to express a preference. Minn. Stat. § 260C.163, Subd. 5(e).

238.    The trial, if any, on the CHIPS petition must take place no later than 93 days after the child enters foster care.

239.    The court may order the following dispositions for a child who is adjudicated as CHIPS:  (a) place the child in the home of a parent, including a non-custodial parent, under protective supervision of the social services agency and under conditions set by the court; (b) transfer legal custody of the child to the social services agency for placement in an appropriate foster home; or (c) without modifying the transfer of legal custody to the social services agency, order a trial home visit with the parent

from whom the child was removed for a period not to exceed six months. Minn. Stat. § 260C.212.

240.   During the period of any trial home visit, the social services agency must continue to provide services to the family, monitor the parent and child, and may terminate the trial home visit and remove the child to foster care without court authorization if necessary to protect the child's health, safety, and welfare.

241.   Within 30 days of a child entering protective care or foster care, whichever is earlier, the social services agency must file an Out of Home Placement Plan, based on the contents of the CHIPS petition.  Minn. Stat. § 260C.212, Subd. 1(a).  The Out of Home Placement Plan (often referred to as the "case plan") is prepared by the social services agency, jointly with the parent, and in consultation with the child's guardian ad litem, foster parent, Indian tribe, and, if appropriate, the child.

242.   The case plan is the key document setting forth the actions the parents must take, and the time period in which they must take such actions, to remedy the conditions leading to the removal of the child from their home.  It sets out the services which will be provided to the parents or which the parents have requested.   The court may approve the case plan, and the parents may agree at any time to comply with the requirements of the case plan.  However, the court cannot order compliance with the case plan by the parents unless and until the child has been adjudicated as CHIPS and the court issues a disposition order under Minn. Stat. § 260C.212.

243.   The case plan also includes child-focused provisions.  The case plan must document the social services agency's individualized determination of the needs of the

child and how those needs will be met in the selected placement.  Minn. Stat.

§ 260C.212.

244.    The case plan must include provisions to ensure educational stability for the

child, and address the child's medical and other needs, as well as responsibility for

management of those needs and provision of services to the child.  Children in foster care

must be visited monthly by the assigned social worker in a face-to-face visit of sufficient

length and duration to address and ensure case planning, service delivery, safety,

permanency, and well-being, as well as to determine that the child is enrolled in and

attending school.  Minn. Stat. § 260C.212, Subd. 4(a).

245.    After a CHIPS adjudication and entry of an initial disposition order, a

review hearing is held by the juvenile court every 90 days.  The purpose of these periodic

review hearings is to determine whether continuation of the child in foster care is

necessary and appropriate, and whether the child can be returned home or a trial home

visit.  The court reviews the case plan, and the parents' progress in complying with the

plan and remedying the conditions leading to the child's removal.

246.    For children who remain in foster care at the 180-day mark, a Permanency

Progress Review is held.  The court again reviews the child's status and the parents'

compliance with the case plan.  It also determines whether the social services agency has

made reasonable efforts (or active efforts, in a CHIPS matter involving an Indian child)

to reunify the child with the parent, and whether the social services agency has made

reasonable efforts to finalize a permanency plan for the child.

247.   At Day 335, if the child remains in foster care, a Permanency Petition must be filed, unless the social services agency recommends that the child be returned to the parent.

### ii.   Permanency Matters

248.   Although there are five permanency options available to the juvenile court in Permanency proceedings, two are preferred as a matter of public policy:  (a) termination of parental rights and adoption; or (b) guardianship to the Commissioner through consent to adopt, which frees the child to be adopted by an identified prospective adoptive parent, with the consent of the parents involved in the CHIPS proceeding.  If the court finds that these options are not in the child's best interests, it may order a transfer of permanent legal and physical custody of the child to a suitable relative when that is in the child's best interests.  Minn. Stat. § 260C.513.

249.   The remaining two permanency options are:  permanent legal custody to the agency, also known as "long term foster care," available only to children 16 and over, and the plan is that the child will remain in foster care until age 18, or, if the child chooses, until age 21; and temporary custody to the agency, not to exceed one year, and available only for children who have been adjudicated as CHIPS solely by reason of their own behavior.

250.   A petition to involuntarily terminate parental rights must allege one of nine bases for the termination.  Eight of the bases describe misconduct or neglect by the parent.  Two of the bases specifically describe misconduct in the context of the underlying CHIPS proceeding:  the parents' failure to correct the conditions leading to

removal of the child from the home within the applicable timelines, and the child's status as neglected and in foster care.

251.    As with a CHIPS petition, the court must hold an Admit/Deny hearing on the Permanency Petition, which must be held no later than Day 365 on the timeline.  The trial, if any, must commence no later than Day 425, and the court's permanency order must be issued within 15 days after the trial ends, although the court may extend that time to 30 days in the interests of justice and the best interests of the child.  Post-trial motions must be filed and ruled on within 30 days, and an appeal of the court's permanency decision must be made within 20 days.  Appeals in juvenile protection matters are expedited by the Minnesota Court of Appeals.

### D.     Post-Termination of Parental Rights

252.    Certain permanency options require children to remain under the jurisdiction of the juvenile court for extended proceedings.  A child who is placed in long-term foster care will generally remain under the jurisdiction of the juvenile court until age 18.

253.    Children  as to whom parental rights have been terminated and who are under the guardianship of the Commissioner of Human Services, commonly referred to as "state wards," will remain under the jurisdiction of the juvenile court until an adoption has been finalized, or until reaching age 18.

254.    A child who is placed in long-term foster care must have his or her status reviewed at an in-court hearing at least annually.  The purpose of the hearing is to ensure: (a) "intensive, ongoing" efforts of the social services agency to secure an alternate

permanency option for the child, including adoption, transfer of custody to a relative, or a

return to the child's parents; (b) agency efforts to assist the child build connections to his

or her family and the community; (c) agency efforts to plan with the child for

independent livings skills and an orderly and successful transition to adulthood; (d) the

child's current foster home or institution is following "reasonable and prudent parenting

standards"; and (e) the continued appropriateness of the child's out-of-home placement

plan and current foster care placement.  Minn. Stat. § 260C.521, Subd. 1.

255.   For a state ward who is awaiting adoption, review hearings are required to

be held at least every 90 days until an adoption is finalized.  The court must review the

social services agency's reasonable efforts to finalize an adoption for the child, guided by

the specific requirements of the efforts to be made as found in Minn. Stat. § 260C.607,

Subd. 1(b).  In addition, the court reviews the child's current out-of-home placement plan

to ensure that the child is receiving all necessary services and supports to meet his or her

needs for (a) placement, (b) visitation and contact with siblings, (c) visitation and contact

with relatives, (d) medical, mental and dental health, and (e) education.

256.   For a child age 14 or over who is living in foster care while waiting for

adoption, the court must also review planning for the child's independent living.  Minn.

Stat. § 260C.607, Subd. 4.

257.   The responsible social services agency must make efforts to locate a

suitable adoptive family from among the child's relatives.  If no adoptive family is

secured through the family search, the agency may then search for an adoptive family

using other means, such as the state adoption exchange, newspapers and other media, and assistance by contracted adoption agencies.  Minn. Stat. § 260C.605, Subd. 1.

258.    The responsible social services agency must compile and prepare a "detailed, thorough, and currently up to date" medical and social history for the child, provide a copy of that document to the adoptive family, and ensure that that this history is thoroughly discussed with the adoptive parent.  Minn. Stat. § 260C.609.

259.    A child living in foster care on his or her 18th birthday may continue in foster care until age 21, under certain circumstances.

260.    Children who were under the guardianship of the Commissioner as state wards, and for whom no adoption has been finalized, may remain in, or re-enter, foster care until age 21.

261.    Although youth who are in foster care between the ages of 18 and 21 do so pursuant to a voluntary agreement, even though they are legal adults, they are under the jurisdiction of the juvenile court and subject to periodic reviews by the court.

## III.    The Systemic Deficiencies in Hennepin County's Child Welfare System
### A.    General Failures

262.    Hennepin County's child protection system deviates substantially from the requirements of federal and state law.  For example, the rate for recurrence of maltreatment in Hennepin County for children who have left foster care is and has been well above the national standard.

263.    In June 2015, in the aftermath of media reports concerning several high-profile deaths of children involved in Minnesota's child welfare system, Casey Family

Services, a well-respected child welfare organization, issued a report (the "Casey Report") concerning the Hennepin County child protection system.

264.   The report observed that "[e]very part of the agency's child protective process, from screening through investigation and case management, has been negatively affected [by drastic budget cuts since 2008]. In addition, major organizational initiatives viewed by County leaders as innovative and even visionary have damaged the CFS workforce, the agency's most important asset. Time, resources and leadership will be required to repair and renew a child protective system that was once viewed as a model for other child welfare systems around the country."

265.   The Casey Report found that Minnesota had one of the highest screen-out rates of reports of child maltreatment in the country, and that the Hennepin County screen-out rate was particularly high.

266.   The Casey Report also found that Hennepin County child protection caseworkers believed that far too many of the cases that were screened in had been assigned to the family assessment track, and that far too few had been assigned to the more rigorous investigation track.

267.   The percentage of screened-out maltreatment reports in Hennepin County has been reduced somewhat since 2015. Children are now entering foster care at a higher rate, but the number of available beds is far exceeded by the increasing number of children needing a placement. As a result, some children are moving from one temporary placement to another, other children are being sent to live with relatives who do not meet state foster care licensing standards, and yet other children either remain in their homes,

or return to their homes prematurely, often without necessary services to ensure their health and safety, because there is no available foster care placement.

268.    To date, the problems outlined in the Casey Report remain largely unaddressed.

269.    Hennepin County's child protection system is inadequate with respect to its social workers as well.  They are consistently assigned caseloads in excess of national standards and many social workers do not have desks to which they are regularly assigned to work.  Generally, morale is low and turnover is high.

270.    In August 2016, Minnesota underwent and failed its third federal audit of its child welfare system.  The audit, known as Child and Family Service Reviews ("CFSR"), is conducted by the United States Department of Health and Human Services to assess the performance of child welfare systems across the country, including examining the outcomes achieved for children.  It identifies areas in which systemic improvement is required to assure appropriate outcomes for children, and to implement corrective actions where outcomes for children are found to be deficient.

271.    In the CFSR, states are evaluated on seven outcome indicators of safety, permanency, and well-being—the unequivocal goals of all foster care systems pursuant to federal statutory law—and on seven systemic factors that affect a state's capacity to deliver foster care services effectively.

272.    Minnesota underwent prior audits in 2001 and 2007.  In 2007, Minnesota failed to achieve substantial conformity with any of the seven outcomes related to the

permanency, safety, and well-being of children in foster care, but was in substantial

conformity with five of the seven factors related to the operation of its foster care system.

273.    In Minnesota's 2016 CFSR, Minnesota again failed to achieve substantial

conformity with any of the seven outcomes related to the permanency, safety, and well-

being of children in foster care, and was only in substantial conformity with one of the

systemic factors.

274.    Because Hennepin County is the largest county in the state, its cases have

been included in the CFSR's case reviews during each of the three Minnesota audits.

275.    Overall, systemic failures permeate every aspect of Hennepin County's

child protection system.

### B.    Inadequate and Untimely Investigations of Reports of Child Abuse and Neglect

276.    Despite the findings in the Casey Report, Minnesota and Hennepin County

still fail to meet their legal requirements.  Children still do not receive adequate safety

assessments within required time periods, too many maltreatment reports are still

screened out, and there is significant confusion between the "investigation" and "family

assessment" tracks, resulting in improper and inadequate implementation of these tracks.

277.    Specifically, Hennepin County child protection caseworkers screen out far

too many reports, including significant numbers of reports that allege facts that meet the

statutory definitions of abuse or neglect and the minimal reporting requirements of the

statute.

70

278.   Upon information and belief, in recent years, Hennepin County screened out, and thus took no action on, up to 65% of the child maltreatment reports it received, including with respect to significant numbers of reports that allege facts that meet the statutory definitions of abuse or neglect.  By comparison, the average screen-out rate nationally for child maltreatment reports is under 40%.

279.   Every time that Hennepin County screens out a report that alleges facts that meet the statutory definitions of abuse or neglect, an allegation of child maltreatment is neither investigated nor assessed, in violation of Minnesota law and widely accepted professional standards.

280.   Upon information and belief, Hennepin County has recently increased the number of child maltreatment reports that are screened in for investigation or family assessment.  However, it is clear that Hennepin County has not been prepared to handle the increased volume of investigations and family assessments, and that it continues to routinely fail to comply with statutory time limits for investigating or assessing maltreatment reports.

281.   For reports alleging sexual abuse or substantial child endangerment in 2016, Hennepin County failed to meet its statutory requirements to commence an investigation "immediately" (as soon as possible, but in no event longer than 24 hours after receipt of the report) and failed to conduct the required face-to-face contact with the child and the child's primary caretaker within the first 24 hours.  Specifically, up to 20% of reports alleging child sexual abuse or substantial child endangerment were not properly and timely investigated.  That is, in response to up to 20% of the reports for

which Hennepin County caseworkers had already determined there was an allegation that a child had been or was being sexually abused or otherwise substantially endangered, no caseworker was dispatched to meet with the child face-to-face in order to assess the child's safety for at least 24 hours after receiving the report.

282.   Upon information and belief, among the reports that Hennepin County child protection caseworkers received in 2016 that were determined to warrant a family assessment, caseworkers failed to make contact with the subject child and his or her primary caregiver within the statutorily mandated five-day period in 53.4% of the cases.

283.   It bears emphasis that these cases do not include reports that were screened out for failing to allege facts that would meet the statutory definition of abuse or neglect. These are the cases that were screened in for agency action, including urgent cases alleging child sexual abuse or substantial child endangerment.

284.   Upon information and belief, Hennepin County is also failing to timely begin its investigation or family assessment of such cases more than half the time when sexual abuse or substantial child endangerment is not alleged, and up to 20% of the time when sexual abuse or substantial endangerment is alleged.

285.   Hennepin County's failure to make timely contact with the children and families who are the subjects of the child maltreatment reports it receives is a failure of one of the most fundamental duties of a child protection system.

a.   Children who wait longer than the statutorily mandated timeframes for agency contact are subject to heightened risk of further abuse and neglect or, in a foreseeable number of extreme cases, death.

72

b.      Caregivers and families whose cases have been tracked for family assessment often are in immediate need of supportive services, and Hennepin County's failure to timely initiate contact with the child and caregiver often exacerbates the child maltreatment that gave rise to the report.

c.      Once it has made contact with a family, Hennepin County often fails to provide families with necessary supportive services.  Minnesota law provides that in conducting either an investigation or family assessment, the county child welfare agency must gather information on the existence of issues such as substance abuse and domestic violence, and the agency must offer services for the purpose of preventing future child maltreatment, safeguarding and enhancing the welfare of the abused or neglected child, and supporting and preserving family life whenever possible.

d.      Upon information and belief, Hennepin County fails to offer any supportive services at all in up to half of the cases in which child maltreatment has been reported and screened in for investigation or family assessment. Hennepin County's failure to provide such services often exacerbates the child maltreatment that gave rise to the report.

286.   Supportive services needed by caregivers are often unavailable because Hennepin County has failed to contract with an appropriate number of service providers. The few available service providers are overburdened, and families often languish on waiting lists for months.

73

287.   Hennepin County's longstanding failure to provide appropriate services to many families following a report alleging child maltreatment contributes to the alarmingly high rate of repeated reports made to the Hennepin County child protection system involving the same children.

288.   Upon information and belief, in 2015 and 2016, nearly a quarter of the children who were the subject of a maltreatment report were the subject of a subsequent maltreatment report within 12 months.

289.   Minnesota's self-imposed statewide standard is that no more than 15% of children who were the subjects of a maltreatment report should be the subject of a subsequent maltreatment report within 12 months.  In many cases, the fact that these children were re-reported was due to the failure to offer appropriate intervention and supportive services, and otherwise to assess risk, during the first investigation or family assessment.  The result of the above is that far too many children in need of services or even court protection are not receiving it.

290.   These significant failures in Hennepin County's system for investigating and assessing reports of child maltreatment substantially depart from widely accepted professional standards and demonstrate a deliberate indifference to the risk of harm to the Plaintiff classes.

## C.  Inappropriate Use of Temporary Foster Shelter Care Resources

291.   Although Hennepin County has sharply increased the number of maltreatment reports that are screened in for investigation or assessment, it has not ensured that it has a sufficient number of trained caseworkers, available foster homes,

and other resources to handle the resulting increase in children who are removed from their homes and placed in foster care.

292.    Because Hennepin County does not have nearly sufficient resources to handle the increased volume of children in its care, when it determines that a child should be removed from his or her home, the child too often is put into temporary placements that are or become inappropriate and inadequate.

293.    Federal law and widely accepted professional standards require Hennepin County to ensure that each child in its custody is placed in the most appropriate, least restrictive placement available.

294.    The abrupt removal of a child from his or her home can be overwhelming and often exacerbates the trauma caused by the abuse or neglect that warranted the child's removal.

295.    Foster care placements are required to be based on an assessment of the individual child's needs and should promote stability and continuity by placing children with appropriate relatives, keeping children in their communities and schools, and keeping siblings together whenever possible.  This is most critical for children as they initially enter foster care.

296.    Hennepin County routinely fails to make sufficient efforts through its temporary foster shelter care resources to meet these requirements.

297.    Rather than being the exception, immediate shelter placement is Hennepin County's default practice for most children who are removed from their home and enter foster care.  Hennepin County's standard use of a shelter placement when children are

first removed from home and entering foster care goes against long-established reasonable professional practices in child welfare.

298.   This longstanding practice results in an additional placement for children in foster care in Hennepin County, despite clear goals in the child welfare field to minimize the number of placements and moves that children experience.  This systemic practice also relies indiscriminately on institutional care for children, despite extensive evidence and guidance in the child welfare field about the importance of minimizing institutional care for children.

299.   Hennepin County relies heavily on two types of temporary shelter care, both of which compound the trauma of children entering the foster care system.

300.   Children often linger in these "temporary" placements for months while a longer-term foster care placement is sought for them.  When these children finally are moved to their longer-term foster care placement, they often experience additional trauma from being removed yet again from a caregiver to whom they have grown attached.

301.   "Home shelter care" involves placement in special foster homes licensed to provide short-term, temporary care.

302.   "Emergency shelter care" involves placement in an institutional facility that necessarily fails to provide an appropriate home-like environment.

303.   Children placed in emergency shelter care facilities often lose continuity of schooling, are often not placed with siblings, and often experience disruption of, or unavailability of, mental health and other services they need.

304.    Upon information and belief, the State of Minnesota and Hennepin County often house newly removed children in emergency shelter care facilities for up to 90 days.  That is far too long to house vulnerable children in such settings.

305.    Upon information and belief, many newly removed children remain in emergency shelter care facilities far longer than the 90 days allowed by the State of Minnesota and Hennepin County, due to the foreseeable and avoidable lack of available foster home placements in the Hennepin County foster care system.

306.    Upon information and belief, approximately 130 foster children (upwards of 10% of the children in the Hennepin County foster care system) currently reside in emergency shelter care facilities.

307.    Upon information and belief, Hennepin County's temporary foster care shelter system is so overwhelmed, and the County has such an acute shortage of adequate foster home placements, that in some instances CFS has placed children in hospitals for days when there was no medical reason for doing so, temporarily housed infants in County offices, refrained from removing children from known abusive or neglectful homes, or placed children in inadequate and unlicensed relative homes.

308.    These significant failures in Hennepin County's use of temporary foster shelter care resources substantially depart from widely accepted professional standards and demonstrate a deliberate indifference to the risk of harm to the Plaintiffs and the classes.

**D.      There are Insufficient Numbers of, and Poorly Trained, Case Workers.**

309.    Child welfare research has shown that high caseworker caseloads negatively impact children in foster care.

310.    Caseworkers with high caseloads have less time to interact with children, families, and service providers or to provide meaningful and appropriate case plans, necessary services, and timely casework and decision-making.

311.    It is therefore critical that caseworkers have manageable caseloads.

312.    Hennepin County fails to ensure that its caseworkers carry caseloads consistent with reasonable professional standards.

313.    The Child Welfare League of America, a coalition of private and public agencies that develops child welfare policies and promotes sound child welfare practice, has established nationally recognized standards for caseworker caseloads.  Those standards governing foster care caseworkers limit caseloads to between 12 and 15 children in foster care per worker.

314.    The Council on Accreditation, an accrediting body that partners with human service organizations to improve child welfare service delivery outcomes, recommends that caseloads for foster care caseworkers be limited to between eight and 15 children in foster care per worker, depending on the needs of the children.

315.     Hennepin County fails to ensure that its caseworkers' caseloads comply with these standards, and many (and perhaps most) of Hennepin County's caseworkers' caseloads exceed these standards.

316.    In November 2016, Defendant Moore acknowledged publicly that many Hennepin County caseworkers have "unreasonable workload[s]" of 18 or 19 cases, which can include up to 50 children.  Hennepin County counts child welfare cases by the number of families on the workers' caseloads, not the number of children involved, even though the standards maintained by professional organizations are child-only caseloads.

317.    Hennepin County does not provide many of its caseworkers with office space.  Instead, workers use an "open office space" and are assigned "business lockers." In practice, caseworkers often work out of their cars, from home, or in unassigned office space, so that they must transport their case files and computers.  According to the Casey Report, although this practice was noted to be "overwhelmingly perceived as damaging to the CFS workforce and its ability to serve children and families," the use of this practice is still widespread.

318.    Minnesota law requires that caseworkers must make monthly visits with each child in foster care to ensure their well-being and address any issues that have arisen.

319.    Upon information and belief, however, Hennepin County caseworkers failed to perform almost a quarter of these required visits in 2016.

320.    As a direct and proximate result of CFS's failure to ensure that caseworkers maintain regular contact with children, parents, and foster parents, the Plaintiffs and the classes they represent have been and will continue to be harmed because their assigned caseworkers are unable to meaningfully assess their safety and well-being and to

facilitate the provision of services that are necessary to reunite them with their parents or
to place them into a safe, legally permanent home.

321.    Because most Hennepin County caseworkers are overburdened, Hennepin
County has alarmingly high caseworker turnover.

322.    Hennepin County's high caseworker turnover exacerbates problems
throughout its child protection system because CFS is compelled to fill growing numbers
of vacancies with less qualified applicants, because caseworkers have less experience in
the field, and because of diminished caseworker continuity in particular cases.

323.    Research has shown that high caseworker turnover is strongly correlated
with children experiencing multiple placements, receiving fewer services, staying in
foster care longer, and failing to achieve permanency.

324.    In some instances, cases are closed without proper consideration as a result.

325.    CFS's failure to ensure that caseworkers carry reasonable caseloads and
make sufficient contacts with the children in its custody substantially departs from widely
accepted professional standards and demonstrates a deliberate indifference to the risk of
harm to Plaintiffs and the classes they represent.

### E.    Dangerous Placements

326.    The fact that Hennepin County has removed a child from an abusive or
neglectful home does not always mean that the child will then be safe.  Hennepin County
foster children are, all too often, subjected to maltreatment while in foster care.

327.    Upon information and belief, this problem dramatically worsened between
2014 and 2016.

328.    Upon information and belief, Hennepin County determined that 32 children in foster care placements that were supervised by CFS were subjected to maltreatment in 2014.

329.    Upon information and belief, Hennepin County determined that 55 children in foster care placements supervised by CFS were subjected to maltreatment in 2015.

330.    Upon information and belief, Hennepin County determined that 104 children in foster care placements supervised by CFS–approximately 7% of the total population in foster care– were subjected to maltreatment in 2016.

331.    Therefore, the incidence rate of maltreatment in foster care more than doubled, and perhaps more than tripled, between 2014 and 2016.

332.    These are just the substantiated maltreatment cases.  There were many more allegations of maltreatment in foster care that Hennepin County was unable to substantiate, and many children experience placements with foster parents who are unable to meet their needs.  Because of the shortage of foster homes, the standards for licensing homes have been dropping precipitously.

333.    The high rate of maltreatment of children in the Department's custody is a direct result of Defendants' long-standing and well-documented actions and inactions and Defendants' failure to remedy structural and systemic deficiencies that have plagued Hennepin County's child protection system for years.  The Department's failure to ensure that children are protected from maltreatment while in the custody and care of the Department substantially departs from accepted professional judgment and norms and

demonstrates a deliberate indifference to the risk of harm to Plaintiffs and the classes they represent.

### F.      Inadequate Permanency Planning

334.    Children in foster care should remain in care for as short a period as possible, according to the requirements of both Minnesota and federal law.

335.    Many children in foster care fail to receive appropriate case plans that fully comply with the requirements for such plans.  Further, children may not receive necessary services required by their case plans, because, in part, Defendants fail to contract for required services and caseworkers have inappropriately heavy caseloads that preclude them from managing each child's foster care placement effectively.

336.    Upon information and belief, many case plans are simply recopied from one period to the next with use of the same language.

337.    Upon information and belief, Hennepin County continues to contract with a transportation service that provides cars and drivers but no responsible adult to accompany a child to visits with parents, leaving many children, including very young children, unaccompanied and crying during the transportation to and from such visits, without the presence of any adult charged with ensuring the child's safety, or available to soothe the child.

338.    Although the law requires that case plans must be meaningful and that necessary services must be provided, children often remain on waiting lists for services; accurate and necessary information about children's circumstances, medical and social history, and special needs is withheld from foster parents; and biological parents are

referred for services that exist in such small numbers that they never become available within the limited timeframe the parents have to comply with their case plans.

339.    Hennepin County's failure to provide necessary services to children and parents substantially impedes reunification efforts because reunification often is not possible, legally and practically, in the absence of such services.

340.    Children often are returned to the care of their parents even though the conditions underlying the removal of the children have not been addressed.

341.    Hennepin County has a relatively high rate of reunifying children with their parents within 12 months of their removal (though, as discussed below, these returns often do not lead to true "permanency," as these children too often re-enter foster care). Children who remain in foster care in Hennepin County longer than 12 months, however, often linger for years without permanency.

342.    Upon information and belief, only 37.1% of children who were in foster care between 12-23 months were discharged to a legally permanent home in 2016, and only 17% of children who were in foster care longer than 24 months were discharged to a legally permanent home in 2016.

343.    This is significantly lower than the applicable federal standard for permanency.

344.    In fact, the County regularly does not seek permanent placement for children, even though required by statute to do so, and does not develop concurrent plans for children who have a plan of return home.

345.    This differs from the applicable federal standard for permanency.

346.    Hennepin County often fails to plan effectively for timely permanency for many children.

347.    For older teens who may express that they do not want to be adopted, CFS often fails to explore non-adoptive options that nevertheless would be conducive to the child's long-term stability, such as facilitating the child's connection with a non-adoptive kinship resource who will maintain a stable, long-term relationship with the child after he or she ages out of the system.

348.    Hennepin County does not comply with requirements that it effectively plan for, and make ongoing reasonable efforts to achieve, permanency for children who cannot be reunified with their parents.

349.    Caseworkers regularly fail to research all potentially available kin who might provide a legally permanent home for a child.

350.    Hennepin County often fails even to take the basic step of listing all children who are available for adoption on its publicly available adoption website.

351.    CFS's failure to engage in meaningful permanency planning substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to Plaintiffs and the classes they represent.

### G.    Re-Entry

352.    An important indicator of the adequacy of a foster care system is the extent to which children who are reunified with their parent(s) and exit the system subsequently re-enter the system.

353.    Hennepin County has extremely high re-entry rates.

354.    Upon information and belief, in 2016, 259 Hennepin County children who had previously been the subjects of a substantiated maltreatment report were the subject of a second substantiated maltreatment report within 12 months of the first, which is a maltreatment recurrence rate of 15.4%.

355.    Upon information and belief, this repeat maltreatment rate is nearly 70% higher than the federal standard, which is 9.1%.

356.    An even higher percentage of children re-enter foster care in Hennepin County after having been reunited with their parents.  Upon information and belief, in 2016, 16.2% of children re-entered foster care within 12 months of leaving.

357.    Upon information and belief, this re-entry rate is nearly double the federal standard, which is 8.3%.

358.    Hennepin County's alarmingly high re-entry rates substantially depart from widely accepted professional standards and demonstrate a deliberate indifference to the risk of harm to Plaintiffs and the classes they represent.

**H.    Recent Remedial Efforts by Hennepin County Do Not Address Plaintiffs' Claims.**

359.    In the wake of the Casey Report, Hennepin County convened a Child Protection Oversight Committee to address problems identified in the report.  The Oversight Committee's recommendations were presented to the Hennepin County Board of Commissioners in late 2016.

360.    The recommendations were presented as a plan leading to a "profound transformation" of the child protection system that Hennepin County believes can dramatically reduce costs and improve stability of children and families.

361.    Hennepin County has a history of embarking on failed initiatives to reduce costs and improve services to children and families.  Most recently, these include excessive, inappropriate use of the Family Assessment Model to respond to maltreatment reports, and adoption of a results-only work environment, or ROWE, for child protection case workers.  ROWE is a management strategy designed to increase productivity and lower office space costs by giving employees the flexibility to work at the times and in the places of their choice.  In Hennepin County, this model has hampered child protection caseworkers in carrying out their duties effectively.

362.    Both of these initiatives were among those cited by the Casey Report as efforts viewed by Hennepin County as innovative and visionary, but which in practice contributed significantly to a child protection system that has devolved into crisis, and that the County itself now describes as unsustainable.

363.    Hennepin County reports that the new transformational effort will focus on Child Well-Being in Hennepin County, in order to "shrink the child protection necessity." Specifically, a three-to-five-year pilot will develop and coordinate community efforts to meet the physical, emotional, social, relational, growth, and developmental needs of all children, in order to reduce child maltreatment.  County officials posit these community efforts will also lead to a reduction in the number of child maltreatment reports made to

86

Hennepin County, and a corresponding reduction in the number of children who enter foster care.   This may or may not be the case.

364.   In 2016, Hennepin County received over 20,000 maltreatment reports, a 98% increase in reports in the period 2008-2016. Foster care placements in Hennepin County have increased 65% since 2014.  Efforts to halt and reverse these extraordinary, steep upward trajectories are to be commended, but will not solve the statutory and Constitutional violations outlined in this Complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**42 U.S.C. § 1983 – Substantive Due Process**
**(On Behalf of the Special Relationship Class Against All Defendants)**

365.   Each of the foregoing allegations is incorporated as if fully set forth herein.

366.   A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to provide reasonable care, to and to protect from harm, a child with whom it has formed a special relationship.

367.   The foregoing actions and omissions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all of the members of the Special Relationship Class.

368.   Defendants are well aware of the policies and practices that prevent these class members from receiving adequate protection from harm after the State has formed a special relationship with them.

369.    As a result, the named Plaintiffs and all of the members of the class of children to whom the state owes a special duty, children who have a special relationship with Defendants, have been, and are, at risk of being deprived of substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution.

370.    These substantive due process rights include, but are not limited to:

a.    the right to freedom from maltreatment while under the protective supervision of the State;

b.    the right to protection from unnecessary intrusions into the child's emotional well-being once the State has established a special relationship with that child;

c.    the right to services necessary to prevent unreasonable risk of harm;

d.    the right to conditions and duration of foster care reasonably related to the purpose of government custody;

e.    the right to treatment and care consistent with the purpose and assumptions of government custody; and

f.    the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 – First, Ninth, and Fourteenth Amendments**
**(On Behalf of the Maltreatment Report and Special Relationship Classes**
**Against All Defendants)**

371.    Each of the foregoing allegations is incorporated as if fully set forth herein.

372.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to the constitutional rights of Plaintiffs' and the members of the Maltreatment Report and Special Relationship Classes.

373.    Defendants have failed to take all reasonable efforts toward securing a permanent home for the named Plaintiffs and the class members they represent.

374.    As a result, the named Plaintiffs and all of the members of the Maltreatment Report Class and Special Relationship Class have been, and are, at risk of being, deprived of the right to a permanent home and family derived from the First Amendment's right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.

### THIRD CAUSE OF ACTION
**The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq*.**
**(On Behalf of the Maltreatment Report and Special Relationship Classes Against All Defendants)**

375.    Each of the foregoing allegations is incorporated as if fully set forth herein.

376.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom of depriving the named Plaintiffs and the classes they represent of the rights contained in the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, to:

    a.    a written case plan that includes a plan to provide safe, appropriate and stable placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

b.      a written case plan that ensures that the child receives safe and

proper care while in foster care and implementation of that plan, 42 U.S.C.

§§ 671(a)(16), 675(1)(B);

c.      a written case plan that ensures provision of services to parents,

children, and foster parents to facilitate reunification, or where that is not possible,

the permanent placement of the child and implementation of that plan, 42 U.S.C.

§§ 671(a)(16), 675(1)(B); and

d.      a case review system in which each child has a case plan designed to

achieve safe and appropriate foster care placements, 42 U.S.C. §§ 671(a)(16),

675(5)(A).

e.      These provision of the Child Welfare Act of 1980, as amended by

the Adoption and Safe Families Act of 1997, are clearly intended to benefit

Plaintiffs and the classes they represent; the rights conferred are neither vague nor

amorphous such to strain judicial competence; and the statute imposes a binding

obligation on the states.

### FOURTH CAUSE OF ACTION
**Negligence in the Investigation and Intervention of Child Abuse and Neglect
Reports in Violation of Minn. Stat. § 626.556
(On Behalf of the Maltreatment Report Class
Against Defendants County of Hennepin, David J. Hough,
Jennifer DeCubellis, Jodi Wentland, and Janine Moore)**

377.    Each of the foregoing allegations is incorporated as if fully set forth herein.

378.   Defendants owe a special duty to act on behalf of the Plaintiffs and the class members they represent in accordance with Minn. Stat. § 626.556.  See Radke v. County of Freeborn, 694 N.W.2d 788 (Minn. 2005).

379.   Defendants have failed meet their obligations.

380.   Plaintiffs and the class members are uniquely vulnerable persons.

381.   Defendants have failed to perform the mandatory acts prescribed by Minn. Stat. § 626.556 and have done so on a repeated, widespread, and systemic basis.

382.   Defendants have not act in good faith or exercised due care in performing or in failing to perform their duties under Minn. Stat. § 626.556.

383.   Defendants have performed negligent and inadequate investigations with respect to a very substantial number of the named Plaintiffs and class members. The majority of children receive either no response from the child protection system, or a response that fails to adequately protect them.

384.   Defendants knew that the Plaintiffs and the class members were in dangerous conditions.

385.   Plaintiffs' and class members' representatives and families relied on Defendants' representations and conduct with respect to their duties under Minn. Stat. § 626.556.

386.   Defendants failed to exercise due care to avoid increasing the risk of harm in performing or in failing to perform the duties required under Minn. Stat. § 626.556.

387.   As a result of the foregoing, named Plaintiffs and all members of the Maltreatment Report Class have been, and are at risk of being, deprived of their statutory

entitlement to the performance of appropriate and adequate investigations and family assessments when there are reports of child abuse or neglect.

**WHEREFORE**, the named Plaintiffs, on behalf of themselves and the classes, respectfully request that this Court:

1.      Order that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

2.      Declare unconstitutional and unlawful:

a.      Defendants' violation of Plaintiffs' and class members' right to be free from harm under the Fourteenth Amendment to the United States Constitution;

b.      Defendants' violation of Plaintiffs' and class members' rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

c.      Defendants' violation of Plaintiffs' and class members' rights under the Adoption Assistance and Child Welfare Action of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 et seq.; and

d.      Defendants County of Hennepin, Jennifer DeCubellis, Jodi Wentland, and Janine Moore's violation of Plaintiffs' and class members' rights under Minn. Stat. § 626.556.

3.      Appoint a special master or monitor to ensure that the following occur:

a.      all reports of abuse or neglect are appropriately screened in or screened out, and properly assigned for investigation or assessment, as specified by law;

b.      all children who are entitled to receive investigations do so in a manner and within the time periods specified by law;

c.      all children whose cases have been appropriately referred to the family assessment process have the required assessment completed within the time period required by law;

d.      all children who enter placement remain in temporary or shelter care no longer than 10 days absent extraordinary circumstances;

e.      all children who are placed in temporary or shelter case are placed in the least restrictive environment with adequate access to full-time education.

f.      all children whose case plan identifies a need for services and/or treatment receive those services and/or treatment;

g.      all children who are placed in foster care are placed in a safe home and are adequately monitored;

h.      all children being discharged from foster care be discharged initially on a trial basis, with their care being monitored for six months by Defendant Hennepin County Human Services and Public Health Department, and all services are provided that are necessary and adequate to remedy the problems leading to foster care placement;

i.      all children who have been in care for 15 out of the last 22 months and for whom compelling reasons are not documented in the child's records have a timely petition to terminate parental rights filed and pursued;

j.      the Hennepin County child welfare agency be required to employ an adequate number of qualified and appropriately trained caseworkers and to count cases on a per-child, per-worker basis;

k.      the Hennepin County child welfare agency be required to develop an adequate number and array of placements and services to ensure that all children needing foster care in the County are provided with necessary and adequate services;

l.      the Hennepin County child welfare agency be required to develop an adequate program for recruiting and matching children with adoptive homes;

m.      the Commissioner of the Minnesota Department of Human Services require that Hennepin County provide all necessary data and other information to determine whether the County is in compliance with federal law and standards; and

n.      the Commissioner of the Minnesota Department of Human Services be required to certify annually whether the Hennepin County child protection system is in compliance with federal and state law and, if not, take all reasonable steps to ensure its compliance.

4.     Award  reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

5.     Grant such other and further relief as the Court deems just, necessary, and proper to protect Plaintiffs and the class members from further harm.

**FAEGRE BAKER DANIELS LLP**

Dated: September 15, 2017

*s/ James L. Volling*

James L. Volling, MN Atty #113128
  *James.Volling@FaegreBD.com*
Katherine K. Bruce, MN Atty #388887
  *Kate.Bruce@FaegreBD.com*
Larry E. LaTarte, MN Atty #0397782
  *Larry.LaTarte@FaegreBD.com*
Cicely R. Miltich, MN Atty #0392902
  *Cicely.Miltich@FaegreBD.com*
Anne C. Kruger, MN Atty #0397819
  *Anne.Kruger@FaegreBD.com*
Staci L. Perdue, MN Atty #0395216
  *Staci.Perdue@FaegreBD.com*
Laura Reilly, MN Atty #0397655
  *Laura.Reilly@FaegreBD.com*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000


A BETTER CHILDHOOD, INC.
Marcia Robinson Lowry (*pro hac vice pending*)
  *mlowry@abetterchildhood.org*
Sarah Jaffe (*pro hac vice pending*)
  *sjaffe@abetterchildhood.org*
1095 Hardscrabble Road
Chappaqua, New York 10514


CUTI HECKER WANG LLP
Eric Hecker (*pro hac vice pending*)
  *ehecker@chwllp.com*
305 Broadway
New York, New York 10007


***Attorneys for Plaintiffs***