## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| T.F. by his next friend Tracy Keller; K.D. by his next friend Laura Ferenci; C.O. by her next friend Laura Ferenci; L.L. by his next friend Gerald Kegler; T.T. and M.T. by their next friend Dr. Caryn Zembrosky; T.M., T.E., and A.T. by their next friend James Dorsey; A.W. and J.W. by their next friend Margaret Shulman, and I.W., D.W., and B.W by their next friend Gloria Anderson, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br>v.<br><br>Hennepin County; Hennepin County Department of Human Services and Public Health; David J. Hough, Hennepin County Administrator; Jennifer DeCubellis, Hennepin County Deputy Administrator for Health and Human Services; Jodi Wentland, Hennepin County Director of Human Services; Janine Moore, Director, Hennepin County Child and Family Services; and Tony Lourey, Commissioner, Minnesota Department of Human Services,<br><br>    Defendants. | Civil No.  0:17-cv-01826-PAM-BRT<br><br><br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND PROVISIONAL CLASS CERTIFICATION** |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................ 3

I.      THE CLAIMS AND DEFENSES IN THIS ACTION ................................. 3

II.     THE PARTIES' SETTLEMENT DISCUSSIONS .................................... 8

III.    SUMMARY OF THE PRINCIPAL BENEFITS OF THE
        SETTLEMENT ........................................................................................ 10

        A.      Settlement Structure .................................................................. 10

        B.      Commitments by the Hennepin County Defendants................... 11

                1.      Provision of data................................................... 12

                2.      Commitments related to maltreatment reports................... 12

                3.      Commitments related to foster care ................................. 13

                4.      Commitments related to adoption ................................... 15

                5.      Commitments related to shelter care................................ 15

                6.      Commitments in other areas............................................ 16

        C.      Commitments by the State Defendant........................................ 17

        D.      Monitoring and Enforcement of Settlement Obligations ........... 18

ARGUMENT........................................................................................................ 20

I.      PROVISIONAL CLASS CERTIFICATION SHOULD BE
        GRANTED............................................................................................. 20

        A.      Numerosity Is Satisfied. ............................................................ 22

        B.      There are Common Questions of Law and Fact......................... 23

        C.      Plaintiffs' Claims Are Typical of Each Settlement Class. ......... 24

i

D.      The Named Child Plaintiffs Have Adequately Represented
        Each Class. ................................................................................. 25

E.      Certification Under Fed. R. Civ. P. 23(b)(2) ............................... 26

II.     PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS
        SETTLEMENT CLASS COUNSEL. ..................................................... 28

III.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS
        APPROPRIATE. .................................................................................... 29

A.      The Terms of the Proposed Settlement Provide a Substantial
        Benefit to the Settlement Classes. .............................................. 32

B.      The Complexity and Expense of Continued Litigation Favor
        Preliminary Approval. ................................................................. 36

C.      The Settlement Is the Result of Arm's-Length Negotiation,
        Which Favors Granting Preliminary Approval. .......................... 40

D.      Financial considerations .............................................................. 41

IV.     THE PROPOSED NOTICE PROGRAM IS APPROPRIATE. ............. 42

V.      PROPOSED SCHEDULE OF EVENTS ............................................... 44

CONCLUSION ........................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................. 27

*Coley v. Clinton*,
    635 F.2d 1364 (8th Cir.1980) ................................................................ 27

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) .............................................................. 39

*DeBoer v. Mellon Mortg. Co.*,
    64 F.3d 1171 (8th Cir. 1995) ......................................................... 25, 31

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ................................................................ 42

*In re Control Data Corp. Sec. Litig.*,
    116 F.R.D. 216 (D. Minn. 1986)........................................................... 24

*In re Employee Benefit Plans Sec. Litig.*,
    No. 3-92-708, 1993 WL 330595 (D. Minn. June 2, 1993) ......................... 38

*In re Nat'l Arb. Forum Trade Pracs. Litig.*,
    No. 10-2122, 2011 WL 13135575 (D. Minn. Aug. 8, 2011) ...................... 42

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass 2005)............................................................... 31

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    MDL No. 14-2522, 2016 WL 2757692 (D. Minn. May 12, 2016).............. 42

*In re UnitedHealth Group Inc. S'holder Derivative Litig.*,
    631 F. Supp. 2d 1151 (D. Minn. 2009) .............................................. 31, 40

*In re UnitedHealth Grp. Inc. PSLRA Litig.*,
    643 F. Supp. 2d 1094 (D. Minn. 2009) .................................................. 39

*In re Uponor, Inc., F1807 Plumbing Fittings Poducts Liab. Litig.*,
    2012 WL 2512750, at *7 (D. Minn. June 29, 2012)........................ 30, 38, 39

*In re Wireless Tel Fed. Cost Recovery Fees Litig.*,
  396 F.3d 922 (8th Cir. 2005) ............................................................... 31, 32

*In re Xcel Energy, Inc.*,
  364 F. Supp. 2d 1005 (D. Minn. 2005).......................................... 31, 38, 40

*Karsjens v. Jesson*,
  283 F.R.D. 514 (D. Minn. 2012)................................................................ 24

*Katun Corp. v. Clarke*,
  484 F.3d 972 (8th Cir. 2007) .................................................................... 29

*Liddell by Liddell v. Board of Educ. of the City of St. Louis*,
  126 F.3d 1049 (8th Cir. 1997) .................................................................. 29

*Lockwood Motors, Inc. v. Gen. Motors Corp.*,
  162 F.R.D. 569 (D. Minn. 1995)........................................... 22, 23, 24, 26

*M.B. by Eggemeyer v. Corsi*,
  327 F.R.D. 271 (W.D. Mo. 2018) ....................................................... 25, 28

*Officers for Justice v. Civil Serv, Comm'n of City & Cty. of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) .................................................................... 39

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ............................................................ 30, 32

*Portz v. St. Cloud State Univ.*,
  297 F. Supp. 3d 929 (D. Minn. 2018)................................................. 27, 28

*Schmidt v. Fuller Brush Co.*,
  527 F.2d 532 (8th Cir.1975) ..................................................................... 39

*Snell v. Allianz Life Ins. Co. of N. Am.*,
  CIV. 97-2784 RLE, 2000 WL 1336640 (D. Minn. Sept. 8, 2000) ............. 39

*U.S. Fid. & Guar. Co.*, 585 F.2d 860, 875 (8th Cir. 1978) ............................. 27

*Unitarian Universalist Church of Minnetonka v. City of Wayzata*,
  890 F. Supp. 2d 1119 (D. Minn. 2012)..................................................... 30

*Van Horn v. Trickey*,
  840 F.2d 604 (8th Cir 1988) ..................................................................... 31

iv

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................. 23, 27

*White v. Nat'l Football League*,
    822 F. Supp. 1389 (D. Minn. 1993) ............................................... 30, 32, 42

**STATE STATUTES**

Minn. Stat. § 626.556 ............................................................................. passim

**OTHER AUTHORITIES**

4 Herbert B. Newberg, *Newberg on Class Actions*, § 11.25 (4th ed. 2002)............... 22, 30

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84
    N.Y.U. L.Rev. 97, 132 (2009) ................................................................... 23

## INTRODUCTION

Plaintiffs' counsel submit this memorandum on behalf of the Plaintiff Minor Children, who are represented by their respective Court-appointed Next Friends, and the proposed Settlement Classes in support of their motion under Federal Rule of Civil Procedure 23(e) for preliminary approval of the settlement reached by the parties and for provisional certification of the proposed Settlement Classes for purposes of effectuating the settlement.

The Plaintiffs in this class action allege that Defendant Hennepin County's child welfare and child protection system is not doing all that it should to protect children in the system. Plaintiffs are fourteen children who are or have been in Hennepin County's child welfare and child protection system, many of whom have suffered abuse and neglect at the hands of their biological and foster families. Plaintiffs brought this action seeking to represent two classes of children: the "special relationship" class, which consists of all children in the County's child welfare and child protection system, and the "maltreatment" class, which consists of children who are or will be the subject of maltreatment reports in Hennepin County. The Defendants are the State Commissioner of the Department of Human Services, Hennepin County, Hennepin County's Department of Human Services and Public Health, and various officials in Hennepin County's Department of Human Services. The individual Defendants are named solely in their official capacities.

1

After two years of litigation, including dispositive motion practice before this Court, and months of intense negotiations with the significant assistance of retired United States Magistrate Judge Arthur Boylan and retired Chief Justice of the Minnesota Supreme Court Kathleen Blatz, the parties have reached a settlement, which is memorialized in the Stipulation and Settlement Agreement attached as Exhibit 1 to the Declaration of James L. Volling ("Volling Decl.").

The settlement is intended to resolve and settle all disputes and claims among the parties. The settlement, among other things, creates a four-year settlement period under which the Defendants and Plaintiffs agree to take specific steps to work together to address the issues raised by Plaintiffs in this litigation. The settlement provides several mechanisms for oversight, assessment, periodic reporting, and public disclosure of the actions taken under the settlement.

Pursuant to the Settlement Agreement, the parties agree that the claims asserted in the Amended Complaint will be dismissed without prejudice. The Named Child Plaintiffs and members of the Settlement Classes will not provide releases to the Defendants, but agree that they will not pursue the existing claims in the Second Amended Complaint or substantially similar claims, unless the Court determines there has been a material and unremedied breach of the Stipulation and Settlement Agreement.

The proposed settlement is an outstanding result for each proposed Settlement Class, given the uncertainties, risks, and costs of continued litigation, trial, and potential appeals. Plaintiffs' counsel fully support the settlement, having concluded that it is fair,

reasonable, adequate, and in the best interests of the Named Child Plaintiffs and each proposed Settlement Class.

Accordingly, the Named Child Plaintiffs, by their Next Friends, respectfully request that the Court provisionally certify each proposed Settlement Class for purposes of settlement; grant preliminary approval of the proposed settlement; approve the notice plan; and set a schedule for the final approval process.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Claims and Defenses in this Action

Plaintiffs commenced an action against the Hennepin County Defendants and the State Defendant by filing their Complaint on May 31, 2017, and thereafter filed a First Amended Complaint and then filed a Second Amended Complaint on May 24, 2018. In their pleadings, Plaintiffs' asserted four claims: (1) that Defendants' policies, customs, or practices violated Plaintiffs' substantive due process right to protection from harm; (2) that Defendants violated Plaintiffs' right to a permanent home; (3) that Defendants violated the Adoption Assistance and Child Welfare Act; and (4) that the Hennepin County Defendants conducted untimely and negligent investigations of maltreatment reports.  These claims were based on Plaintiffs' allegations that, *inter alia*, Hennepin County's child welfare and child protection system is not doing all that it should to protect children in the system by failing to set and maintain appropriate caseloads to enable caseworkers to work effectively with children and families, failing to investigate or assess reports of alleged abuse or neglect, failing to conduct complete and adequate

investigations when it does investigate those reports, misusing shelter care resources, failing to provide necessary and adequate services to children and families, failing to develop and maintain adequate and appropriate foster care and adoptive resources, failing to protect children from maltreatment while in foster care, failing to provide permanency to children on a timely basis, and failing to address high rates of maltreatment re-reporting, maltreatment recurrence, and foster care re-entry.

Plaintiffs did not seek monetary damages in this action, but rather requested injunctive relief relating to the operation of the County's child welfare and child protection system. They commenced this action as a putative class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of two prospective classes, the "Maltreatment Report Class" and the "Special Relationship Class." These classes are defined in the Stipulation and Settlement Agreement as follows:

i.    Maltreatment Report Settlement Class.  All children who were the subject of maltreatment reports made or referred to Hennepin County during the Class Period that were or should have been investigated or assessed by Defendants pursuant to Minn. Stat. § 626.556.

ii.   Special Relationship Settlement Class.  All children for whom Hennepin County had legal responsibility and/or a special relationship in the context of the child protection system during the Class Period.

(Settlement Agreement § 3.) The Class Period is defined in the Agreement as the period from May 31, 2011, through the Execution Date of the Settlement Agreement, which was June 28, 2019. (*Id.* § 1.c)

Defendants filed two motions to dismiss, asserting that all of the claims should be dismissed. The Court dismissed Count III with prejudice on February 16, 2018, and dismissed Count II with prejudice on September 26, 2018. The Court denied Defendants' motions with respect to Counts I and IV.

The Hennepin County Defendants and the State Defendant continue to assert numerous defenses and deny any liability to Plaintiffs. These defenses were based on, *inter alia*, their contentions that they have been taking steps to remedy the issues raised by Plaintiffs. As set forth in the Stipulation and Settlement Agreement, prior to this action, in 2014, the Hennepin County Board of Commissioners adopted a Resolution directing a comprehensive review of children and youth services across County departments.  (Settlement Agreement § 2.a.) In connection with this review, Hennepin County commissioned the Casey Foundation to assess the effectiveness of the Child and Family Services' ("CFS") child protection intake system (screening, assessment, investigation, and closure/transition) in addressing child safety, risk, and family need. (*Id.*)

The Casey Report found that the CFS Program "has been dramatically impacted by [the] need to accommodate a series of drastic budget cuts" and that "[e]very part of the agency's child protection assets, from screening through investigation and case

management, has been negatively affected."  (Settlement Agreement § 2.a.i.)  The Casey

Report further found that "major organizational initiatives have damaged the CFS

workforce." (*Id.*)

The Casey Report identified three key recommendations:  (1) initiate a re-

visioning process of the CFS Program; (2) reconsider past reorganization efforts; and (3)

provide additional caseworker positions, case aides, and administrative staff for the child

protection screening and investigative units and re-examine requirements "with the goal

of freeing up caseworkers to spend more time with children and parents." (Settlement

Agreement § 2.a.ii.)

In addition to the challenges identified by the Casey Report, Hennepin County

experienced a significant rise in reports of child maltreatment since 2015, further

impacting an already overtaxed system. (Settlement Agreement § 2.b.)

Hennepin County contends that it has made significant efforts to address the issues

raised in the Casey Report and to respond to increasing child protection caseloads,

including:

    i.      Hennepin County created the Child Protection Oversight Committee to

            review Hennepin County's practices and make recommendations to address

            the issues identified by the Casey Report;

    ii.     Hennepin County increased funding for the CFS Program through its

            property tax levy, and overall expenditures for the CFS Program increased

by $48 million from 2013 to 2017 and by an additional $13.1 million from 2017 to 2018;

iii.    Hennepin County more than doubled the number of staff in CFS and substantially reduced workforce turnover; and

iv.    Hennepin County made significant improvements in finding and recruiting relatives to take in children who have been removed from their homes, and reformed and improved the services that are offered to families in order to prevent the removal of children from their homes.

(Settlement Agreement § 2.c.)

Hennepin County also created the Child Well-Being Advisory Committee as the permanent successor to the Oversight Committee, which is made up of 18 community and child welfare system experts.  (Settlement Agreement § 2.d.) The Child Well-Being Advisory Committee advises the County on implementation of:

i.    Best practices to advance the well-being of children and embed a child well-being practice model;

ii.    Requirements and recommendations from the Minnesota Department of Human Services, the Governor's Task Force on Child Protection, and the Legislative Task Force on Child Protection; and

iii.    Recommendations from the Child Protection Oversight Committee and the Casey Report.

(*Id.*)  The Committee also updates the County Board on progress toward child well-being outcomes and identifies and advances recommendations to the County Board. (*Id.*)

In addition to various legal defenses, the County asserts that it has made progress and remains committed to further improving its child welfare and child protection system, including improving timeliness in responding to reports of maltreatment, continuing to reduce caseloads, and reducing maltreatment recurrence, foster care re-entry, maltreatment in foster care, as well as improving placement stability. (Settlement Agreement § 2.e.)

## II.     The Parties' settlement discussions

Following the Court's issuance of its Memorandum and Order on Defendants' second Motions to Dismiss (Dkt. 157), the parties agreed to mediate the case in an effort to reach a settlement. They retained retired United States Magistrate Judge Arthur Boylan and retired Minnesota Supreme Court Justice Kathleen Blatz to serve as co-mediators.

The first mediation session was held on Friday, November 30, 2018. Over the next several months, Magistrate Judge Boylan and Chief Justice Blatz supervised the settlement process and presided over numerous negotiating sessions, including in-person and telephone meetings. During this period, counsel for the Plaintiffs and Defendants held numerous additional meetings in person and by phone. In addition, counsel for the State Defendant had separate conferences with the counsel for the Hennepin County Defendants.

The parties first exchanged a draft settlement agreement in early December 2018. During their negotiations, the parties exchanged numerous drafts of the agreement. By early May 2019, the parties had agreement on the principle terms of the settlement, but final resolution required that appropriate funding be provided by the Minnesota Legislature. After the legislative session closed on May 25, 2019, with the necessary appropriations, the parties were able to reach final resolution over the next several weeks. The Stipulation and Settlement Agreement was completed and signed as of June 28, 2019.

During the settlement discussions, Plaintiffs' counsel investigated the facts and analyzed the law relating to the matters set forth in the Second Amended Complaint, including the review of documents and other discovery produced by the Hennepin County Defendants and the State Defendant. Based on that investigation and analysis, Plaintiffs' counsel concluded that the settlement with the Hennepin County Defendants and the State Defendant according to the terms set forth in the Stipulation and Settlement Agreement is fair, reasonable, and adequate, and beneficial to, and in the best interests of, Plaintiffs and the putative Settlement Classes, given the uncertainties, risks, and costs of litigation.

The Hennepin County Defendants and the State Defendant also agreed that the Agreement is in the best interests of Plaintiffs, the Hennepin County Defendants, and the State Defendant. The settlement will not be deemed or construed to be an admission or evidence of any violation of any statute, law, rule, or regulation, or of any liability or

wrongdoing by the Hennepin County Defendants and/or the State Defendant, or of the truth of any of Plaintiffs' claims or allegations, or of the viability or truth of any of Defendants' defenses and denials of liability.

## III.    Summary of the Principal Benefits of the Settlement

Under the terms of the settlement, the Hennepin County Defendants and the State Defendant each agreed to separate undertakings to address the issues and concerns raised by Plaintiffs. Plaintiffs, in turn, also agreed to an ongoing commitment to involvement in a process to help develop specific goals and practices to address those issues and concerns. The Agreement also includes various reporting provisions that will enable the parties to monitor and evaluate progress.

### A.    Settlement Structure

The Stipulation and Settlement Agreement establishes a structure that will be in place for four years following the date of final approval. During that period, the parties' respective obligations and undertakings will be directed and monitored primarily by a six-member Settlement Subcommittee working in conjunction with, but separate from, the existing Child Well-Being Advisory Committee. Plaintiffs and Hennepin County each will be entitled to appoint two members of the Subcommittee. (Settlement Agreement § 5.d.iv.) The Managing Director at Casey Family Programs will serve as a non-voting, *ex officio* member of the Subcommittee. (*Id.*) Finally, the Subcommittee will be chaired by John Stanoch, former Hennepin County District Court Judge, who will also serve as an independent Neutral with the duties set forth in the Agreement. (*Id.*)

The Plaintiffs also have the right to appoint a representative to serve on the Child Well-Being Advisory Committee. (*Id.* § 5.d.iii.) The representative will be Dianne Heins, as long as she is willing and able to serve.

The Settlement Subcommittee, which will meet at least monthly, will have particular duties as set forth in the Stipulation and Settlement Agreement. In general, its role is to evaluate the results of audits and reviews conducted as specified in the Agreement; to identify, direct, and/or conduct the reasonable and necessary reviews and evaluations identified in the Agreement and to report the findings of such evaluations and reviews to the Child Well-Being Advisory Committee; to have a standing agenda item to present on its work at each meeting of the Child Well-Being Advisory Committee; and to provide strategic guidance and recommendations regarding priority issues and concerns for further analysis and improvement by Hennepin County. (Settlement Agreement § 5.b.iv.) The Settlement Subcommittee also will report at least biannually in writing to the Child Well-Being Advisory Committee and to counsel for the Parties on the progress made to implement this Agreement, and each such report will include a section prepared by the independent Neutral addressing any compliance issues under the Agreement. (*Id.*)

### B.     Commitments by the Hennepin County Defendants

The Hennepin County Defendants committed to use reasonable efforts to fully comply with the requirements of federal and state law with respect to it child welfare and child protection program. (Settlement Agreement § 5.b.i). To assist in those efforts, the Hennepin County Defendants will take the following specific actions:

11

### 1. Provision of data

Within 90 days of the date of final approval, Hennepin County will create and provide to the Settlement Subcommittee a monthly data dashboard which includes items specifically identified in Exhibit A to the Agreement. (Settlement Agreement § 5.b.ii). This dashboard will be in place for the full four-year settlement period. (*Id.*)

### 2. Commitments related to maltreatment reports

Within six months of the date of final approval, the County will (a) develop and implement a multi-disciplinary team approach to screen certain maltreatment reports in or out and to determine the appropriate track response for such reports which are screened in (assessment or investigation); and (b) establish a method to confirm that this multi-disciplinary screening is occurring and report the implementation data to the Settlement Subcommittee. (Settlement Agreement § 5.b.iii.)

The County also will screen in all maltreatment re-reports over which it has jurisdiction and promptly offer and make available services to families.  (Settlement Agreement § 5.b.iv.)  If families decline such services, the County will reassess risk to the children and consult with the County Attorney regarding filing a CHIPS petition. (*Id.*)  Within six months of the date of final approval, the County will establish a method to confirm that this consultation with counsel is occurring and report the implementation data to the Settlement Subcommittee. (*Id.*)

The County also agrees that it will conduct all interviews of children during screening, assessment, or investigation of maltreatment reports outside the presence of

any alleged perpetrator, including a parent, and outside the presence of any parent who has a familial or personal relationship with the alleged perpetrator.  (Settlement Agreement § 5.b.v.) An exception may be made only if there are "exceptional and documented circumstances" such that it would not be in the best interests of the child to do so.  (*Id.*) The County will work with the State to ensure that changes are made to the electronic State Social Services Information System (SSIS) to track compliance with this requirement.  (*Id.*)  The County must also annually audit a statistically-appropriate and mutually-agreed upon sample of caseworker notes or SSIS data for compliance with this requirement and provide the results to the Settlement Subcommittee.  (*Id.*)

### 3.     Commitments related to foster care

Within six months from the date of final approval, Hennepin County will commission an appropriate third party, approved by the Settlement Subcommittee, to complete a comprehensive foster care needs analysis and make recommendations to address current and projected needs for foster care resources.  (Settlement Agreement § 5.b.vi.)  The analysis must include an analysis of current foster parent training, as well as factors or systemic issues which have contributed to maltreatment of children in foster care.  (*Id.*)  The recommendations must be provided to the Settlement Subcommittee and the Child Well-Being Advisory Committee, which will work together to develop a plan with measurable goals and benchmarks and a timeline for achieving them, and will also monitor and assess compliance with them. (*Id.*)

For every foster home in which a child is placed, the caseworker must fully inform the foster parents of the needs of the child and document that the parents have received the information and have articulated or otherwise demonstrated an ability to meet those needs. (Settlement Agreement § 5.b.vii.)

The County will also conduct all interviews of children four years of age or older during monthly caseworker visits outside the presence of the foster parents. (Settlement Agreement § 5.b.viii.) An exception may be made only if there are "exceptional and documented circumstances" such that it would not be in the best interests of the child to do so. (*Id.*) The County will work with the State to ensure that changes are made to the electronic State SSIS to track compliance with this requirement. (*Id.*) The County must also annually audit a statistically-appropriate and mutually-agreed upon sample of caseworker notes or SSIS data for compliance with this requirement and provide the results to the Settlement Subcommittee. (*Id.*)

The County further will establish and maintain a review team to provide quarterly reviews of cases involving children who have been in foster care for longer than 24 months and are without a permanency disposition or are state wards. (Settlement Agreement § 5.b.ix.) The members of the review team will be identified to the Settlement Subcommittee and will include Program Managers, Supervisors and Assistant County Attorneys. (*Id.*) The team will review impediments to permanency, including adoption. (*Id.*) The team will submit biannual reports on its work to the Settlement Subcommittee. (*Id.*)

14

### 4.    Commitments related to adoption

Hennepin County will ensure, subject to any applicable court orders, that no pre-adoptive placement is made until the adoptive parents have received all information known to the County about the child, have been informed in writing that they will have an opportunity to meet with the child's service providers, foster parents, and others who know the child, and have articulated or otherwise demonstrated an ability to meet the needs of the child. (Settlement Agreement § 5.b.x.) The potential adoptive parents may decline in writing a meeting with the collateral sources, but this declination will be considered in evaluating them as an adoption resource.  (*Id.*) If the home study or other information known to the County indicates the potential adoptive parents are unwilling or unable to meet the child's needs, the County will evaluate and document in writing how those issues will be overcome if the adoption proceeds. (*Id.*)

The County also will utilize the Minnesota Public-Private Adoption Initiative to manage recruitment of adoptive resources for state wards for whom Hennepin County has not identified an adoptive resource within 12 months of the termination of parental rights. (Settlement Agreement § 5.b.xi.)

### 5.    Commitments related to shelter care

During the settlement period, Hennepin County will provide quarterly reports to the Settlement Committee and the Child Well-Being Advisory Committee on trends in shelter use, and request that those bodies provide recommendations to improve County practices and policies related to the use of shelter care. (Settlement Agreement § 5.b.xii.)

In addition to this reporting function, within 18 months of the date of final approval, the County will work with the Settlement Subcommittee and the Child Well-Being Advisory Committee to re-vision shelter care in Hennepin County and develop, establish, and implement protocols and practice standards to address limitations on the use of shelter care, limitations on the use of institutional shelter care for young children, and ensuring uninterrupted full-day education and other needed services to children in shelter care. (Settlement Agreement § 5.b.xiii.)  The County will also work with its shelter care providers to build a trauma-informed shelter system that addresses children's therapeutic, cultural, and educational needs. (*Id.*)

## 6.       Commitments in other areas

The Settlement Agreement provides that the parties will work together on other issues as well. First, within 12 months of the date of final approval, the County will work with the Settlement Subcommittee and the Child Well-Being Advisory Committee to develop, establish, and implement protocols and practice standards for case plans. (Settlement Agreement § 5.b.xiv.)  Second, within 18 months of the date of final approval, the County will work with the Settlement Subcommittee and the Child Well-Being Advisory Committee to develop, establish, and implement protocols and practice standards relating to trial home visits. (Settlement Agreement § 5.b.xv.)  Finally, during the four-year settlement period, Hennepin County will make a good-faith effort to work on a timely basis to develop, establish, and implement protocols, practice standards, and/or recommendations to address other issues or concerns identified by the Settlement

Subcommittee or the Child Well-Being Advisory Committee. (Settlement Agreement §
5.b.xvi.)

      **C.**      **Commitments by the State Defendant**

      The State Defendant serves a different role in the child welfare and child

protection system from the County, and thus has a different set of commitments. Those

commitments are, first, that it will conduct monthly audits of at least five percent of

Hennepin County's maltreatment report screen-outs and at least five percent of the

County's response track assignments (investigation or assessment) of screened-in reports.

(Settlement Agreement § 5.c.i.) Hennepin County will in turn provide the audit results to

the Settlement Subcommittee and will also provide any underlying data and records

requested by the Settlement Subcommittee. (*Id.*)

      Second, the State Department of Human Services will conduct annual audits of the

case records of at least 10 percent of Hennepin County state wards for whom an adoptive

resource has not been identified within 24 months after termination of parental rights.

(Settlement Agreement § 5.c.ii.) Again, Hennepin County will provide the audit results to

the Settlement Subcommittee and will also provide any underlying data and records

requested by the Settlement Subcommittee. (*Id.*)

      Third, the State Defendant will take all reasonable actions necessary to request and

implement any necessary modifications to its SSIS database to allow tracking of

information related to interviews of children apart from parents, alleged perpetrators, and

foster parents, as required by the Agreement. (Settlement Agreement § 5.c.iii.)

Finally, the State will, by December 31, 2019, appropriate and provide $2,250,000.00 to Hennepin County to accomplish the objectives of the settlement. (Settlement Agreement § 5.c.iv.) This amount is over and above the federal funds and other monies the Department of Human Services would otherwise distribute to Hennepin for its child welfare and child protection system. (*Id.*)

### D.    Monitoring and Enforcement of Settlement Obligations

The parties have also agreed to several mechanisms to monitor and enforce the terms of the Stipulation and Settlement Agreement. As noted above, the Settlement Subcommittee will meet at least monthly and will report regularly on progress under the Agreement.

In addition, for the length of the four-year settlement period, Hennepin County's Continuous Quality Improvement Team will evaluate the findings of any audits of Hennepin County performed by the State Department of Human Services and any reviews conducted by the Hennepin Collaborative Safety Team. (Settlement Agreement § 5.d.i.) The Quality Improvement Team will provide an annual report of those evaluations to the Settlement Subcommittee. (*Id.*) Hennepin County also will provide the Settlement Subcommittee the specific reviews and audits identified in Exhibit B to the Agreement and will also provide any underlying data and records requested by the Settlement Subcommittee. (*Id.*)

In addition, the Settlement Subcommittee can direct Hennepin County to gather data and records for review or analysis, or to conduct reviews, analyses, or audits, which

are not otherwise included in the terms of the Agreement, on any issue of concern in the child welfare and child protection system or to measure progress on identified goals or compliance with the Agreement. (Settlement Agreement § 5.d.ii.) The parties agree that this work at the direction of the Settlement Subcommittee will not exceed 600 hours of staff time in a calendar year, and that this work is in addition to any hours expended by Hennepin County to comply with specific obligations under the Agreement. (*Id.*)

Hennepin County also agrees to take additional actions to promote transparency and public disclosure around its Child and Family Services Program.  Specifically, the County agrees to conduct an annual meeting separate from the periodic County Board of Commissioners meetings, for this purpose, and to prepare an annual written report addressing the actions and priority issues and concerns identified by the Settlement Subcommittee and the Child Well-Being Advisory Committee. (Settlement Agreement § 5.e.)

The parties have agreed to a mechanism for resolving disputes under the Stipulation and Settlement Agreement. Any dispute among the parties about interpretation of the Agreement or compliance with the obligations imposed by the Agreement will first be submitted to the mediators, retired Magistrate Judge Arthur Boylan and retired Minnesota Supreme Court Chief Justice Kathleen Blatz, for resolution. (Settlement Agreement § 8.d.)   If resolution by the mediators is unsuccessful, the parties may bring the dispute to this Court for final resolution. (*Id.*)

Finally, the Agreement does not contain any releases that will be granted by the Plaintiffs. Rather, upon final approval, the remaining two claims in the Second Amended Complaint will be dismissed without prejudice. (Settlement Agreement § 4.a.) All of the members of the Settlement Classes will be bound by the settlement and dismissal. While no releases are provided, the Named Child Plaintiffs and the members of the Settlement Classes will not bring the same or substantially similar claims within the four-year settlement period, unless permitted to do so by the Court after a finding that there has been a material and unremedied breach of the Agreement. (*Id.* § 4.c.) At the same time, none of the Plaintiffs or members of the Settlement Classes are prohibited from asserting individual claims seeking individual, as opposed to systemic, relief for injuries arising from their particular circumstances. (*Id.*)

The Stipulation and Settlement Agreement, therefore, is largely self-executing, with no need for ongoing Court monitoring or supervision. Rather, the parties have established a structure to work together to develop and implement solutions to the challenges faced by the Hennepin County child welfare and child protection system. They have also established a robust system for measuring and evaluating progress toward their agreed-upon goals.

## ARGUMENT

### I. Provisional Class Certification Should Be Granted.

Plaintiffs respectfully request that the Court provisionally certify each of the proposed Settlement Classes for purposes of effectuating the settlement. To qualify for

certification, an action must satisfy all of the provisions of Federal Rule of Civil

Procedure 23(a), plus one of the subdivisions of Federal Rule of Civil Procedure 23(b).

Rule 23(a) requires the proponents of certification to establish each of the following: (1)

that the members of the proposed class are so numerous that joinder of the individual

claims would be impracticable; (2) that there are questions of law or fact common to the

class; (3) that the claims of the proposed class representatives are typical of the claims of

the class members; and (4) that the proposed class representatives will adequately

represent the interests of the class.  As relevant here, Fed. R. Civ. P. 23(b)(2) requires that

the defendants have acted or refused to act on grounds that apply generally to the class,

so that final injunctive relief or corresponding declaratory relief is appropriate respecting

the class as a whole.

       As noted above, Plaintiffs are seeking provisional certification of two separate

Settlement Classes, as follows:

    i.     Maltreatment Report Settlement Class.  All children who were the subject

        of maltreatment reports made or referred to Hennepin County during the

        Class Period that were or should have been investigated or assessed by

        Defendants pursuant to Minn. Stat. § 626.556.

    ii.    Special Relationship Settlement Class.  All children for whom Hennepin

        County had legal responsibility and/or a special relationship in the context

        of the child protection system during the Class Period.

As discussed in more detail below, all of the certification requirements for settlement purposes are met and Defendants consent to certification. *See* 4 Herbert B. Newberg, *Newberg on Class Actions*, § 11.25 (4th ed. 2002) ("*Newberg*") ("When the court has not yet entered a formal order determining that the action may be maintained as a class action, the parties may stipulate that it be maintained as a class action for the purpose of settlement only.")

### A. Numerosity Is Satisfied.

Each of the proposed Settlement Classes is sufficiently numerous to satisfy Rule 23(a)(1) because there are thousands of class members. As of the time the Second Amended Complaint was filed, the Special Relationship Class consisted of at least 1,600 children who were then in foster care placements or otherwise in the legal and/or physical custody of Hennepin County. (Dkt. 86 ¶ 35.) The membership of that class will have grown as new children entered the system through the time the Stipulation and Settlement Agreement was executed.  The Maltreatment Report Class consists of thousands of children who have contact with the Hennepin County child protection system as the subjects of maltreatment reports. (*Id.*) Hennepin County received over 17,000 maltreatment reports in 2017 alone.

For a class action to be appropriate, the proposed class must be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). Impracticable does not mean impossible, only difficult or inconvenient to join all members of the class. *See Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995).

Courts in this District have determined that putative class sizes of 40 will support a

finding of numerosity. *Id.* Each of the proposed Settlement Classes here far exceeds that

threshold.

### B.    There are Common Questions of Law and Fact.

A common question, for purposes of Rule 23(a)(2), is a "common contention" that

is "of such a nature that it is capable of classwide resolution – which means that

determination of its truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

(2011). What matters is "the capacity of a classwide proceeding to generate common

*answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda,

*Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.Rev. 97, 132 (2009)).

"Rule 23 does not set forth a mere pleading standard," so a party seeking class

certification must "prove that there are *in fact* . . . common questions of law or fact."

*Dukes,* 564 U.S. at 350. The existence of a single, common question will satisfy Rule

23(a)(2). *Id.* at 359.

Here, with respect to the Special Relationship Class, Plaintiffs contend there a

common questions relating to the Defendants' alleged failure to protect members from

physical, psychological, and emotional harm; the alleged failure to take reasonable steps

to make it such that class members who are returned to their parents do not re-enter foster

care; and the alleged failure to make sufficient efforts to place members in a permanent

home in a reasonable period of time. With respect to the Maltreatment Report Class,

Plaintiffs contend there are common questions regarding the alleged failure to conduct timely and adequate investigations. These issues are all further subject to common questions of law, because they allege systemic failures that violate the class members' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and constitute negligence under Minnesota law. The application of common questions to the alleged violation of rights establishes commonality under Rule 23(a)(2). *See Karsjens v. Jesson*, 283 F.R.D. 514, 518 (D. Minn. 2012) (holding commonality is satisfied when common questions have common answers that drive case resolution, such as "whether Defendants violated Plaintiffs' and Class members' rights").

### C.      Plaintiffs' Claims Are Typical of Each Settlement Class.

The typicality prerequisite is satisfied "when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members." *Lockwood Motors*, 162 F.R.D. at 575. "When the claims or defenses of the representatives and the class are based on the same course of conduct or legal theory, it is thought that the representatives will advance the interest of the class members by advancing his or her own interests." *In re Control Data Corp. Sec. Litig.*, 116 F.R.D. 216, 220 (D. Minn. 1986) (citations omitted). Therefore, it has been held that any differences between the class representative and the putative class must be material to the claims and defenses pled – not merely incidental to the allegations – to defeat typicality. *See Lockwood,* 162 F.R.D. at 575-76. Accordingly, courts have held that the burden of

24

demonstrating typicality is fairly easily met. *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1174 (8th Cir. 1995).

In this case, the legal claims of the Named Child Plaintiffs arise out of the same treatment and experiences in the Hennepin County child welfare and child protection system as the other class members. Thus, with respect to the causes of action alleged, the legal theories underlying the Named Child Plaintiffs' claims are identical to those underlying the claims of all members of each of the proposed Settlement Classes. The claims of all Named Child Plaintiffs and class members arise from Defendants' alleged systemic failures, both with respect to the allegations of inadequate protection and systemic violations of the rights of the members of the Special Relationship Class and with respect to the alleged untimely and inadequate investigations of maltreatment reports for the Maltreatment Report Class. As such, the typicality requirement is satisfied. *See M.B. by Eggemeyer v. Corsi*, 327 F.R.D. 271, 279 (W.D. Mo. 2018) (finding common issues of fact and law for class of children in foster care based on alleged systemic violations of rights).

### D.      The Named Child Plaintiffs Have Adequately Represented Each Class.

Under Rule 23(a)(4), a class representative must also "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In order to meet this requirement, the Court must find that (1) the representatives and their counsel are able and willing to prosecute the action competently and vigorously and (2) each

representative's interests are sufficiently similar to those of the class that it is unlikely

that their goals and viewpoints will diverge. *See Lockwood,* 162 F.R.D. at 576.

In this case, the Named Child Plaintiffs are acting through their Next Friends. The

Court previously appointed all of the Next Friends, either permanently or on a temporary

basis, pending further discussions between the Next Friends and the Named Child

Plaintiffs or other individuals in their lives. (*See* Dkt. 198.) The Court has now, pursuant

to the parties' stipulation, appointed all the Next Friends permanently for purposes of the

settlement. (Dkt. 218.)

The Named Child Plaintiffs, acting through these Next Friends and their counsel,

have vigorously prosecuted this action on behalf of all the class members. They have

repeatedly appeared before this Court tos pursue their claims and have conducted

discovery. They engaged in long and serious negotiations with Defendants. And, under

the terms of the Stipulation and Settlement Agreement, they have agreed to remain

involved for the four-year settlement period to work with the Defendants to design and

implement improvements to the child welfare and child protection system for the benefit

of the Settlement Classes. Thus, each proposed Settlement Class has been and is

adequately represented for purposes of provisionally certifying each Settlement Class.

### E.      Certification Under Fed. R. Civ. P. 23(b)(2)

In addition to Rule 23(a), certifying each proposed Settlement Class is appropriate

because a class action here satisfies the requirement that the Defendants acted or refused

to act on grounds that apply generally to each Settlement Class, so that final injunctive

relief would be appropriate respecting each Settlement Class as a whole. "Rule 23(b)(2)

applies only when a single injunction or declaratory judgment would provide relief to

each member of the class." *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 949 (D.

Minn. 2018) (*quoting Dukes*, 564 U.S. at 360).  The United States Supreme Court and the

Eighth Circuit have recognized that class actions under Rule 23(b)(2) are particularly

appropriate in the context of civil-rights litigation. *See Amchem Prod., Inc. v. Windsor*,

521 U.S. 591 (1997); *see also Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir.1980)

(reversing denial of certification under 23(b)(2) of a class of inmates confined at the state

hospital claiming violation of their constitutional rights); *U.S. Fid. & Guar. Co.*, 585 F.2d

860, 875 (8th Cir. 1978) (affirming certification under 23(b)(2) of a class of female

employees claiming sex discrimination). Indeed, "[b]ecause one purpose of Rule 23(b)(2)

was to enable plaintiffs to bring lawsuits vindicating civil rights, the rule must be read

liberally in the context of civil rights suits." *Coley*, 635 F.2d at 1378 (internal quotation

marks and citation omitted).

In this case, Plaintiffs sought declaratory and injunctive relief that would apply

classwide. The primary relief that they sought were declarations that Defendants had

violated Plaintiffs' and class members' rights and injunctive relief to ensure that

appropriate actions were taken to remedy those violations. (Dkt. 86 at 105-106.) The

relief in the Stipulation and Settlement Agreement likewise provides a classwide remedy,

by implementing a structure to develop, measure, and evaluate improvements to the

entire child welfare and child protection system. As a result, the requirements of Rule

23(b)(2) are satisfied. *See Portz*, 297 F. Supp. 3d at 949; *M.G. by Eggemeyer*, 327 F.R.D. at 282.

## II.    Plaintiffs' Counsel Should Be Appointed As Settlement Class Counsel.

When certifying a class action, Fed. R. Civ. P. 23(g)(1) requires the Court to appoint class counsel. In appointing class counsel, the Court must consider (i) the work counsel has done in identifying or investigating potential claims in the action, (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action, (iii) counsel's knowledge of the applicable law, and (iv) the resources that counsel will commit to representing the class.

Plaintiffs' undersigned counsel satisfy these standards. Plaintiffs' counsel include attorneys from Faegre Baker Daniels LLP, the largest law firm in the State of Minnesota, including James L. Volling, who served as a law clerk for Chief Justice Warren E. Burger of the United States Supreme Court, and who has extensive experience and expertise in complex litigation, including class actions, in state and federal courts throughout the United States. Plaintiffs' counsel also include Marcia Robinson Lowry, an attorney with A Better Childhood, Inc, a non-profit legal advocacy organization, who has extensive experience and expertise in federal child welfare class actions throughout the United States. Finally, Plaintiffs' counsel include Eric Hecker, an experienced civil rights litigator who has successfully represented plaintiffs in numerous class actions and in children's rights cases.

Moreover, Plaintiffs' counsel have demonstrated their commitment to litigating this action and to expending the necessary resources to pursue Plaintiffs' claims. In addition to having vigorously pursued this litigation for several years, after extensive pre-suit investigation, they are committed to ongoing work during the four-year settlement period. Among other things, Plaintiffs intend to appoint an attorney from Faegre Baker Daniels LLP, Dianne Heins, who has extensive experience with the child welfare and child protection system, as one of their representatives on the Settlement Subcommittee and as their representative on the Child-Well Being Advisory Committee. (Settlement Agreement § 5.d.iv.) Faegre Baker Daniels LLP also has agreed to pay all costs of the independent Neutral. (*Id.*)

For all these reasons, Plaintiffs' counsel are well suited to be named as Settlement Class Counsel for purposes of seeking approval of the Stipulation and Settlement Agreement and, if final approval is granted, as continuing to represent the Settlement Classes throughout the settlement period.

## III.   Preliminary Approval Of The Settlement Is Appropriate.

As a matter of long-standing public policy, settlement is a strongly favored method for resolving disputes. *See Katun Corp. v. Clarke,* 484 F.3d 972, 975 (8th Cir. 2007) ("Minnesota courts recognize a 'strong public policy favoring the settlement of disputed claims without litigation.'") (citations omitted); *Liddell by Liddell v. Board of Educ. of the City of St. Louis,* 126 F.3d 1049, 1056 (8th Cir. 1997). It is beyond question that there is an overriding public interest in settling litigation, and this is particularly true

in class action suits. *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,* 111-MD-2247 ADM/JJK, 2012 WL 2512750, at *7 (D. Minn. June 29, 2012) ("The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context." (quoting *White v. Nat'l Football League,* 822 F. Supp. 1389, 1416 (D. Minn. 1993) *aff'd*, 41 F.3d 402 (8th Cir. 1994), *abrogated by Amchem*, 521 U.S. 591.); *Unitarian Universalist Church of Minnetonka v. City of Wayzata,* 890 F. Supp. 2d 1119 (D. Minn. 2012); *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1148 (8th Cir. 1999) ("[S]trong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor.").

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for the compromise of claims brought on a class basis. The procedure for review of a proposed class action settlement is a well-established process. *See* Manual for Complex Litigation § 13.14 (4th ed. 2007) (hereinafter "*Manual*"). First, the Court conducts a preliminary hearing to determine whether the proposed settlement falls within the range of possible judicial approval. *Newberg* § 11.25. At the final approval hearing, the Court will have before it extensive papers submitted in support of the proposed settlement and will be asked to make a determination as to whether the proposed settlement is fair, reasonable, and adequate, under all the circumstances. At this juncture, Plaintiffs and Defendants request only that the Court grant preliminary approval of the settlement.

In determining whether preliminary approval is warranted, the sole issue before the Court is whether the proposed settlement is within the range of what might be found

fair, reasonable, and adequate, so that notice of the proposed settlement can be given to the class members and a hearing scheduled to consider Plaintiffs' motion for final approval of the proposed settlement. *See, e.g., In re Xcel Energy, Inc.,* 364 F. Supp. 2d 1005 (D. Minn. 2005); *see also In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 57 (D. Mass 2005) ("First, the [court] reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and hearing. If so, the final decision on approval is made after the hearing." (citing *Manual* at 173)).

The Eighth Circuit has established four factors for determining whether a proposed settlement is fair, reasonable, and adequate: (1) the merits of plaintiffs' case, weighed against the terms of the settlement; (2) the defendants' financial conditions; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *In re UnitedHealth Group Inc. S'holder Derivative Litig.,* 631 F. Supp. 2d 1151, 1156 (D. Minn. 2009) (citing *In re Wireless Tel Fed. Cost Recovery Fees Litig.,* 396 F.3d 922, 932 (8th Cir. 2005)); *see also Van Horn v. Trickey,* 840 F.2d 604 (8th Cir 1988). At the preliminary approval stage, only the first three factors are considered. *In re Wireless Tel.,* 396 F.3d at 932.

A court may also consider procedural fairness to ensure the settlement is not the product of collusion, but instead resulted from arm's-length negotiations. *In re UnitedHealth Group Inc.,* 631 F. Supp. 2d at 1156; *In re Wireless,* 396 F.3d at 934; *DeBoer,* 64 F.3d at 1178.

Plaintiffs respectfully request that the Court take the first step in this process and grant preliminary approval of the proposed settlement. The proposed settlement clearly satisfies the standard for preliminary approval.

**A.   The Terms of the Proposed Settlement Provide a Substantial Benefit to the Settlement Classes.**

The most important consideration in deciding whether a settlement is fair, reasonable, and adequate is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *Petrovic*, 200 F.3d at 1150 (internal quotations omitted); *In re Wireless Tel.,* 396 F.3d at 932-33. The Court "cannot be expected to balance the scales with the nicety of an apothecary. The very object of compromise 'is to avoid the determination of sharply contested and dubious issues.'" *White,* 822 F. Supp. at 1417 (quotation omitted). Thus, the Court's determination generally "will not go beyond 'an amalgam of delicate balancing, gross approximation and rough justice.'" *Id.* (quotation omitted).

The Court is familiar with the facts of this case from the previous motions to dismiss. (*E.g.*, Dkt. 63.) As the Court previously explained, "all parties acknowledge that a 2015 report by Casey Family Services found serious and systemic problems" in Hennepin County's child protection system. (Dkt. 74 at 2.) Plaintiffs alleged in their Complaint that "Defendants ignored the dangers and harms the systemic failures created for children in their care," and their "allegations include a description of the unspeakable things that have happened to each of them during their time in the Hennepin County

foster-care system." (*Id.* at 9.) While the Defendants disputed that they violated the

children's rights, no one disputes that there is an ongoing need for improvement. As set

forth in the Stipulation and Settlement Agreement, the Hennepin County-commissioned

Casey Report recognized the need for improvement and recommended various actions

that could be taken. (*See* Settlement Agreement § 2.)

The Stipulation and Settlement Agreement in this case establishes a structure that

will significantly improve the Hennepin County child welfare and child protection system

to the benefit of all class members. As described in detail above, the Agreement requires

creation of a Settlement Subcommittee. The Plaintiffs and Defendants each will appoint

two members to that Subcommittee, and it will be chaired by an independent Neutral,

highly respected former Hennepin County District Court Judge John Stanoch.

Through the Settlement Subcommittee, the Parties have agreed to work together to

develop specific policies, protocols, and practices to improve various aspects of the child

welfare and child protection system. Specific targets for improvement include:

- Maltreatment Reports and Investigations.  The Agreement provides for

  developing improved screening of maltreatment reports, to improve the

  response to reports of maltreatment and reduce the number of reports that are

  inappropriately "screened out" of the system. The Agreement focuses in

  particular on maltreatment re-reports, emphasizing the need to make services

  available to families where multiple maltreatment reports are made and to

  reassess the risk where such services are refused. The Agreement further

33

provides for making improvements to the interview process for children, including conducting interviews outside the presence of alleged perpetrators, unless limited exceptions apply. These improvements are all designed to reduce the risk that children will be left in situations where they will suffer abuse and neglect.

- Foster Care. The Agreement provides that Hennepin County will commission a third party to complete a comprehensive foster care needs analysis and make recommendations to address current and projected needs for foster care resources. The Settlement Subcommittee will then work with the Child Well-Being Advisory Committee to develop a plan with specific, measurable goals to achieve the recommended improvements. The Agreement also provides for other improvements in foster care, including ensuring that foster parents are fully informed of the child's needs, that children be interviewed outside the presence of the foster parents during caseworker visits (with limited exceptions), and establishing a review team to provide quarterly reviews of children who have been in foster care for more than 24 months.

- Adoption. The Agreement provides that procedures will be put in place to improve pre-adoptive placements, including ensuring that no pre-adoptive placement is made until the potential adoptive parents have received all information known to Hennepin County about the child and have been given certain information in writing. The Agreement further provides for use of the

Minnesota Public-Private Adoption Initiative to manage recruitment of
adoptive resources for state wards for whom adoptive resources have not been
identified within 12 months of termination of parental rights.

- Shelter Care. The Agreement provides for quarterly reporting on trends in
shelter care use and to develop, among other things, protocols and practice
standards to address limitations on the use of shelter care and the use of
institutional shelter care for young children.

- Additional areas. The Parties also agreed that the Settlement Subcommittee
and the Child Well-Being Advisory Committee will develop protocols and
practice standards for case plans and trial home visits. They also committed to
making good-faith efforts to work on a timely basis to address other areas of
issue or concern identified by the Settlement Subcommittee and/or the Child
Well-Being Advisory Committee.

These provisions address many of the key areas of need identified by Plaintiffs in
this lawsuit. Moreover, the Agreement does not simply set out generic goals, but it
includes specific timelines for developing the plans. It also includes robust provisions for
reporting data, reviewing data, providing information, and other ongoing monitoring of
issues. For example, the Defendants have agreed to provide a data dashboard that will
include detailed information, reported on a monthly basis, that the Settlement
Subcommittee can use to monitor the system. The Agreement provides for regular audits
by the State, and provides that Hennepin County's Continuous Quality Improvement

Team will review the results of those audits and report to the Settlement Subcommittee. The Settlement Subcommittee has additional rights to conduct its own reviews, and Hennepin County has committed up to 600 hours annually of staff time to assist in those reviews.

These provisions afford a substantial benefit to class members. They supply the opportunity for real, measurable improvement in key areas of the child welfare and child protection system. And these improvements offer the prospect of significantly reducing the risk that class members will be exposed to the type of harm described in Plaintiffs' Second Amended Complaint.

### B. The Complexity and Expense of Continued Litigation Favor Preliminary Approval.

Plaintiffs continue to believe that their case has merit and that the issues and concerns identified in their pleadings must be remedied. At the same time, they have considered the challenges they would face in continuing to litigate compared with the remedies provided by this settlement. The Defendants deny having violated any Plaintiff's rights, that they are liable, or that the declaratory and injunctive relief Plaintiffs seek is warranted. Defendants have raised numerous contentions of fact and law with Plaintiffs' case, which are summarized in part in the Agreement, that they believe provide strong defenses, including the actions Hennepin County has already taken to address the issues identified in the Casey Report. In addition, the Court has already dismissed two of the claims Plaintiffs originally brought.  There are complexities to this action and

continued litigation carries substantial risks, including (a) the significant expenses required to conduct the remaining necessary factual and expert discovery, (b) the risk and expense of pursuing a contested motion for class certification, (c) the challenges of pursuing Plaintiffs' claims against Defendants to trial and subsequent appeals, and (d) the inherent difficulties and delays that complex litigation entails. Given all of this, Plaintiffs' counsel believe that the proposed settlement represents an excellent result and eliminates the risk that the putative classes might not otherwise receive the desired classwide declaratory and injunctive relief if the litigation were to continue. In light of the exceptional benefits afforded through the proposed settlement to the Settlement Classes and to avoid the uncertainties of continued litigation, preliminary approval of the settlement is appropriate.

This assessment was made based on a detailed analysis. Prior to entering into the Stipulation and Settlement Agreement, Plaintiffs, through their counsel, conducted discovery, obtaining and reviewing records related to the Named Child Plaintiffs and data regarding the Hennepin County child welfare and child protection system. They also engaged in significant discussions with Defendants and their counsel regarding the status of the Hennepin County child welfare and child protection system, including attending Child Well Being Advisory Committee meetings and being granted access to review detailed data regarding the system.

Plaintiffs' counsel, having many years of experience in complex class action litigation and having negotiated several substantial settlements, took all of this into

account. Plaintiffs' counsel also included attorneys who have litigated similar cases regarding child welfare and child protection systems around the country. Counsel carefully considered and evaluated relevant legal authority and evidence to support the claims asserted against Defendants; the likelihood of prevailing on these claims; the risk, expense, and duration of continued litigation; and the appeals and subsequent proceedings that would likely have occurred in any event. Were the litigation to continue, the amount of time and expense necessary to take this case through trial would be significant, without any assurance that any relief, let alone relief that would provide more significant benefits than those afforded by the proposed settlement, could be achieved. A lengthy trial and the inevitable appeals would not serve the interests of the proposed Settlement Classes, especially in light of the substantial benefits that the proposed settlement furnishes.

Based on this experience and these considerations, Plaintiffs' counsel concluded that the settlement is fair, reasonable, and adequate, and in the best interests of the proposed Settlement Classes and they so advised the Plaintiff Next Friends. As this Court has previously held: "[t]he Court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *See In re Employee Benefit Plans Sec. Litig.,* No. 3-92-708, 1993 WL 330595, at *5 (D. Minn. June 2, 1993). *See also In re Uponor*, 2012 WL 2512750, at *7 ("[C]ourts give great weight to and may rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." (quotations omitted)); *Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018.

Moreover, an evaluation of the benefits of a settlement must be tempered by a recognition that any compromise involves concessions on the part of all settling parties. As this Court has noted: "The Court concludes that, at the time of settlement, there remained significant risk of a null recovery. This risk, balanced against the settlement's substantial recovery, favors approval." *In re UnitedHealth Grp. Inc. PSLRA Litig.,* 643 F. Supp. 2d 1094, 1099 (D. Minn. 2009). *See also Officers for Justice v. Civil Serv, Comm'n of City & Cty. of San Francisco,* 688 F.2d 615, 624 (9th Cir. 1982) (noting that "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandonment of highest hopes.'" (citations omitted)); *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977) (recognizing that a trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained …").

The complexity and expense of class action litigation is well-recognized. *See Schmidt v. Fuller Brush Co.,* 527 F.2d 532, 535 (8th Cir.1975) ("[r]ecognizing that class actions place an enormous burden of costs and expense upon the parties ..."). Moreover, as has been noted in other class action cases, "the various procedural and substantive defenses likely to be argued to the hilt by the…Defendants, the expense of proving [C]lass [M]embers' claims, the certainty of resolution under this Settlement forecloses any subsequent appeals, and the fear that the 'ultimate resolution of the action' ... could well extend into the distant future," all weigh in favor of the settlement's approval. *In re Uponor,* 2012 WL 2512750, at *8 (quoting *Snell v. Allianz Life Ins. Co. of N. Am.,* CIV.

39

97-2784 RLE, 2000 WL 1336640 (D. Minn. Sept. 8, 2000)). The complexity and expense of continuing the litigation favor granting preliminary approval of the proffered settlement.

### C.     The Settlement Is the Result of Arm's-Length Negotiation, Which Favors Granting Preliminary Approval.

The terms of the proposed settlement are the product of arm's-length negotiations conducted between counsel who are highly experienced in complex litigation. *In re UnitedHealth Group Inc.,* 631 F. Supp. 2d at 1158. The proposed settlement was forged in arm's-length negotiations and aided by experienced, independent mediators. While the parties have not completed factual or expert discovery, they have exchanged significant information and, because Defendants are public entities, there are significant public records available for review. Thus, the parties are well-informed about the factual background and merits of their claims and defenses. In such situations, where the parties bargained at arm's-length, there is a presumption in favor of the settlement. *Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018 (quotations omitted).

During the settlement negotiations, Plaintiffs' counsel zealously advanced the position of Plaintiffs and the putative class members and were fully prepared to continue to litigate rather than accept a settlement that was not in the best interests of the Plaintiffs and the class members. Magistrate Judge Boylan and Chief Justice Blatz actively supervised and participated in the settlement discussions and greatly assisted the parties

where needed. As such, this factor weighs in favor of granting preliminary approval of the settlement.

###     D.      Financial considerations

While this class action does not seek monetary relief, there remain significant financial benefits to the settlement. As noted above, in the Agreement, the State Defendant agreed to contribute $2,250,000.00 to help Hennepin County fulfill its obligations under the Agreement. While the State and County are financially solvent entities, the budgetary considerations and necessary fiscal appropriations were available at the present time to ensure that the Defendants are able to comply fully with their obligations. While there is nothing in the record to indicate that the Defendants could not ultimately fund the full relief sought in the Second Amended Complaint if ordered to do so by the Court, the fact that the budgetary issues have been resolved now weighs in favor of the settlement.

Moreover, the Agreement also provides for a one-time payment of attorneys' fees, payable to Plaintiffs' counsel at A Better Childhood, Inc. and at Cuti Hecker Wang LLP. Plaintiffs' counsel at Faegre Baker Daniels LLP have waived any fee recovery, and no counsel will seek fees for any future work. Faegre Baker Daniels LLP has also agreed to pay the costs for the members of the Settlement Subcommittee appointed by Plaintiffs and for the independent Neutral chair of the Settlement Subcommittee. As a result, the proposed settlement fully addresses and satisfies any fee award that may have been sought.

For all these reasons, this factor also supports a finding of preliminary approval of the settlement.

Although the Plaintiffs believe that the proposed settlement merits final approval, the Court need not reach that question yet. The Court is being asked to find only whether the proposed settlement is within the range of possible approval, and whether class members should be notified of the terms of the proposed settlement and the date of a final approval hearing to determine whether the Court should grant final approval. *See White,* 822 F. Supp. at 1399.  Plaintiffs have satisfied the criteria for preliminary approval and the Court should grant preliminary approval of the proposed settlement and order that notice be given to the putative Settlement Classes.

## IV.     The Proposed Notice Program Is Appropriate.

Under Rule 23(e), the Court "must direct notice in a reasonable manner to all Class Members who would be bound by a proposed settlement."  Fed. R. Civ. P. 23(e)(1). Additionally, "the notice must [be] 'reasonably [calculated] to convey the required information and it must afford a reasonable time for those interested to make their appearance.'"  *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 120 (8th Cir. 1975).  In the context of a (b)(2) class, the Court has considerable discretion in determining what constitutes appropriate notice.  *In re Target Corp. Customer Data Sec. Breach Litig.*, MDL No. 14-2522, 2016 WL 2757692, at *2 (D. Minn. May 12, 2016); *In re Nat'l Arb. Forum Trade Pracs. Litig.*, No. 10-2122, 2011 WL 13135575, at *2 (D. Minn. Aug. 8, 2011).

The proposed Settlement Notice, a copy of which is attached as Exhibit 1 to the Declaration of Charles Nauen submitted herewith, will advise Settlement Class members of the case name, docket number, and nature of the action; identify essential terms of the settlement; explain the injunctive relief agreed to by the parties; set forth dates for objecting to the settlement; direct recipients to a website for additional information; and provide specifics on the date, time, and place of the final settlement approval hearing. The Notice will explain that there is no monetary relief for class members associated with the settlement. (*See* Ex. 1 to the Declaration of C. Nauen.) A one-page summary of the Notice has been drafted to accompany the full Settlement Notice. (*See* Ex. 2 to the Declaration of C. Nauen.)

In order to reach the most Settlement Class members possible, the Notice will be posted in all Hennepin County Human Service Centers and Satellite Offices that serve child protection clients.  This includes the Human Service Centers in North Minneapolis, South Minneapolis, Brooklyn Center, Bloomington, and Hopkins, and the Satellite Offices in North Minneapolis, Richfield, Brookdale, Ridgedale, the Sabathani Satellite in Minneapolis, and the Eastside Neighborhood Services Satellite in Minneapolis.  The Notice will also be provided to all shelter providers, group home providers, and residential treatment centers where Hennepin County places children or with which Hennepin County contracts for the provision of foster care services.  (*See* Ex. 3 to the Declaration of C. Nauen.)  In addition, the Notice will be posted in the Hennepin County Juvenile Courthouse, and will be provided to each judge and clerk of the Hennepin

County Juvenile Court, who will be encouraged to alert the parties who appear in front of them to the settlement.  Finally, Hennepin County will set up a webpage with information about the settlement.

In this case, this proposed notice program is a practical way to reach as many Settlement Class members as possible.  Given the class definitions at issue in this case, and the fact that there is no monetary relief associated with this settlement, attempting to mail notices to the potential Settlement Class members would be unwieldly and unduly expensive.  Accordingly, the Court should find that this notice program will provide the best notice practicable under the circumstances and approve the proposed form and method of giving notice to the Settlement Class members.

## V.  Proposed Schedule of Events

The Parties propose the following schedule of events leading to the final approval hearing, as agreed in section 6.a and 6.b of the Stipulation and Settlement Agreement:

| EVENT | DATE |
|---|---|
| Preliminary Approval Hearing | **July 30, 2019** |
| Notice Date | **14 days following date of preliminary approval** |
| Mailing Deadline for Objections | **60 days following Notice Date** |
| Deadline for filing papers in support of Final Approval of Settlement | **21 Days After Objection Deadline** |
| Final Approval Hearing | **Dec. 9, 2019, or such other date as appropriate** |

This schedule is similar to those used in numerous class action settlements and provides due process for Settlement Class members with respect to their rights concerning the proposed settlement.

## CONCLUSION

Plaintiffs and Defendants have reached a comprehensive settlement following extensive discussions and arm's-length negotiations that include very experienced and respected mediators. For all of the above-stated reasons, Plaintiffs respectfully request that the Court:

1. Grant preliminary approval of the proposed settlement reached by Plaintiffs and Defendants;

2. Provisionally certify, for purposes of settlement only, the Settlement Classes specified in the Stipulation and Settlement Agreement, pursuant to Fed. R. Civ. P. 23(a) and 23(b);

3. Appoint Plaintiffs' undersigned counsel as Settlement Class Counsel and approve the Named Plaintiffs as Class Representatives;

4. Approve the Notice Plan as the best practicable means of providing notice of the settlement to the Settlement Classes;

5. Establish the deadlines for any Settlement Class member to object to the proposed settlement; and

6. Schedule a final approval hearing to consider Plaintiffs' motion for final approval of the proposed settlement and for entry of final judgment.

Dated:  July 12, 2019

Respectfully submitted,

**FAEGRE BAKER DANIELS LLP**


<u>s/ James L. Volling</u>
James L. Volling, MN Atty #113128
 *James.Volling@FaegreBD.com*
Larry E. LaTarte, MN Atty #0397782
 *Larry.LaTarte@FaegreBD.com*
Nathaniel J. Zylstra, MN Atty #0314328
 *Nathaniel.Zylstra@FaegreBD.com*
Nicholas J. Nelson, MN Atty #0391984
 *Nicholas.Nelson@FaegreBD.com*
Jeffrey P. Justman, MN Atty #0390413
 *Jeff.Justman@FaegreBD.com*
Laura Reilly, MN Atty #0397655
 *Laura.Reilly@FaegreBD.com*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone: (612) 766-7000

A BETTER CHILDHOOD, INC.
Marcia Robinson Lowry (admitted *pro hac vice*)
 *mlowry@abetterchildhood.org*
Sarah Jaffe (admitted *pro hac vice*)
 *sjaffe@abetterchildhood.org*
355 Lexington Ave., 16th Floor
New York, New York 10017

CUTI HECKER WANG LLP
Eric Hecker (admitted *pro hac vice*)
 *ehecker@chwllp.com*
305 Broadway
New York, New York 10007

***Attorneys for Plaintiffs***

46