## STIPULATION AND SETTLEMENT AGREEMENT

This Stipulation and Settlement Agreement ("Agreement") is entered into by and among Plaintiffs T.F. by his next friend Tracy Keller; K.D. by his next friend Laura Ferenci; C.O. by her next friend Laura Ferenci; L.L. by his next friend Gerald Kegler; T.T. and M.T. by their next friend Dr. Caryn Zembrosky; T.M., T.E., and A.T. by their next friend James Dorsey; A.W. by his next friend Margaret Shulman; I.W., D.W., and B.W. by their next friend Gloria Anderson; and J.W. by her next friend Margaret Shulman (collectively, "Plaintiffs"), individually and on behalf of the Settlement Classes (as hereinafter defined), on the one hand, and Hennepin County; Hennepin County Department of Human Services and Public Health; David J. Hough, Hennepin County Administrator; Jennifer DeCubellis, Hennepin County Deputy Administrator for Health and Human Services; Jodi Wentland, Hennepin County Director of Human Services (collectively "Hennepin County Defendants")[1] and Tony Lourey, Commissioner, Minnesota Department of Human Services ("the State Defendant"),[2] on the other hand.  This Agreement is submitted pursuant to Fed. R. Civ. P. 23, and is subject to approval and order of the Court.

---

[1] In this action, Defendant Janine Moore, former Director of Hennepin County Child and Family Services, was also named as one of the Hennepin County Defendants.  Ms. Moore was sued in her official capacity only and she is no longer employed by Hennepin County, and there is no current successor to her position.  Accordingly, the Parties stipulate to the dismissal without prejudice of all claims against Defendant Janine Moore, and she is not a Party to this Agreement.

[2] Tony Lourey succeeded Emily Johnson Piper as Commissioner of the Department of Human Services on January 7, 2019 and was substituted as a Defendant to this action pursuant to Fed. R. Civ. P. 25(d).

Exhibit 1

## RECITALS

WHEREAS, Plaintiffs commenced an action against the Hennepin County Defendants and the State Defendant, entitled T.F., et al. v. Hennepin County, et al. (Civ. No. 17-1826 (PAM/BRT)), in the United States District Court for the District of Minnesota by filing their Complaint on May 31, 2017, and thereafter filed a First Amended Complaint and then a Second Amended Complaint on May 24, 2018 (the "Litigation"); and

WHEREAS, Plaintiffs allege, *inter alia*, that Hennepin County's child welfare and child protection system is not doing all that it should to protect children in the system by failing to set and maintain appropriate caseloads to enable caseworkers to work effectively with children and families, failing to investigate or assess reports of alleged abuse or neglect, failing to conduct complete and adequate investigations when it does investigate those reports, misusing shelter care resources, failing to provide necessary and adequate services to children and families, failing to develop and maintain adequate and appropriate foster care and adoptive resources, failing to protect children from maltreatment while in foster care, failing to provide permanency to children on a timely basis, and failing to address high rates of maltreatment re-reporting, maltreatment recurrence, and foster care re-entry; and

WHEREAS, Plaintiffs do not seek monetary damages, but rather request injunctive relief relating to the operation of the County's child welfare and child protection system; and

WHEREAS, Plaintiffs commenced the Litigation as a putative class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of two prospective

Exhibit 1

classes: (1) the "Special Relationship Class," consisting of "all children for whom Hennepin County has or will have legal responsibility and/or a special relationship in the context of the child protection system," and (2) the "Maltreatment Report Class," consisting of "all children who are or will be the subject of maltreatment reports … that are or should be investigated or assessed by Defendants;" and

WHEREAS, Count III of Plaintiffs' Amended Complaint (alleging violations of the Adoption Assistance and Child Welfare Act) was dismissed with prejudice on February 16, 2018, and Count II of Plaintiffs' Second Amended Complaint (alleging Plaintiffs were deprived of their purported right to a permanent home) was dismissed with prejudice on September 26, 2018; and

WHEREAS, after successfully withstanding two sets of motions to dismiss, Plaintiffs have proceeded with Count I of their Second Amended Complaint (alleging violations of their Substantive Due Process rights) against Hennepin County Defendants and the State Defendant and with Count IV of their Second Amended Complaint (alleging negligence) against Hennepin County Defendants (collectively "the Remaining Claims"); and

WHEREAS, Class Counsel (as hereinafter defined) conducted an investigation of the facts and analyzed the law relating to the matters set forth in the Second Amended Complaint, including the review of documents and other discovery produced by Hennepin County Defendants and the State Defendant. Based on that investigation and analysis, Class Counsel concluded that a settlement with Hennepin County Defendants and the State Defendant according to the terms set forth below is fair, reasonable, and adequate, and

Exhibit 1

beneficial to, and in the best interests of, Plaintiffs and the putative classes, given the uncertainties, risks, and costs of litigation; and

WHEREAS, Hennepin County Defendants and the State Defendant assert numerous defenses and deny any liability to Plaintiffs; and

WHEREAS, Plaintiffs, Hennepin County Defendants, and the State Defendant agree that this Agreement is in the best interests of Plaintiffs, Hennepin County Defendants, and the State Defendant and will not be deemed or construed to be an admission or evidence of any violation of any statute, law, rule, or regulation, or of any liability or wrongdoing by Hennepin County Defendants and/or the State Defendant, or of the truth of any of Plaintiffs' claims or allegations, or of the viability or truth of any of Defendants' defenses and denials of liability; and

WHEREAS, arm's-length settlement negotiations have taken place between Class Counsel (as hereinafter defined) and Defendants' Counsel, including multiple mediation sessions with retired Magistrate Judge Arthur Boylan and retired Minnesota Supreme Court Chief Justice Kathleen Blatz, and this Agreement has been reached as a result of those arm's-length negotiations; and

WHEREAS, Plaintiffs, Hennepin County Defendants, and the State Defendant (collectively, the "Parties") desire to resolve and settle all disputed claims between them; and

NOW, THEREFORE, in consideration of the mutual agreements and promises contained in this Agreement, the receipt and sufficiency of which are hereby

Exhibit 1

acknowledged, Plaintiffs, Hennepin County Defendants, and the State Defendant agree as follows:

**1.    Definitions**

a.    "Class Counsel" means, collectively, Faegre Baker Daniels LLP, A Better Childhood, Inc., and Cuti Hecker Wang LLP.

b.    "Class Notice" means the notice to the Settlement Classes that is approved by the Court in accordance with Section 6 of this Agreement.

c.    "Class Period" means the period from and including May 31, 2011 until and including the Execution Date of this Agreement.

d.    "Court" means the United States District Court for the District of Minnesota and The Honorable Paul A. Magnuson or his successor.

e.    "Date of Final Approval" means the date, following the Court's entry of an order granting final approval of this Agreement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, as provided in Section 6 of this Agreement, on which that order becomes final either because no timely appeal is taken or the order is upheld on appeal and no further appeal is possible.

f.    "Date of Preliminary Approval" means the date on which the Court enters an order granting preliminary approval of this Agreement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, as provided in Section 6 of this Agreement.

Exhibit 1

g.      "Execution Date" means the date on which this Agreement is entered into and executed by all Parties or, if executed in counterparts, the date on which the final counterpart is executed.

h.      "Fairness Hearing" means a hearing on the settlement proposal in this Agreement held by the Court to determine whether the proposed settlement is fair, reasonable, and adequate, and whether it should be finally approved by the Court pursuant to Rule 23 of the Federal Rules of Civil Procedure.

i.      "Notice Date" means the date upon which Class Notice is provided to members of the Settlement Classes.

j.      "Notice Program" means the plan for providing notice to members of the Settlement Classes as approved by the Court.

k.      "Objection Deadline" means the date sixty (60) days after the Notice Date (or such other date as is set by the Court) by which members of the Settlement Classes must submit to Class Counsel any objections to this Agreement.

l.      "Order and Final Judgment" means the Order and Final Judgment of the Court approving this Agreement.

m.      "Settlement Classes" means, collectively, the two Classes described in Section 3.a. below.

n.      "Settlement Subcommittee" means the subcommittee described in Section 5.d.iv below.

Exhibit 1

2.    **Hennepin County's Child and Family Services Program**

a.    Prior to the Litigation, in 2014, the Hennepin County Board of Commissioners adopted a Resolution directing a comprehensive review of children and youth services across County departments. In connection with this review, Hennepin County commissioned the Casey Foundation to assess the effectiveness of the Child and Family Services' ("CFS") child protection intake system (screening, assessment, investigation, and closure/transition) in addressing child safety, risk, and family need.

i.    The Casey Report found that the CFS Program "has been dramatically impacted by [the] need to accommodate a series of drastic budget cuts" and that "[e]very part of the agency's child protection assets, from screening through investigation and case management, has been negatively affected." The Casey Report further found that "major organizational initiatives have damaged the CFS workforce."

ii.    The Casey Report identified three key recommendations: (1) initiate a re-visioning process of the CFS Program; (2) reconsider past reorganization efforts; and (3) provide additional caseworker positions, case aides, and administrative staff for the child protection screening and investigative units

Exhibit 1

and re-examine requirements "with the goal of freeing up caseworkers to spend more time with children and parents."

b.    In addition to the challenges identified by the Casey Report, Hennepin County experienced a significant rise in reports of child maltreatment since 2015, further impacting an already overtaxed system.

c.    Hennepin County contends that it has made significant efforts to address the issues raised in the Casey Report and to respond to increasing child protection caseloads, including:

    i.    Hennepin County created the Child Protection Oversight Committee to review Hennepin County's practices and make recommendations to address the issues identified by the Casey Report;

    ii.    Hennepin County increased funding for the CFS Program through its property tax levy, and overall expenditures for the CFS Program increased by $48 million from 2013 to 2017 and by an additional $13.1 million from 2017 to 2018;

    iii.    Hennepin County more than doubled the number of staff in CFS and substantially reduced workforce turnover; and

    iv.    Hennepin County made significant improvements in finding and recruiting relatives to take in children who have been removed from their homes and reformed and improved the

Exhibit 1

services that are offered to families, in order to prevent the removal of children from their homes.

d.     Hennepin County also created the Child Well-Being Advisory Committee as the permanent successor to the Oversight Committee, which is made up of eighteen community and child welfare system experts. The Child Well-Being Advisory Committee advises the County on implementation of:

i.     Best practices to advance the well-being of children and embed a child well-being practice model;

ii.    Requirements and recommendations from the Minnesota Department of Human Services, the Governor's Task Force on Child Protection, and the Legislative Task Force on Child Protection;

iii.   Recommendations from the Child Protection Oversight Committee and the Casey Report; and

iv.    The Committee also updates the County Board on progress toward child well-being outcomes, and identifies and advances recommendations to the County Board.

e.     The County asserts that it has made progress and remains committed to further improving its child welfare and child protection system, including improving timeliness in responding to reports of maltreatment, continuing to reduce caseloads, and reducing

Exhibit 1

maltreatment recurrence, foster care reentry, maltreatment in foster care, as well as improving placement stability.

3. **Settlement Classes**

a.  Based on all of the files, records, and proceedings in the Litigation, including the above Recitals, Plaintiffs will seek, and Defendants agree not to oppose, approval and certification of two settlement classes (the "Maltreatment Report Settlement Class" and the "Special Relationship Settlement Class," or collectively, the "Settlement Classes") under Federal Rule of Civil Procedure 23(b)(2) defined as follows:

i.  Maltreatment Report Settlement Class. All children who were the subject of maltreatment reports made or referred to Hennepin County during the Class Period that were or should have been investigated or assessed by Defendants pursuant to Minn. Stat. § 626.556.

ii.  Special Relationship Settlement Class. All children for whom Hennepin County had legal responsibility and/or a special relationship in the context of the child protection system during the Class Period.

Exhibit 1

4.      **Dismissal Without Prejudice of Remaining Claims and Forbearance from Additional Litigation**

a.      The Parties stipulate to the dismissal of the Remaining Claims without prejudice.  Class Counsel Faegre Baker Daniels LLP agrees not to seek an award of its fees or costs.  Other Class Counsel (A Better Childhood, Inc. and Cuti Hecker Wang LLP), as full and total payment of their reasonable fees and costs, agree to accept the sum of $500,000.00, which amount will be paid by Hennepin County within ten (10) days after the funds from DHS are released to Hennepin County, as provided in Section 5.c.iv below, following the Date of Final Approval.  Such other Class Counsel waive their rights to seek any further award of their reasonable fees and costs.

b.      This settlement and the dismissal without prejudice of the Remaining Claims will be binding upon the "Settlement Classes" consisting of all members of the Special Relationship Settlement Class and the Maltreatment Report Settlement Class.

c.      Plaintiffs, including all members of the Settlement Classes, will not provide any releases to Defendants, but will not reassert or revive the Remaining Claims or substantially similar claims for systemic relief against Hennepin County Defendants or the State Defendant for a period of four (4) years after the Date of Final Approval, unless as expressly permitted by the Court because the Court has determined

11

Exhibit 1

that there has been a material and unremedied breach of this Agreement. If the Court determines that there has been a material and unremedied breach of this Agreement, Plaintiffs may reassert or revive their Remaining Claims or substantially similar claims for systemic relief against only the breaching Party or Parties. Nothing in this Section 4.c precludes Plaintiffs, including all members of the Settlement Classes, from asserting claims alleging a particularized injury arising from their individual circumstances and seeking individual, as opposed to systemic, relief; except that Plaintiffs, including all members of the Settlement Classes, may not allege, as the basis for any such claims, systemic failures or deficiencies in Hennepin County's child welfare and child protection system occurring during the four (4)-year settlement period following the Date of Final Approval.

d.      Plaintiffs will not appeal the February 16, 2018 Order dismissing Count III of their Amended Complaint with prejudice or the September 26, 2018 Order dismissing Count II of their Second Amended Complaint with prejudice.

**5.      Settlement Obligations of Defendants**

a.      As fair and reasonable consideration for the equitable and injunctive relief requested by Plaintiffs in the Litigation, the Parties agree that Defendants will implement the following:

12

Exhibit 1

    b.    Hennepin County Defendants' Commitments

        i.    Hennepin County will use reasonable efforts to fully comply with the requirements of state and federal law, including Minn. Stat. § 626.556 (the Minnesota Maltreatment of Minors Reporting Act); the Minnesota Child Maltreatment Intake, Screening and Response Path Guidelines; Minnesota's Best Practices for Family Assessment and Family Investigation; Minn. Stat. Ch. 260C, including Minn. Stat. § 260C.212, subd. 1 (with respect to creation and implementation of individualized out-of-home placement plans); Minn. Stat. § 260C.212, subd. 2 (with respect to foster care placement decisions being made in the best interests of a child); Minn. Stat. § 260C.212, subd. 4a (with respect to monthly caseworker visits to children in foster care); Minn. Stat. § 260.012(e) (with respect to making reasonable efforts to finalize permanency plans for children in out-of-home placements); Minn. Stat. § 260C.605 (with respect to making reasonable efforts to finalize adoptions, including reasonable efforts to place siblings together); and the Juvenile Protection Rules, and applicable court orders (with respect to providing services to children and families during trial home visits).

Exhibit 1

ii.      Within ninety (90) days from the Date of Final Approval and for a period of at least four (4) years from the Date of Final Approval, Hennepin County will create and provide to the Settlement Subcommittee and the Child Well-Being Advisory Committee a data dashboard to track data on the County's Child and Family Services Program. The data dashboard will be updated monthly, will be in the form of the CWB Metrics Report (a copy of which from Year-End 2018 is included as part of EXHIBIT A), and will include the data items identified on EXHIBIT A.

iii.     Within six (6) months from the Date of Final Approval, Hennepin County will develop and implement a team screening approach for addressing maltreatment reports. Decisions regarding whether a report is screened-in or screened-out and, if the report is screened-in, whether it is assigned to the family investigation track or the family assessment track, will be made by a multidisciplinary team, except with regard to the following types of reports that are automatically screened-in or screened-out. Reports of maltreatment at a facility, reports of educational neglect, birth match reports referred to Hennepin County from DHS, reports involving alleged maltreatment by an individual required to

14

Exhibit 1

register as a predatory sex offender, and reports requiring an immediate child protection response due to the nature of the allegations, are all automatically screened-in and assigned to the appropriate investigation track (except that reports of educational neglect are assigned to the appropriate investigation or assessment track). Reports that fail to allege facts constituting child maltreatment, additional reports with no new information on an allegation that has already been investigated or assessed, additional reports on an allegation that is being investigated or assessed, and reports involving allegations of maltreatment occurring outside of Hennepin County's jurisdiction are all automatically screened out. Decisions made by a multidisciplinary team will not delay the first face-to-face contact with the child reported to be maltreated. The team will include, as appropriate and available in any particular case, representatives of the following: Hennepin County Child and Family Services; Hennepin County Attorney's Office; and community partners (*e.g.*, Minneapolis Public Schools, etc.). Within six (6) months from the Date of Final Approval, Hennepin County will establish a method to confirm that such team screening is occurring, and Hennepin County will report this implementation data to the

15

Exhibit 1

Settlement Subcommittee.  Hennepin County will not disclose any attorney-client privileged information to the Settlement Subcommittee.

iv.   Hennepin County will screen-in maltreatment re-reports over which it has jurisdiction unless they do not meet the statutory standards for such reports.  Hennepin County will offer and make promptly available to parents appropriate services.  If the parents decline to participate in those services, Hennepin County will reassess the risk to children who are the subjects of maltreatment re-reports, and will consult with the Hennepin County Attorney's Office regarding potential filing of Child in Need of Protective Services petitions.  Within six (6) months from the Date of Final Approval, Hennepin County will establish a method to confirm that such consultation is occurring, and Hennepin County will report this implementation data to the Settlement Subcommittee. Hennepin County will not disclose any attorney-client privileged information to the Settlement Subcommittee.

v.    Consistent with Minnesota's Best Practices for Family Assessment and Family Investigation, any interview of a child conducted as part of screening, family assessment, or family investigation of a maltreatment report will be conducted by

16

Exhibit 1

Hennepin County outside the presence of any alleged perpetrator (including a parent) and outside the presence of any parent who has a familial or personal relationship with the alleged perpetrator (unless there are exceptional, documented circumstances such that it would not be in the child's best interest to do so). Within thirty (30) days from the date of Final Approval, the State Defendant, in coordination with Hennepin County, will request that Minnesota IT Services ("MNIT") make any necessary database modifications that allow the tracking of the interview information provided for in this Section 5.b.v, the State Defendant will make all reasonable efforts to obtain from MNIT a determination regarding its request for database modifications within sixty (60) days following the request, and all reasonable efforts will be made to have those necessary database modifications implemented within twelve (12) months from the date of the request to MNIT. In any event, within ninety (90) days from a determination that MNIT cannot or will not make the necessary database modifications, Hennepin County will require that caseworkers enter into the "caseworker notes" field of the database the interview information provided for in this Section 5.b.v. In addition, Hennepin County will annually review

17

Exhibit 1

and/or audit a statistically-appropriate and mutually-agreed sample of the relevant caseworker notes or the interview data in the database for compliance with this Section 5.b.v, and the results will be provided to the Settlement Subcommittee.

vi.   Within six (6) months from the Date of Final Approval, Hennepin County will commission from an appropriate third party (which must be approved by the Settlement Subcommittee) a foster care needs analysis and plan to address current and projected needs for foster care resources. The analysis will include a summary and description of available foster care placements (including the licensed capacity of each available placement resource and whether any variance to increase the number of foster children authorized to be in the placement resource has been granted within the last three (3) years), an analysis of how well the available foster home resources match the current and projected needs (including cultural needs) of children who are in foster care or are projected to enter foster care, an analysis of shortages of specific types of foster care resources (such as therapeutic foster homes or foster homes for sibling groups or for children of specific ages), an analysis of current foster parent training and preparation, and an analysis of systemic issues or factors related to individual foster care

18

Exhibit 1

providers which have contributed to maltreatment in foster care. The analysis will also include recommendations for Hennepin County to meet current and projected needs for foster care placements by recruiting additional resources which can meet specific, identified systemic needs and/or for developing alternative placement options (such as placements that allow parents to remain with their children while they participate in treatment, expanding use of kinship care, additional foster parent training and preparation, and addressing systemic issues or factors related to selection of individual foster homes that contribute to maltreatment in foster care). The Hennepin County foster care resources analysis and recommendations will be reviewed and assessed by the Settlement Subcommittee and by the Child Well-Being Advisory Committee, which together will develop a plan with measurable goals and benchmarks and a timeline for achieving them, and will review and assess compliance with them.

vii.    For every foster home in which Hennepin County places a child, the responsible caseworker will apprise the foster parents of the needs of the child and will document that the foster parents have received the information about the child's needs

19

Exhibit 1

and have articulated and otherwise demonstrated an ability to meet those needs.

viii.    With respect to monthly caseworker visits to children in foster care, any child four (4) years of age or older will be interviewed at these visits outside the presence of their foster parents, unless there are exceptional, documented circumstances such that it would not be in the child's best interest to do so. Within thirty (30) days from the Date of Final Approval, the State Defendant, in coordination with Hennepin County, will request that Minnesota IT Services ("MNIT") make any necessary database modifications that allow the tracking of the interview information provided for in this Section 5.b.viii, the State Defendant will make all reasonable efforts to obtain from MNIT a determination regarding its request for database modifications within sixty (60) days following the request, and all reasonable efforts will be made to have those necessary database modifications implemented within twelve (12) months from the date of the request to MNIT. In any event, within ninety (90) days from a determination that MNIT cannot or will not make the necessary database modifications, Hennepin County will require that caseworkers enter into the "caseworker notes" field of the database the interview

20

Exhibit 1

information provided for in this Section 5.b.viii.  In addition, Hennepin County will annually review and/or audit a statistically-appropriate and mutually-agreed sample of the relevant caseworker notes or the interview data in the database for compliance with this Section 5.b.viii, and those results will be provided to the Settlement Subcommittee.  Hennepin County will not disclose any attorney-client privileged information to the Settlement Subcommittee.

ix.    Hennepin County will establish and maintain a review team to provide ongoing quarterly review of cases involving children who are under the guardianship of the Commissioner of Human Services or who have no permanency disposition and who have been in foster care for more than twenty-four (24) months.  The members of the review team will include Program Managers, Supervisors, and Assistant County Attorneys, all of whom will be identified to the Settlement Subcommittee.  The purpose of the review team is to identify any specific impediments that are keeping a child from being reunified with his or her parents; to review the child's placement and permanency plan and determine whether they are appropriate for the child; and, for children under the guardianship of the Commissioner of Human Services, to

Exhibit 1

identify child-specific recruitment efforts to locate an adoptive resource. The review team will submit biannual reports about its work to the Settlement Subcommittee.

x.   Subject to applicable court orders, for every child who is under the guardianship of the Commissioner of Human Services, no pre-adoptive placement will be made until the potential adoptive parents: (a) have received, both orally and in writing, all information known by Hennepin County about the child's history (including health history), needs, current circumstances and condition; (b) have been informed in writing that they will have an opportunity to meet with the child's service providers, foster parents, and others with knowledge of the child if they so desire, which they may decline in writing (but any declination of that opportunity will be considered in evaluating the potential adoptive parents as an appropriate resource); and (c) have articulated and otherwise demonstrated their ability to meet the needs of the child. If the adoptive home study or any other information provided to Hennepin County by or about the potential adoptive parents indicates that the potential adoptive parents have an unwillingness or inability to parent a child whose needs or behavior are like those of the child to be placed, Hennepin County will evaluate and document in

Exhibit 1

writing how those issues would be overcome if the adoption proceeded.

xi.    For any child under the guardianship of the Commissioner of Human Services for whom an adoptive resource has not been identified within twelve (12) months after the child was placed by court order under the guardianship of the Commissioner, Hennepin County will utilize the Minnesota Public-Private Adoption Initiative of the Minnesota Department of Human Services to manage recruitment of an adoptive resource for the child.

xii.    For a period of four (4) years from the Date of Final Approval, Hennepin County will provide quarterly reports to the Child Well-Being Advisory Committee and the Settlement Subcommittee regarding trends in shelter use, and will request that the Child Well-Being Advisory Committee and the Settlement Subcommittee provide recommendations for potential improvements in Hennepin County's policies and procedures relating to the use of shelter care.

xiii.    Within eighteen (18) months from the Date of Final Approval, Hennepin County will work with the Child Well-Being Advisory Committee and the Settlement Subcommittee to identify priority concerns and offer guidance for re-visioning

Exhibit 1

shelter care in Hennepin County, and to develop, establish, and implement protocols and practice standards addressing such concerns as:  limiting the duration of a child's placement in shelter care absent exceptional, documented circumstances; facilitating the transition to an appropriate foster home, kinship home, other licensed or therapeutic placement, or return to the parents or custodians from whom the child was removed; limiting placement of children under a certain age in a shelter care facility unless they have exceptional, documented needs that can only be met in a specialized program or facility; providing, if possible, uninterrupted full-day education for school-age children who are placed in shelter care, preferably at the same school they attended prior to placement; and continuing services which a child has been receiving at the time the child is placed in shelter care (including, but not limited to, mental health services, medication management, and services related to a disability) during the child's shelter placement. Hennepin County will coordinate with its shelter-care providers to develop and implement consistent placement standards to:  build a trauma-informed system; address children's educational needs; ensure cultural competency; and address children's therapeutic needs.

24

Exhibit 1

xiv.    Within twelve (12) months from the Date of Final Approval, Hennepin County will work with the Child Well-Being Advisory Committee and the Settlement Subcommittee to develop, establish and implement protocols and practice standards regarding case plans and services addressing such concerns as: identification in individualized case plans of all services necessary to meet the needs of children (including, but not limited to, health care, mental health care, medication management, disability-related services, educational services, and visitation services); review and modification of individualized case plans while children are in out-of-home placements or on trial home visits; prompt and consistent provision of necessary services across placements and during any trial home visits; and provision of safe and appropriate transportation services.

xv.    Within eighteen (18) months from the date of Final Approval, Hennepin County will work with the Child Well-Being Advisory Committee and the Settlement Subcommittee to develop, establish and implement protocols and practice standards regarding trial home visits addressing such concerns as: development of service plans and presentation of those service plans to parents in advance of trial home visits;

Exhibit 1

inclusion in service plans of all appropriate and necessary services during trial home visits; elimination or minimization of any disruption of ongoing services to children as a result of their return home; timely provision of new services after children's return home; frequency of caseworker home visits and interviewing of children during those caseworker home visits; anticipated dismissal dates after trial home visits begin; and monitoring of conditions in homes for a sufficient length of time to ensure children's safety and successful transition into their homes.

xvi.  During the four (4) years of the settlement period, the Child Well-Being Advisory Committee and/or the Settlement Subcommittee may identify additional areas and issues of concern related to the effective functioning of Hennepin County's child welfare and child protection system and the safety and well-being of children in the system.  If so, Hennepin County will make a good-faith effort to work on a timely basis in consultation with the Child Well-Being Advisory Committee and/or the Settlement Subcommittee to develop, establish, and implement protocols, practice standards, and/or recommendations addressing those areas and issues of concern.  In doing so, every reasonable effort will be

26

Exhibit 1

made to create action plans, timelines, measurable goals and benchmarks, and appropriate random sample reviews in connection with those protocols, practice standards, and/or recommendations.

c.    The State Defendant's Commitments

   i.    On a monthly basis, the Minnesota Department of Human Services ("DHS") will audit (utilizing standards consistent with state and federal law and best practices) at least five percent (5%) of Hennepin County's decisions to screen-out maltreatment reports and will audit at least five percent (5%) of Hennepin County's track assignments for maltreatment reports that are screened-in.  The results of such audits will be provided to Hennepin County, which will promptly make the results available to the Settlement Subcommittee for review pursuant to Section 5.d.i of this Agreement.  Hennepin County will also provide any requested underlying data and records to the Settlement Subcommittee as part of the County's obligations under Section 5.d.ii of this Agreement.

   ii.    On at least an annual basis, DHS will audit (utilizing standards consistent with state and federal law and best practices) the case records of at least ten percent (10%) of the state wards for whom Hennepin County is the Commissioner's agent and for

Exhibit 1

whom no adoptive resource has been identified within twenty-four (24) months after the child was placed by court order under the guardianship of the Commissioner. The results of such audits will be provided to Hennepin County, which will promptly make the results available to the Settlement Subcommittee for review pursuant to Section 5.d.i of this Agreement. Hennepin County will also provide any requested underlying data and records to the Settlement Subcommittee as part of the County's obligations under Section 5.d.ii of this Agreement.

iii. The State Defendant will take all reasonable actions necessary to request and implement any necessary database modifications that allow the tracking of additional information as provided for in Sections 5.b.v and 5.b.viii of this Agreement. The Parties recognize that any database modification to be performed by the State Defendant first requires the approval and assistance of Minnesota IT Services ("MNIT"), a State agency that is not party to this lawsuit. The State Defendant does not represent or warrant whether MNIT will approve or assist with any database modification.

iv. By December 31, 2019, DHS will appropriate and provide to Hennepin County an additional amount of $2,250,000.00, over

Exhibit 1

and above the federal funds and other monies DHS would otherwise distribute to Hennepin County for its child welfare and child protection system, in order to accomplish the objectives of this Agreement and the settlement reached by the Parties.

d.    Ongoing Oversight and Assessment

i.    For a period of at least four (4) years from the Date of Final Approval, Hennepin County's Continuous Quality Improvement Team ("CQI Team") will evaluate the findings of any audits performed by DHS (including the audits provided for in this Agreement and the MnCSFR audits) and any reviews by Hennepin County's Collaborative Safety Team. In addition, the leadership of the CQI Team ("CQI Governance Team") will provide an annual written report to the Child Well-Being Advisory Committee and the Settlement Subcommittee regarding the CQI Team's evaluation of audit/review findings and any resulting conclusions and recommendations. Upon request and consistent with applicable confidentiality and privacy requirements, Hennepin County will with reasonable promptness provide the findings from the DHS audits, the Collaborative Safety Team reviews, and the audits and reviews

Exhibit 1

identified in EXHIBIT B, as well as any requested underlying records and data, to the Settlement Subcommittee.

ii.    Moreover, for a period of at least four (4) years from the Date of Final Approval, the Settlement Subcommittee can direct Hennepin County to gather data and records for review and analysis or to conduct reviews, analyses, or audits, which are not otherwise required under the other terms of this Agreement, relating to any priority concerns or issues regarding the Hennepin County child welfare and child protection system or to measure progress on identified goals and/or compliance with this Agreement, including, for example, assessments of:  foster care placements that were made and/or that disrupted; adoptions that were finalized and/or that disrupted; shelter care placements; new and continuing individualized case plans; case records of trial home visits; and implementation of new protocols and/or practice standards.  Such reviews, analyses, or audits will be reasonable and necessary and will utilize professionally-accepted, statically-appropriate, mutually-agreed standards, and such work at the direction of the Settlement Subcommittee will be done efficiently and will not exceed six hundred (600) hours in a calendar year, which hours are in addition to, and

Exhibit 1

not inclusive of, the hours expended by Hennepin County to comply with Hennepin County's specific obligations under the other terms of this Agreement. Hennepin County will coordinate with the Settlement Subcommittee to provide meaningful data and an annual accounting of its work and the hours expended.

iii. For a period of at least four (4) years from the Date of Final Approval, Plaintiffs will appoint Dianne Heins (or another designee subject to approval by Hennepin County if Dianne Heins is unable or unwilling) to serve on Hennepin County's Child Well-Being Advisory Committee.

iv. Hennepin County will establish and maintain, for a period of at least four (4) years from the Date of Final Approval, a Settlement Subcommittee of the Child Well-Being Advisory Committee, which will: evaluate the results of the audits and reviews, and identify, direct, and/or conduct the reasonable and necessary reviews, identified in this Agreement and in EXHIBIT B, and report the findings of such evaluations and reviews to the Child Well-Being Advisory Committee; have a standing agenda item to present on its work at each meeting of the Child Well-Being Advisory Committee; and provide strategic guidance and recommendations regarding priority

31

Exhibit 1

issues and concerns for further analysis and improvement by Hennepin County. The Settlement Subcommittee will meet at least monthly and will consist of the following five (5) voting members: two (2) members appointed by Plaintiffs subject to approval by Hennepin County, one (1) of whom will be Dianne Heins, so long as she is able and willing to serve, and one (1) of whom will be Susan Ault, former Senior Director at Casey Family Programs, so long as she is able and willing to serve; two (2) members appointed by Hennepin County, one (1) of whom at least initially will be Jodi Wentland, Director of Hennepin County Human Services, and one (1) other to be designated by Hennepin County; and John Stanoch, former Hennepin County District Court Judge, who will act as chair and serve as the independent Neutral, subject to appointment by the Court. In addition, Eric Fenner, Managing Director at Casey Family Programs, will serve as a non-voting *ex officio* member of the Settlement Subcommittee, unless Hennepin County determines, after consultation with Mr. Fenner, that the position of non-voting *ex officio* member can be eliminated. All costs related to the Settlement Subcommittee members appointed by Hennepin County and all costs related to the non-voting *ex officio* member (unless otherwise paid by Casey

Exhibit 1

Family Programs) will be paid by Hennepin County. All costs related to the Settlement Subcommittee members appointed by Plaintiffs and all costs related to the independent Neutral will be paid by Class Counsel Faegre Baker Daniels LLP. The Settlement Subcommittee will report at least biannually in writing to the Child Well-being Advisory Committee and to counsel for the Parties on the progress made to implement this Agreement, and each such report will include a section prepared by the independent Neutral addressing any compliance issues under this Agreement.

    e.    Reporting and Public Disclosure

        i.    For a period of at least four (4) years from the Date of Final Approval, to promote transparency and public disclosure of information related to the County's Child and Family Services Program, Hennepin County will conduct an annual meeting, separate from County Board of Commissioners meetings, and will prepare a written annual report addressing the actions and priority issues and concerns identified by the Child Well-Being Advisory Committee and the Settlement Subcommittee.

**6.    Approval of Settlement Agreement**

    a.    Plaintiffs, Hennepin County Defendants, and the State Defendant will use their best efforts to effectuate this Settlement Agreement,

Exhibit 1

including cooperating in promptly seeking the Court's approval of the Settlement Agreement, the giving of appropriate Class Notice under Federal Rules of Civil Procedure 23(c) and (e), securing certification of the Settlement Classes, and the prompt dismissal without prejudice of the Remaining Claims, as follows:

i.    Within seven (7) days after the Execution Date, the Parties will jointly file with the Court a stipulation for suspension of all litigation deadlines pending approval of this Agreement.

ii.    Within fourteen (14) days of the Execution Date, Class Counsel will file this Agreement with the Court and will file a motion—which motion Defendants will not oppose—for the Court's preliminary approval of this Agreement and the Parties' settlement. Plaintiffs simultaneously will move the Court for the entry of an Order preliminarily approving the settlement, which by its terms will:

1)    Determine, preliminarily, that this Agreement and the settlement fall within the range of reasonableness, and merit possible final approval and dissemination of Class Notice;

2)    Determine, preliminarily, that Plaintiffs are members of the Settlement Classes and that, for purposes of settlement, they: (1) satisfy the requirements of

34

Exhibit 1

typicality; (2) adequately represent the interests of the Settlement Classes; and (3) should be appointed as representatives of the Settlement Classes;

3)      Determine, preliminarily, that the Settlement Classes meet all applicable requirements of Fed. R. Civ. P. 23, and conditionally certify the Settlement Classes for purposes of the Settlement;

4)      Appoint Faegre Baker Daniels LLP, A Better Childhood, Inc., and Cuti Hecker Wang LLP as Class Counsel pursuant to Fed. R. Civ. P. 23(g);

5)      Schedule a Final Approval Hearing to: (1) determine, finally, whether the Settlement Classes satisfy the applicable requirements of Fed. R. Civ. P. 23 and should be finally certified for settlement purposes only; (2) review objections, if any, regarding the settlement; (3) consider further the fairness, reasonableness, and adequacy of the settlement; and (4) consider whether the Court will issue the Final Order and Judgment Approving Settlement and will dismiss the Remaining Claims without prejudice;

6)      Set a briefing schedule for the Final Approval Hearing;

Exhibit 1

7)   Consider and determine that the proposed Class Notice and Notice Program meet the requirements of Fed. R. Civ. P. 23(c)(2)(A) and due process and provide appropriate notice;

8)   Direct Class Counsel and Defendants' Counsel to cause the Class Notice to be distributed on or before the Notice Date in the manner set forth in the Notice Program, the cost of which will be paid by Hennepin County;

9)   Require any member of any Settlement Class who wishes to object to the fairness, reasonableness, or adequacy of the settlement to submit to Class Counsel, postmarked on or before the Objection Deadline, a statement of his or her objection, as well as the specific reason(s), if any, for each objection, including any legal support that the Settlement Class member wishes to bring to the Court's attention and any evidence that the Settlement Class member wishes to introduce in support of his/her objection, and to state whether the Settlement Class member and/or his/her counsel wish to make an appearance at the Final Approval Hearing, or be barred from separately objecting;

36

Exhibit 1

10) Suspend and extend all applicable pretrial deadlines in the Litigation so that Plaintiffs, Hennepin County Defendants, and the State Defendant will in no way be prejudiced by their efforts to resolve the Litigation by means of this settlement; and

11) Establish (1) the date and time of the Final Approval Hearing; (2) the Notice Date; and (3) the Objection Deadline.

iii. Within fourteen (14) calendar days after the Court's preliminary approval of this Agreement and the Parties' settlement, Class Counsel and Defendants' Counsel will cause the Court-approved Class Action Settlement Notice to be distributed to the members of the Settlement Classes, in accordance with the Notice Program.

iv. Members of the Settlement Classes will have sixty (60) days, or such other time as the Court may provide, after the date of the Class Action Settlement Notice to object to the settlement (Objection Deadline).

v. Within twenty-one (21) calendar days after the Objection Deadline, Plaintiffs will file a motion for final approval of this Agreement and the Parties' settlement, which motion

37

Exhibit 1

Defendants will not oppose. Such Final Order and Judgment Approving Settlement will:

1)      Confirm the final certification of the Settlement Classes for settlement purposes only;

2)      Confirm that the Settlement Classes comply with all requirements of Fed. R. Civ. P. 23(b)(2), including confirmation of the adequacy of Plaintiffs as representatives of the Settlement Classes;

3)      Confirm that the Notice Program complied in all respects with the requirements of due process and Fed. R. Civ. P. 23 by providing appropriate notice to the Settlement Classes;

4)      Determine that this Agreement was entered into in good faith, is reasonable, fair, and adequate, and is in the best interest of the Settlement Classes;

5)      Make all appropriate and necessary findings of fact required to enter a final judgment pursuant to Fed. R. Civ. P. 58(b);

6)      Dismiss the Remaining Claims without prejudice and bar Plaintiffs and all members of the Settlement Classes from reasserting the Remaining Claims or substantially similar claims against Hennepin County Defendants

38

Exhibit 1

and/or the State Defendant for a period of four (4) years from the Date of Final Approval, unless as expressly permitted by the Court because the Court has determined that there has been a material and unremedied breach of this Agreement;

7)  Order that each party will bear its own fees and costs in connection with the Litigation and the settlement thereof, except as provided in Section 4.a above;

8)  Refer any disputes regarding the construction and/or enforcement of this Agreement to retired Magistrate Judge Arthur Boylan and former Minnesota Supreme Court Chief Justice Kathleen Blatz (or one of them if the other is unable or unwilling to participate) for resolution prior to bringing any such disputes to the Court and, in the event the Parties are unable to resolve any disputes regarding the construction and/or enforcement of this Agreement, provide for resort to the Court for final dispute resolution during the entire four (4)-year period of the settlement.  The Parties hereby consent to the jurisdiction of the Court solely and exclusively for the purpose of deciding and resolving any disputes between them regarding construction

39

Exhibit 1

and/or enforcement of this Agreement and granting any necessary relief for that purpose alone. The Court will have no jurisdiction to order any other relief, including any relief sought by Plaintiffs in their Complaint but not expressly included as a term of this Agreement.

b. The Parties will exercise their best efforts to schedule the Fairness Hearing within thirty (30) days after the Objection Deadline.

**7. No Admission of Liability**

a. By entering into this Agreement, the Hennepin County Defendants and the State Defendant do not admit any wrongdoing and do not concede the existence of any liability to Plaintiffs and expressly deny any wrongful conduct, and Plaintiffs expressly deny and do not concede that the defenses asserted by Defendants have any validity or that Defendants have no liability to Plaintiffs.

**8. Drafting, Execution, Modification, and Enforcement**

a. This Agreement may be executed and delivered, whether by facsimile, e-mail, overnight delivery, courier, or in person, in two or more counterparts, each of which, when so executed and delivered, will be an original, but such counterparts will together constitute but one and the same instrument and Agreement. This Agreement will be deemed to be executed on the last date any such counterpart is executed.

Exhibit 1

b.      This Agreement is the full and final expression of the agreement between the Parties and supersedes and replaces all prior agreements or understandings of the Parties.  This Agreement may be amended or modified only in a writing signed by all Parties and approved by the Court.  The Parties acknowledge that in entering into this Agreement they have not relied upon representations, warranties, promises, or conditions made by any other Party or any third party.  The Parties acknowledge that each of them has executed this Agreement after independent investigation and without fraud or undue influence.  The Parties acknowledge that they have read the terms of this Agreement, that each of them has had legal counsel, and that each of them has executed this Agreement after receiving advice from their own legal counsel.

c.      The terms and provisions of this Agreement were arrived at through the mutual negotiations and drafting of the Parties, with assistance from their respective attorneys.  Therefore, any and all rules of construction to the effect that ambiguity is construed against the drafting party will be inapplicable in any dispute concerning the terms, meaning, or interpretation of the Agreement.

d.      The Parties agree that any disputes regarding the interpretation of the Agreement, or the performance of or compliance with any obligations pursuant to the Agreement, or the failure to reach mutual agreement

41

Exhibit 1

when such is required by the Agreement, will be initially submitted to retired Magistrate Judge Arthur Boylan and former Minnesota Supreme Court Chief Justice Kathleen Blatz (or one of them if the other is unable or unwilling to participate) for resolution. Thereafter, the Parties may bring any such disputes to the Court for final resolution and disposition.

e.     The Parties agree that this Agreement will be governed by, and construed in accordance with, the laws of the State of Minnesota.

f.     The signatories to this Agreement represent and warrant that each of them has full authority to execute this Agreement on behalf of themselves and/or any other indicated person or entity.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the dates written below.

Exhibit 1

**FOR PLAINTIFFS:**

Dated:  June 23, 2019

_____
Tracy Keller, next friend for T.F.

Dated:  June 24, 2019

_____
Laura Ferenci, next friend for K.D.
and C.O.

Dated:  June 26, 2019

_____
Gerald Kegler, next friend for L.L.

Dated:  June 24, 2019

_____
Dr. Caryn Zembrosky, next friend for
T.T. and M.T.

Dated:  June 24, 2019

_____
James Dorsey, next friend for T.M.,
T.E., and A.T.

Dated:  June 20, 2019

_____
Margaret Shulman, next friend for
A.W. and J.W.

Dated:  June 20, 2019

_____
Gloria Anderson, next friend for
I.W., D.W., and B.W.

43

Exhibit 1

Dated:  June 28 2019

FAEGRE BAKER DANIELS LLP


James L. Volling (#113128)
Larry E. LaTarte (#0397782)
Nathaniel J. Zylstra (#0314328)
Nicolas J. Nelson (#0391984)
Jeffrey P. Justman (#0390413)
Laura Reilly (#0397655)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Tel:    (612) 766-7000
Email: James.Volling@FaegreBD.com
        Larry.LaTarte@FaegreBD.com
        Nathaniel.Zylstra@FaegreBD.com
        Nicolas.Nelson@FaegreBD.com
        Jeff.Justman@FaegreBD.com
        Laura.Reilly@FaegreBD.com


A BETTER CHILDHOOD, INC.

Marcia Robinson Lowry (pro hac vice)
Sarah Jaffe (pro hac vice)
1095 Hardscrabble Road
Chappaqua, NY 10514
Tel:    (844) 422-2425
Email: mlowry@abetterchildhood.org
        sjaffe@abetterchildhood.org

CUTI HECKER WANG LLP

Eric J. Hecker (pro hac vice)
305 Broadway
New York, NY  10007
Tel:    (212) 620-2600
Email: ehecker@chwllp.com

Exhibit 1

**FOR HENNEPIN COUNTY DEFENDANTS:**

Dated:  June ___, 2019

David J. Hough
Hennepin County Administrator

Dated:  June ___, 2019

Jennifer DeCubellis
Hennepin County Deputy Administrator
for Health and Human Services

Dated:  June ___, 2019

Jodi Wentland
Hennepin County Director of
Human Services

Dated:  June ___, 2019

HENNEPIN COUNTY

By: _____

Its: _____
County Board Chair

45

Exhibit 1

Dated:  June 28, 2019

LOCKRIDGE GRINDAL NAUEN
P.L.L.P.

_____
Charles N. Nauen (#121216)
David J. Zoll (#0330681)
Brian D. Clark (#0390069)
Rachel A. Kitze Collins (#0396555)
100 Washington Avenue South, Suite
2200
Minneapolis, MN  55401
Tel:      (612) 339-6900
Fax:     (612) 339-0981
Email:   cnnauen@locklaw.com
             djzoll@locklaw.com
             bdclark@locklaw.com
             rakitzecollins@locklaw.com

Dated:  June __, 2019

HENNEPIN COUNTY ATTORNEY'S
OFFICE

_____
Michael O. Freeman (#0031860)
Daniel P. Rogan (#0274458)
C-2000 Government Center
300 South 6th Street
Minneapolis, MN  55487
Tel:      (612) 348-5550
Fax:     (612) 348-9712
Email:   michael.freeman@hennepin.us
             daniel.rogan@hennepin.us

46

Exhibit 1

Dated: June __, 2019

Dated: June 26, 2019

LOCKRIDGE GRINDAL NAUEN
P.L.L.P.

HENNEPIN COUNTY ATTORNEY'S
OFFICE

_____

_____

Charles N. Nauen (#121216)
David J. Zoll (#0330681)
Brian D. Clark (#0390069)
Rachel A. Kitze Collins (#0396555)
100 Washington Avenue South, Suite
2200
Minneapolis, MN  55401
Tel:      (612) 339-6900
Fax:      (612) 339-0981
Email:    cnnauen@locklaw.com
          djzoll@locklaw.com
          bdclark@locklaw.com
          rakitzecollins@locklaw.com

Michael O. Freeman (#0031860)
Daniel P. Rogan (#0274458)
C-2000 Government Center
300 South 6th Street
Minneapolis, MN  55487
Tel:      (612) 348-5550
Fax:      (612) 348-9712
Email:    michael.freeman@hennepin.us
          daniel.rogan@hennepin.us

46

Exhibit 1

**FOR THE STATE DEFENDANT:**

Dated: June 27, 2019

_____
Tony Lourey
Commissioner, Minnesota Department of
Human Services

Dated: June 28, 2019

OFFICE OF ATTORNEY GENERAL
STATE OF MINNESOTA

_____
Jason Marisam (#0398187)
Janine Kimble (#0392032)
Assistant Attorneys General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
Tel:      (651) 757-1243
Fax:      (651) 282-5832
Email:   jason.marisam@ag.state.mn.us
           janine.kimble@ag.state.mn.us

47

Exhibit 1

# EXHIBIT A

Data Dashboard

The data dashboard required pursuant to Section 5.b.ii of the Agreement will include, in addition to the data contained in the CWB Metrics Report (a copy of which is attached to this Exhibit A), the items identified below. Hennepin County and the Settlement Subcommittee will collaborate to modify the information included in the data dashboard as necessary to provide a complete and relevant assessment of the County's Child and Family Services Program.

Definitions

The following definitions apply to the information to be included in the data dashboard:

1.  "Initial maltreatment report" means a maltreatment report about an individual child that is not a maltreatment re-report or a successive maltreatment report, as defined herein.

2.  "Maltreatment recurrence" as defined in the Federal Performance Standards means a child that was the victim of a substantiated maltreatment report in the prior year who is the victim of another substantiated or indicated maltreatment report within twelve (12) months of their initial report.

3.  "Maltreatment re-report" as defined in the DHS State Performance Measure means an accepted maltreatment report about an individual child who was the subject of an accepted maltreatment report in the prior twelve (12) months.

4.  "Successive maltreatment report" means an accepted maltreatment report about an individual child who was the subject of an accepted maltreatment report in the prior four (4) years and is not a maltreatment re-report because it was not made within twelve (12) months of any prior report.

5.  "State ward" means a child who has been placed by court order under the guardianship of the Commissioner of Human Services and for whom Hennepin County is the Commissioner's delegee.

Exhibit 1

**Information**

A.    Maltreatment Report Data

Maltreatment report data will be arranged by the number of individual children and the children's age groupings (0-5; 6-11; and 12-17) and race/ethnicity.

> 1.    The total number of all maltreatment reports received by Hennepin County;
>
> 2.    The number and percentage of maltreatment reports screened out, and the bases on which they were screened out (this includes reports screened out for any reason, including Hennepin County's lack of jurisdiction);
>
> 3.    The number of initial maltreatment reports received by Hennepin County, and the number and percentage of initial maltreatment reports screened in;
>
> 4.    The number of maltreatment re-reports received by Hennepin County, and the number and percentage of screened out reports that if screened in would have qualified as maltreatment re-reports; and
>
> 5.    The number of successive maltreatment reports received by Hennepin County and the number and percentage of screened out reports that if screened in would have qualified as successive maltreatment reports.

B.    Assessment and Investigation Data

Assessment and Investigation report data will be arranged by the number of individual children and the children's age groupings (0-5; 6-11; and 12-17) and race/ethnicity.

> 1.    Initial Maltreatment Reports
>
> > (a)    The number and percentage of initial maltreatment reports assigned to Family Assessment, Family Investigation and Facilities Investigation;
> >
> > (b)    The number and percentage of children who are the subjects of initial maltreatment reports determined to be victims of maltreatment, by maltreatment type;
> >
> > (c)    The number and percentage of children who are the subjects of initial maltreatment reports determined to be victims of maltreatment who entered out-of-home placement, by primary removal reason;

Exhibit 1

(d)     The number and percentage of children who are the subjects of initial maltreatment reports determined to be victims of maltreatment who were not removed from their homes, by maltreatment type;

(e)     The number and percentage of children who are the subjects of initial maltreatment reports who are determined to be in need of child protective services after a Family Investigation or Family Assessment, and who received such services; and

(f)     By month, the number of child protective services cases opened and the number of child protective services cases closed sorted by the reason for closure.

2.     Maltreatment Re-Reports, Successive Maltreatment Reports and Maltreatment Recurrence

(a)     The number and percentage of children who are the subjects of maltreatment re-reports and successive maltreatment reports, by report type (*i.e.*, maltreatment re-report or successive maltreatment report);

(b)     The number and percentage of maltreatment re-reports and successive maltreatment reports assigned to Family Assessment, Family Investigation or Facilities Investigation, by report type;

(c)     The number and percentage of children who were the subjects of a maltreatment re-report who were determined to be victims of maltreatment recurrence, by maltreatment type;

(d)     The number and percentage of children who were not removed from their home after an initial maltreatment report who experienced a maltreatment recurrence;

(e)     The number and percentage of children who were removed from their homes after an initial maltreatment report who experienced a maltreatment recurrence;

(f)     The number and percentage of children who were the subjects of a successive maltreatment report who were determined to be victims of maltreatment; and

(g)     The number and percentage of children who were the subjects of a maltreatment re-report or successive maltreatment report who were determined after a Family Investigation or Family Assessment to be in need of child protective services and who received such services.

3

Exhibit 1

C.      Permanency Data

Permanency data will be arranged by the number of individual children and the child's age groupings (0-5; 6-11; and 12-17), gender, race/ethnicity, length of out-of-home placement, and primary permanency plan.  For state wards, permanency data also includes the number of months since the child was placed by court order under the guardianship of the Commissioner of Human Services.

    1.      State Wards

        (a)     The number of state wards for whom Hennepin County has placement responsibility;

        (b)     The number and percentage of state wards for whom an adoption was finalized within twelve (12) months, twenty-four (24) months, or more than twenty-four (24) months after they were placed by court order under the guardianship of the Commissioner of Human Services;

        (b)     On a quarterly basis, the number of state wards for whom Hennepin County manages recruitment of an adoptive resource for the child;

        (c)     On a quarterly basis, the number and percentage of state wards for whom the Minnesota Public-Private Adoption Initiative of the Minnesota Department of Human Services or another entity manages recruitment of an adoptive resource for the child;

        (d)     On a quarterly basis, the number and percentage of state wards for whom an adoptive resource has not been identified within twelve (12) months, twenty-four (24) months, or more than twenty-four (24) months after the child was placed by court order under the guardianship of the Commissioner; and

        (e)     On a quarterly basis, the number and percentage of state wards who have experienced disruption or termination of a pre-adoptive or adoptive placement, arranged by number of disruptions or terminations experienced, length of the disrupted or terminated placement(s), kinship status of the placement(s), and causes of the disruption(s) or termination(s).

    2.      Time to Permanency

        (a)     The number of children who have been in out of home placement for twelve (12) to twenty-four (24) months, twenty-four (24) to thirty-

Exhibit 1

six (36) months, and longer than thirty-six (36) months without achieving permanency.

Exhibit 1

**EXHIBIT B**

Child Protection Audits

| Audit | Agency | Timing and Subject Matter |
|-------|--------|---------------------------|
| MnCFSR case review | State | Quarterly random case selection; at least six cases from Hennepin County each quarter. |
| CFSR | Federal | Every four years CFSR federal case review |
| ICWA Case review | State | Review County compliance with ICWA and MIFPA |
| CW-TCM (courtesy) | State | Courtesy audits by DHS (no regularly scheduled audit in place) |
| IV-E | Federal | Every two years |
| DHS Human Services Performance Management | State | Annual review of County performance data on MFIP/DWP Self-Support Index and Child Safety and Permanency; three measures related to Child Safety and Permanency:<br>• Child Repeat Maltreatment<br>• Permanency (reunification)<br>• Relative Placement |
| CW-TCM | Local | SSIS mentor-led monthly 60 case review |
| Collaborative Safety | Local/DHS | Hennepin County reviews certain cases with DHS and other cases internally through a collaborative safety lens to determine where there could be potential improvement; reviews result in recommendations and reports that will be shared with the Settlement Subcommittee |

Exhibit 1