**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| T.F. by his next friend Tracy Keller; K.D. by his next friend Laura Ferenci; C.O. by her next friend Laura Ferenci; L.L. by his next friend Gerald Kegler; T.T. and M.T. by their next friend Dr. Caryn Zembrosky; T.M., T.E., and A.T. by their next friend James Dorsey; A.W. and J.W. by their next friend Margaret Shulman, and I.W., D.W., and B.W by their next friend Gloria Anderson, individually and on behalf of all others similarly situated, | Civil No.  0:17-cv-01826-PAM-BRT |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FINAL CLASS CERTIFICATION** |
| Hennepin County; Hennepin County Department of Human Services and Public Health; David J. Hough, Hennepin County Administrator; Jennifer DeCubellis, Hennepin County Deputy Administrator for Health and Human Services; Jodi Wentland, Hennepin County Director of Human Services; and Jodi Harpstead, Commissioner, Minnesota Department of Human Services, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ......................................... 3

I.     THE CLAIMS AND DEFENSES IN THIS ACTION ............................. 3

II.    THE PARTIES' SETTLEMENT DISCUSSIONS ................................. 8

III.   SUMMARY OF THE PRINCIPAL BENEFITS OF THE SETTLEMENT ........ 10

       A.     SETTLEMENT STRUCTURE ................................................ 10

       B.     COMMITMENTS BY THE HENNEPIN COUNTY
              DEFENDANTS ........................................................................ 12

              1.     Provision of data .......................................................... 12

              2.     Commitments related to maltreatment reports ................. 12

              3.     Commitments related to foster care ................................ 13

              4.     Commitments related to adoption .................................... 15

              5.     Commitments related to shelter care ............................... 16

              6.     Commitments in other areas ........................................... 16

       C.     COMMITMENTS BY THE STATE DEFENDANT ................ 17

       D.     MONITORING AND ENFORCEMENT OF SETTLEMENT
              OBLIGATIONS ...................................................................... 18

ARGUMENT ..................................................................................................... 21

I.     CONFIRMING CLASS CERTIFICATION FOR SETTLEMENT
       PURPOSES IS APPROPRIATE ........................................................... 21

       A.     NUMEROSITY IS SATISFIED .............................................. 22

       B.     THERE ARE COMMON QUESTIONS OF LAW AND FACT ............... 23

C.   PLAINTIFFS' CLAIMS ARE TYPICAL OF EACH
     SETTLEMENT CLASS ........................................................... 24

D.   THE NAMED CHILD PLAINTIFFS AND CLASS COUNSEL
     HAVE ADEQUATELY REPRESENTED EACH CLASS ...................... 25

E.   CERTIFICATION UNDER FED. R. CIV. P. 23(B)(2) ............................ 28

II.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND
      SHOULD BE APPROVED BY THE COURT ...................................... 29

A.   THE SETTLEMENT IS THE RESULT OF ARM'S-LENGTH
     NEGOTIATION BY EXPERIENCED COUNSEL (FED. R. CIV. P.
     23(E)(2)(A) & (B)) ...................................................................... 31

B.   THE EIGHTH CIRCUIT'S FACTORS ALL SUPPORT
     APPROVAL OF THE SETTLEMENT ...................................... 32

     1.   The Settlement Terms Provide a Substantial Benefit to the
          Class Members (Eighth Circuit Factor 1 and Fed. R. Civ. P.
          23(e)(2)(C) & (D)) ............................................................ 32

     2.   Financial Considerations Support the Settlement, Including
          the Provision of a Reasonable Attorneys' Fee Award (Eighth
          Circuit Factor 2 and Fed. R. Civ. P. 23(e)(2)(iii)) ............................ 37

     3.   The Complexity and Expense of Continued Litigation Favor
          the Settlement (Eighth Circuit Factor 3 and Fed. R. Civ. P.
          23(e)(2)(C)(i)) ................................................................. 39

     4.   The Reaction of the Classes Favor the Settlement (Eighth
          Circuit Factor 4) ............................................................ 43

CONCLUSION ........................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Amchem Prod., Inc. v. Windsor,*
    521 U.S. 591 (1997) ............................................................................. 28

*Coley v. Clinton,*
    635 F.2d 1364 (8th Cir. 1980) .......................................................... 28

*Cotton v. Hinton,*
    559 F.2d 1326 (5th Cir. 1977) .......................................................... 42

*DeBoer v. Mellon Mortg. Co.,*
    64 F.3d 1171 (8th Cir. 1995) ...................................................... 25, 44

*In re Control Data Corp. Sec. Litig.,*
    116 F.R.D. 216 (D. Minn. 1986) ...................................................... 24

*In re Employee Ben. Plans Sec. Litig.,*
    No. CIV. 3-92-708, 1993 WL 330595 (D. Minn. June 2, 1993) .......... 41

*In re UnitedHealth Grp. Inc. PSLRA Litig.,*
    643 F. Supp. 2d 1094 (D. Minn. 2009) ............................................ 42

*In re UnitedHealth Grp. Inc. S'holder Derivative Litig.,*
    631 F. Supp. 2d 1151 ........................................................................ 31

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.,*
    396 F.3d 922 ...................................................................................... 32

*In re Xcel Energy, Inc.,*
    364 F. Supp. 2d 1013 .................................................................. 31, 42

*Karsjens v. Jesson,*
    283 F.R.D. 514 (D. Minn. 2012) ...................................................... 24

*Katun Corp. v. Clarke,*
    484 F.3d 972 (8th Cir. 2007) ............................................................ 29

*Liddell by Liddell v. Bd. of Educ. of City of St. Louis*,
    126 F.3d 1049 (8th Cir. 1997) ..............................................29

*Lockwood Motors, Inc. v. Gen. Motors Corp.*,
    162 F.R.D. 569 (D. Minn. 1995) ...................................23, 24, 25, 26

*M.B. by Eggemeyer v. Corsi*,
    327 F.R.D. 271 (W.D. Mo. 2018)...............................................25, 29

*Officers for Justice v. Civil Serv., Comm'n of City & Cty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ..............................................42

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ...................................30, 32

*Portz v. St. Cloud State Univ.*,
    297 F. Supp. 3d 929 (D. Minn. 2018).......................................28, 29

*Schmidt v. Fuller Brush Co.*,
    527 F.2d 532 (8th Cir. 1975) ..............................................39

*Snell v. Allianz Life Ins. Co. of N. Am.*,
    No. CIV. 97-2784 RLE, 2000 WL 1336640 (D. Minn. Sept. 8, 2000)..............39

*U.S. Fid. & Guar. Co. v. Lord*,
    585 F.2d 860 (8th Cir. 1978) ..............................................28

*Unitarian Universalist Church of Minnetonka v. City of Wayzata*,
    890 F. Supp. 2d 1119 (D. Minn. 2012)...............................................30

*Van Horn v. Trickey*,
    840 F.2d 604 (8th Cir 1988) ..............................................30

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ..........................23, 28

*Welsh v. Gardebring*,
    667 F. Supp. 1284 (D. Minn. 1987)...............................................30

*White v. Nat'l Football League*,
    822 F. Supp. 1389 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994),
    *abrogated by Amchem*, 521 U.S. 591 ...................................30, 32, 33

## STATE CASES

*In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*,
　　No. 111-MD-2247 ADM/JJK, 2012 WL 2512750 (D. Minn. June 29,
　　2012) ..............................................................................................30, 32, 39, 42

## FEDERAL STATUTES

Adoption Assistance and Child Welfare Act ...........................................................3

## STATE STATUTES

Minn. Stat. § 626.556..........................................................................................5, 21

## RULES

Fed. R. Civ. P. 23 ..............................................................................................23, 45

Fed. R. Civ. P. 23(a) ..........................................................................................21, 27

Fed. R. Civ. P. 23(a)(1) ...........................................................................................22

Fed. R. Civ. P. 23(a)(2) ......................................................................................23, 24

Fed. R. Civ. P. 23(a)(4) ...........................................................................................25

Fed. R. Civ. P. 23(a) and 23(b) ...............................................................................45

Fed. R. Civ. P. 23(b) ................................................................................................21

Fed. R. Civ. P. 23(b)(2)......................................................................................21, 27

Fed. R. Civ. P. 23(c)(2)(A) ......................................................................................43

Fed. R. Civ. P. 23(e).............................................................................................1, 29

Fed. R. Civ. P. 23(e)(1).......................................................................................43, 44

Fed. R. Civ. P. 23(e)(2)....................................................................................29, 30, 32

Fed. R. Civ. P. 23(e)(2)(iii) .....................................................................................37

Fed. R. Civ. P. 23(e)(2)(A) ...........................................................................26, 27, 32

Fed. R. Civ. P. 23(e)(2)(A) & (B)..................................................................31

Fed. R. Civ. P. 23(e)(2)(B) .........................................................................31

Fed. R. Civ. P. 23(e)(2)(C)(i).....................................................................39

Fed. R. Civ. P. 23(e)(2)(C)(ii)....................................................................33

Fed. R. Civ. P. 23(e)(2)(C)(iii) ...................................................................38

Fed. R. Civ. P. 23(e)(2)(C)(iv)....................................................................38

Fed. R. Civ. P. 23(e)(2)(C) & (D)..........................................................32, 33

Fed. R. Civ. P. 23(e)(3)...............................................................................38

Fed. R. Civ. P. 58(b) ...................................................................................45

## CONSTITUTIONAL PROVISIONS

United States Constitution Fourteenth Amendment Due Process Clause ...............24

## OTHER AUTHORITIES

4 Herbert B. Newberg, *Newberg on Class Actions*, § 13.12 (5th ed. 2019)......22, 29

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*
   84 N.Y.U. L.Rev. 97 (2009) .............................................................23

## INTRODUCTION

Plaintiffs' counsel submit this memorandum on behalf of the Plaintiff Minor Children, who are represented by their respective Court-appointed Next Friends, and the proposed Settlement Classes in support of their motion under Fed. R. Civ. P. 23(e) for final approval of the settlement reached by the parties and for certification of the proposed Settlement Classes for purposes of effectuating the settlement. The Court granted preliminary approval to this settlement on July 31, 2019. (Dkt. 233.) The notice program as approved by the Court was implemented, and no objections to the settlement were received. The Plaintiffs and their counsel therefore respectfully request that the Court grant final approval of the settlement, so that the important and valuable relief agreed to by the parties can be implemented.

The Plaintiffs in this class action allege that Defendant Hennepin County's child welfare and child protection system is not doing all that it should to protect children in the system. Plaintiffs are fourteen children who are or have been in Hennepin County's child welfare and child protection system, many of whom have suffered abuse and neglect at the hands of their biological and foster families. Plaintiffs brought this action seeking to represent two classes of children:  the "special relationship" class, which consists of all children in the County's child welfare and child protection system; and the "maltreatment" class, which consists of children who are or will be the subject of maltreatment reports in Hennepin County. The Defendants are the State Commissioner of the Department of Human Services, Hennepin County, Hennepin County's Department

of Human Services and Public Health, and various officials in Hennepin County's Department of Human Services. The individual Defendants are named solely in their official capacities.

After two years of litigation, including dispositive motion practice before this Court, and months of intense negotiations with the significant assistance of mediators retired United States Magistrate Judge Arthur Boylan and retired Chief Justice of the Minnesota Supreme Court Kathleen Blatz, the parties reached the settlement memorialized in the Stipulation and Settlement Agreement that was previously submitted to the Court and to which the Court granted preliminary approval. (Dkt. 227-1)

The settlement is intended to resolve and settle all disputes and claims among the parties. The settlement, among other things, creates a four-year settlement period during which the Defendants and Plaintiffs agree to take specific steps to work together to address the issues raised by Plaintiffs in this litigation. The settlement provides several mechanisms for oversight, assessment, periodic reporting, and public disclosure of the actions taken under the settlement.

Pursuant to the Settlement Agreement, the parties agree that the claims asserted in the Second Amended Complaint will be dismissed without prejudice. The Named Child Plaintiffs and members of the Settlement Classes will not provide releases to the Defendants, but agree that they will not pursue the existing claims in the Second Amended Complaint or substantially similar claims, unless the Court determines there has been a material and unremedied breach of the Stipulation and Settlement Agreement.

The proposed settlement is an outstanding result for each proposed Settlement Class, given the uncertainties, risks, and costs of continued litigation, trial, and potential appeals. Plaintiffs' counsel fully support the settlement, having concluded that it is fair, reasonable, adequate, and in the best interests of the Named Child Plaintiffs and each proposed Settlement Class.

For these reasons, and as explained further below, the settlement is fair, reasonable, and adequate, and warrants this Court's final approval.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### I.      The Claims and Defenses in this Action

Plaintiffs commenced an action against the Hennepin County Defendants and the State Defendant by filing their Complaint on May 31, 2017, and thereafter filed a First Amended Complaint and then filed a Second Amended Complaint on May 24, 2018. In their pleadings, Plaintiffs asserted four claims: (1) that Defendants' policies, customs, or practices violated Plaintiffs' substantive due process right to protection from harm; (2) that Defendants violated Plaintiffs' right to a permanent home; (3) that Defendants violated the Adoption Assistance and Child Welfare Act; and (4) that the Hennepin County Defendants conducted untimely and negligent investigations of maltreatment

---

[1] Plaintiffs previously described the background of the case in detail in the Memorandum of Support of Motion for Preliminary Approval of Settlement and Provisional Class Certification. (Dkt. 226.) For the Court's convenience, Plaintiffs restate that background in this memorandum.

reports.  (Dkt. 86 at 98-104.) These claims were based on Plaintiffs' allegations that, *inter alia*, Hennepin County's child welfare and child protection system is not doing all that it should to protect children in the system by failing to set and maintain appropriate caseloads to enable caseworkers to work effectively with children and families, failing to investigate or assess reports of alleged abuse or neglect, failing to conduct complete and adequate investigations when it does investigate those reports, misusing shelter care resources, failing to provide necessary and adequate services to children and families, failing to develop and maintain adequate and appropriate foster care and adoptive resources, failing to protect children from maltreatment while in foster care, failing to provide permanency to children on a timely basis, and failing to address high rates of maltreatment re-reporting, maltreatment recurrence, and foster care re-entry. (*See* Dkt. 227-1 at 2.)

Plaintiffs did not seek monetary damages in this action, but rather requested injunctive relief relating to the operation of the County's child welfare and child protection system. (*Id.*) They commenced this action as a putative class action pursuant to Fed. R. Civ. P. 23(b)(2) on behalf of two prospective classes, the "Maltreatment Report Class" and the "Special Relationship Class." These classes are defined in the Stipulation and Settlement Agreement as follows:

    i.       Maltreatment Report Settlement Class.  All children who were the subject of maltreatment reports made or referred to Hennepin County during the

Class Period that were or should have been investigated or assessed by

Defendants pursuant to Minn. Stat. § 626.556.

ii.    Special Relationship Settlement Class.  All children for whom Hennepin

County had legal responsibility and/or a special relationship in the context

of the child protection system during the Class Period.

(*Id.* § 3.) The Class Period is defined in the Agreement as the period from May 31, 2011,

through the Execution Date of the Settlement Agreement, which was June 28, 2019. (*Id.*

§ 1.c)

The Hennepin County Defendants and the State Defendant filed two motions to

dismiss, asserting that all of the claims should be dismissed. The Court dismissed Count

III with prejudice on February 16, 2018, and dismissed Count II with prejudice on

September 27, 2018. (Dkt. 74 & 157.) The Court denied Defendants' motions with

respect to Counts I and IV. (*Id.*)

The Hennepin County Defendants and the State Defendant continue to assert

numerous defenses and deny any liability to Plaintiffs. These defenses were based on,

*inter alia*, their contentions that they have been taking steps to remedy the issues raised

by Plaintiffs. As set forth in the Stipulation and Settlement Agreement, prior to this

action, in 2014, the Hennepin County Board of Commissioners adopted a Resolution

directing a comprehensive review of children and youth services across County

departments.  (Dkt. 227-1 § 2.a.) In connection with this review, Hennepin County

commissioned the Casey Foundation to assess the effectiveness of the Child and Family

Services' ("CFS") child protection intake system (screening, assessment, investigation, and closure/transition) in addressing child safety, risk, and family need. (*Id.*)

The Casey Report found that the CFS Program "has been dramatically impacted by [the] need to accommodate a series of drastic budget cuts" and that "[e]very part of the agency's child protection assets, from screening through investigation and case management, has been negatively affected." (*Id.* § 2.a.i.)  The Casey Report further found that "major organizational initiatives have damaged the CFS workforce." (*Id.*)

The Casey Report identified three key recommendations:  (1) initiate a re-visioning process of the CFS Program; (2) reconsider past reorganization efforts; and (3) provide additional caseworker positions, case aides, and administrative staff for the child protection screening and investigative units and re-examine requirements "with the goal of freeing up caseworkers to spend more time with children and parents." (*Id.* § 2.a.ii.)

In addition to the challenges identified by the Casey Report, Hennepin County experienced a significant rise in reports of child maltreatment since 2015, further impacting an already overtaxed system. (*Id.* § 2.b.)

Hennepin County contends that it has made significant efforts to address the issues raised in the Casey Report and to respond to increasing child protection caseloads, including:

    i.    Hennepin County created the Child Protection Oversight Committee to review Hennepin County's practices and make recommendations to address the issues identified by the Casey Report;

ii.    Hennepin County increased funding for the CFS Program through its property tax levy, and overall expenditures for the CFS Program increased by $48 million from 2013 to 2017 and by an additional $13.1 million from 2017 to 2018;

iii.    Hennepin County more than doubled the number of staff in CFS and substantially reduced workforce turnover; and

iv.    Hennepin County made significant improvements in finding and recruiting relatives to take in children who have been removed from their homes, and reformed and improved the services that are offered to families in order to prevent the removal of children from their homes.

(Dkt. 227-1 § 2.c.)

Hennepin County also created the Child Well-Being Advisory Committee as the permanent successor to the Oversight Committee, which is made up of 18 community and child welfare system experts.  (Dkt. 227-1 § 2.d.) The Child Well-Being Advisory Committee advises the County on implementation of:

i.    Best practices to advance the well-being of children and embed a child well-being practice model;

ii.    Requirements and recommendations from the Minnesota Department of Human Services, the Governor's Task Force on Child Protection, and the Legislative Task Force on Child Protection; and

      iii.     Recommendations from the Child Protection Oversight Committee and the

             Casey Report.

(*Id.*)  The Advisory Committee also updates the County Board on progress toward child

well-being outcomes and identifies and advances recommendations to the County Board.

(*Id.*)

In addition to various legal defenses, the County asserts that it has made progress

and remains committed to further improving its child welfare and child protection

system, including improving timeliness in responding to reports of maltreatment,

continuing to reduce caseloads, and reducing maltreatment recurrence, foster care re-

entry, maltreatment in foster care, as well as improving placement stability. (Dkt. 227-1 §

2.e.)

## II.    The Parties' Settlement Discussions

Following the Court's issuance of its Memorandum and Order on Defendants'

second set of Motions to Dismiss (Dkt. 157), the parties agreed to mediate the case in an

effort to reach a settlement. They retained retired United States Magistrate Judge Arthur

Boylan and retired Minnesota Supreme Court Justice Kathleen Blatz to serve as co-

mediators.

The first mediation session was held on Friday, November 30, 2018. Over the next

several months, Magistrate Judge Boylan and Chief Justice Blatz supervised the

settlement process and presided over numerous negotiating sessions, including in-person

and telephone meetings. During this period, counsel for the Plaintiffs and Defendants

held numerous additional meetings in person and by phone. In addition, counsel for the State Defendant had separate conferences with counsel for the Hennepin County Defendants.

The parties first exchanged a draft settlement agreement in early December 2018. During their negotiations, the parties exchanged numerous drafts of the agreement. By early May 2019, the parties had reached agreement on the principle terms of the settlement. The Stipulation and Settlement Agreement was completed and signed as of June 28, 2019.

During the settlement discussions, Plaintiffs' counsel investigated the facts and analyzed the law relating to the matters set forth in the Second Amended Complaint, including the review of documents and other discovery produced by the Hennepin County Defendants and the State Defendant. Based on that investigation and analysis, Plaintiffs' counsel concluded that the settlement with the Hennepin County Defendants and the State Defendant according to the terms set forth in the Stipulation and Settlement Agreement is fair, reasonable, and adequate, and beneficial to, and in the best interests of, Plaintiffs and the putative Settlement Classes, given the uncertainties, risks, and costs of litigation.

The Hennepin County Defendants and the State Defendant also agreed that the Agreement is in the best interests of Plaintiffs, the Hennepin County Defendants, and the State Defendant. The settlement will not be deemed or construed to be an admission or evidence of any violation of any statute, law, rule, or regulation, or of any liability or

wrongdoing by the Hennepin County Defendants and/or the State Defendant, or of the truth of any of Plaintiffs' claims or allegations, or of the viability or truth of any of Defendants' defenses and denials of liability.

### III.   Summary of the Principal Benefits of the Settlement

Under the terms of the settlement, the Hennepin County Defendants and the State Defendant each agreed to separate undertakings to address the issues and concerns raised by Plaintiffs. Plaintiffs, in turn, also agreed to an ongoing commitment to involvement in a process to help develop specific goals and practices to address those issues and concerns. The Agreement also includes various reporting provisions that will enable the parties to monitor and evaluate progress.

### A.   Settlement Structure

The Stipulation and Settlement Agreement establishes a structure that will be in place for four years following the date of final approval. During that period, the parties' respective obligations and undertakings will be directed and monitored primarily by a six-member Settlement Subcommittee working in conjunction with, but separate from, the existing Child Well-Being Advisory Committee. Plaintiffs and Hennepin County each will be entitled to appoint two members of the Subcommittee. (Dkt. 227-1 § 5.d.iv.)[2] The

_____

[2] The Plaintiffs' initial appointments to the Settlement Subcommittee are Dianne Heins of Faegre Baker Daniels LLP and Susan Alt, formerly of Casey Family Services. Hennepin County's initial appointments are Jodi Wentland, Hennepin County Human Services Director, and Dan Rogan, Managing Attorney for the Civil Division of the Hennepin County Attorney's Office.

Managing Director at Casey Family Programs will serve as a non-voting, *ex officio* member of the Subcommittee. (*Id.*) Finally, the Subcommittee will be chaired by John Stanoch, former Hennepin County District Court Judge, who will also serve as an independent Neutral with the duties set forth in the Agreement. (*Id.*)

The Plaintiffs also have the right to appoint a representative to serve on the Child Well-Being Advisory Committee. (*Id.* § 5.d.iii.) The representative will be Dianne Heins, as long as she is willing and able to serve.

The Settlement Subcommittee, which will meet at least monthly, will have particular duties as set forth in the Stipulation and Settlement Agreement. In general, its role is to evaluate the results of audits and reviews conducted as specified in the Agreement; to identify, direct, and/or conduct the reasonable and necessary reviews and evaluations identified in the Agreement and to report the findings of such evaluations and reviews to the Child Well-Being Advisory Committee; to have a standing agenda item to present on its work at each meeting of the Child Well-Being Advisory Committee; and to provide strategic guidance and recommendations regarding priority issues and concerns for further analysis and improvement by Hennepin County. (Dkt. 227-1 § 5.d.iv.) The Settlement Subcommittee also will report at least biannually in writing to the Child Well-Being Advisory Committee and to counsel for the parties on the progress made to implement the Agreement, and each such report will include a section prepared by the independent Neutral addressing any compliance issues under the Agreement. (*Id.*)

11

**B.     Commitments by the Hennepin County Defendants**

The Hennepin County Defendants committed to use reasonable efforts to fully

comply with the requirements of federal and state law with respect to its child welfare

and child protection program. (Dkt. 227-1 § 5.b.i). To assist in those efforts, the

Hennepin County Defendants will take the following specific actions:

**1.     Provision of data**

Within 90 days of the date of final approval, Hennepin County will create and

provide to the Settlement Subcommittee a monthly data dashboard which includes items

specifically identified in Exhibit A to the Agreement. (Dkt. 227-1 § 5.b.ii). This

dashboard will be in place for the full four-year settlement period. (*Id.*)

**2.     Commitments related to maltreatment reports**

Within six months of the date of final approval, the County will (a) develop and

implement a multi-disciplinary team approach to screen certain maltreatment reports in or

out and to determine the appropriate track response for such reports which are screened in

(assessment or investigation); and (b) establish a method to confirm that this multi-

disciplinary screening is occurring and report the implementation data to the Settlement

Subcommittee. (Dkt. 227-1 § 5.b.iii.)

The County also will screen in all maltreatment re-reports over which it has

jurisdiction and promptly offer and make available services to families.  (Dkt. 227-1 §

5.b.iv.)  If families decline such services, the County will reassess risk to the children and

consult with the County Attorney regarding filing a CHIPS petition.  (*Id.*)  Within six

months of the date of final approval, the County will establish a method to confirm that this consultation with counsel is occurring and report the implementation data to the Settlement Subcommittee. (*Id.*)

The County also agrees that it will conduct all interviews of children during screening, assessment, or investigation of maltreatment reports outside the presence of any alleged perpetrator, including a parent, and outside the presence of any parent who has a familial or personal relationship with the alleged perpetrator. (Dkt. 227-1 § 5.b.v.) An exception may be made only if there are "exceptional and documented circumstances" such that it would not be in the best interests of the child to do so. (*Id.*) The County will work with the State to ensure that changes are made to the electronic State Social Services Information System (SSIS) to track compliance with this requirement. (*Id.*) The County must also annually audit a statistically-appropriate and mutually-agreed upon sample of caseworker notes or SSIS data for compliance with this requirement and provide the results to the Settlement Subcommittee. (*Id.*)

### 3.   Commitments related to foster care

Within six months from the date of final approval, Hennepin County will commission an appropriate third party, approved by the Settlement Subcommittee, to complete a comprehensive foster care needs analysis and make recommendations to address current and projected needs for foster care resources. (Dkt. 227-1 § 5.b.vi.) The analysis must include an analysis of current foster parent training, as well as factors or systemic issues which have contributed to maltreatment of children in foster care. (*Id.*)

The recommendations must be provided to the Settlement Subcommittee and the Child Well-Being Advisory Committee, which will work together to develop a plan with measurable goals and benchmarks and a timeline for achieving them, and will also monitor and assess compliance with them. (*Id.*)

For every foster home in which a child is placed, the caseworker must fully inform the foster parents of the needs of the child and document that the parents have received the information and have articulated or otherwise demonstrated an ability to meet those needs. (Dkt. 227-1 § 5.b.vii.)

The County will also conduct all interviews of children four years of age or older during monthly caseworker visits outside the presence of the foster parents. (Dkt. 227-1 § 5.b.viii.) An exception may be made only if there are "exceptional and documented circumstances" such that it would not be in the best interests of the child to do so.  (*Id.*) The County will work with the State to ensure that changes are made to the electronic SSIS to track compliance with this requirement.  (*Id.*) The County must also annually audit a statistically-appropriate and mutually-agreed upon sample of caseworker notes or SSIS data for compliance with this requirement and provide the results to the Settlement Subcommittee. (*Id.*)

The County further will establish and maintain a review team to provide quarterly reviews of cases involving children who have been in foster care for longer than 24 months and are without a permanency disposition or are state wards.  (Dkt. 227-1 § 5.b.ix.)  The members of the review team will be identified to the Settlement

Subcommittee and will include Program Managers, Supervisors, and Assistant County

Attorneys.  (*Id.*) The team will review impediments to permanency, including adoption.

(*Id.*)  The team will submit biannual reports on its work to the Settlement Subcommittee.

(*Id.*)

### 4.      Commitments related to adoption

Hennepin County will ensure, subject to any applicable court orders, that no pre-

adoptive placement is made until the adoptive parents have received all information

known to the County about the child, have been informed in writing that they will have

an opportunity to meet with the child's service providers, foster parents, and others who

know the child, and have articulated or otherwise demonstrated an ability to meet the

needs of the child. (Dkt. 227-1 § 5.b.x.) The potential adoptive parents may decline in

writing a meeting with the collateral sources, but this declination will be considered in

evaluating them as an adoption resource.  (*Id.*) If the home study or other information

known to the County indicates the potential adoptive parents are unwilling or unable to

meet the child's needs, the County will evaluate and document in writing how those

issues will be overcome if the adoption proceeds. (*Id.*)

The County also will utilize the Minnesota Public-Private Adoption Initiative to

manage recruitment of adoptive resources for state wards for whom Hennepin County has

not identified an adoptive resource within 12 months of the termination of parental rights.

(Dkt. 227-1 § 5.b.xi.)

### 5.     Commitments related to shelter care

During the settlement period, Hennepin County will provide quarterly reports to the Settlement Subcommittee and the Child Well-Being Advisory Committee on trends in shelter use, and request that those bodies provide recommendations to improve County practices and policies related to the use of shelter care. (Dkt. 227-1 § 5.b.xii.)

In addition to this reporting function, within 18 months of the date of final approval, the County will work with the Settlement Subcommittee and the Child Well-Being Advisory Committee to re-vision shelter care in Hennepin County and develop, establish, and implement protocols and practice standards to address limitations on the use of shelter care, limitations on the use of institutional shelter care for young children, and ensuring uninterrupted full-day education and other needed services to children in shelter care. (Dkt. 227-1 § 5.b.xiii.)  The County will also work with its shelter care providers to build a trauma-informed shelter system that addresses children's therapeutic, cultural, and educational needs. (*Id.*)

### 6.     Commitments in other areas

The Settlement Agreement provides that the parties will work together on other issues as well. First, within 12 months of the date of final approval, the County will work with the Settlement Subcommittee and the Child Well-Being Advisory Committee to develop, establish, and implement protocols and practice standards for case plans. (Dkt. 227-1 § 5.b.xiv.)  Second, within 18 months of the date of final approval, the County will work with the Settlement Subcommittee and the Child Well-Being Advisory Committee

16

to develop, establish, and implement protocols and practice standards relating to trial home visits. (*Id.* § 5.b.xv.)  Finally, during the four-year settlement period, Hennepin County will make a good-faith effort to work on a timely basis to develop, establish, and implement protocols, practice standards, and/or recommendations to address other issues or concerns identified by the Settlement Subcommittee or the Child Well-Being Advisory Committee. (*Id.* § 5.b.xvi.)

### C.   Commitments by the State Defendant

The State Defendant serves a different role in the child welfare and child protection system from the County, and thus has a different set of commitments. Those commitments are, first, that it will conduct monthly audits of at least five percent of Hennepin County's maltreatment report screen-outs and at least five percent of the County's response track assignments (investigation or assessment) of screened-in reports. (Dkt. 227-1 § 5.c.i.) Hennepin County will in turn provide the audit results to the Settlement Subcommittee and will also provide any underlying data and records requested by the Settlement Subcommittee. (*Id.*)

Second, the State Defendant will conduct annual audits of the case records of at least 10 percent of state wards for whom Hennepin County is the Commissioner's agent and for whom an adoptive resource has not been identified within 24 months after the court ordered the guardianship of the child to the Commissioner of Human Services. (Dkt. 227-1 § 5.c.ii.) Again, Hennepin County will provide the audit results to the

Settlement Subcommittee and will also provide any underlying data and records requested by the Settlement Subcommittee. (*Id.*)

Third, the State Defendant will take all reasonable actions necessary to request and implement any necessary modifications to its SSIS database to allow tracking of information related to interviews of children apart from parents, alleged perpetrators, and foster parents, as required by the Agreement. (Dkt. 227-1 § 5.c.iii.)

Finally, the State will, by December 31, 2019, appropriate and provide $2,250,000.00 to Hennepin County to accomplish the objectives of the settlement. (Dkt. 227-1 § 5.c.iv.) This amount is over and above the federal funds and other monies the Department of Human Services would otherwise distribute to Hennepin for its child welfare and child protection system. (*Id.*)

### D.   Monitoring and Enforcement of Settlement Obligations

The parties have also agreed to several mechanisms to monitor and enforce the terms of the Stipulation and Settlement Agreement. As noted above, the Settlement Subcommittee will meet at least monthly and will report regularly on progress under the Agreement.

In addition, for the length of the four-year settlement period, Hennepin County's Continuous Quality Improvement Team will evaluate the findings of any audits of Hennepin County performed by the State Defendant and any reviews conducted by the Hennepin County's Collaborative Safety Team. (Dkt. 227-1 § 5.d.i.) The Quality Improvement Team will provide an annual report of those evaluations to the Settlement

Subcommittee. (*Id.*) Hennepin County also will provide the Settlement Subcommittee the specific reviews and audits identified in Exhibit B to the Agreement and will also provide any underlying data and records requested by the Settlement Subcommittee. (*Id.*)

In addition, the Settlement Subcommittee can direct Hennepin County to gather data and records for review or analysis, or to conduct reviews, analyses, or audits, which are not otherwise included in the terms of the Agreement, on any issue of concern in the child welfare and child protection system, or to measure progress on identified goals or compliance with the Agreement. (Dkt. 227-1 § 5.d.ii.) The parties agree that this work at the direction of the Settlement Subcommittee will not exceed 600 hours of staff time in a calendar year, and that this work is in addition to any hours expended by Hennepin County to comply with specific obligations under the Agreement. (*Id.*)

Hennepin County also agrees to take additional actions to promote transparency and public disclosure around its Child and Family Services Program.  Specifically, the County agrees to conduct an annual meeting separate from the periodic County Board of Commissioners meetings, for this purpose, and to prepare an annual written report addressing the actions and priority issues and concerns identified by the Settlement Subcommittee and the Child Well-Being Advisory Committee. (Dkt. 227-1 § 5.e.)

The parties have agreed to a mechanism for resolving disputes under the Stipulation and Settlement Agreement. Any dispute among the parties about interpretation of the Agreement or compliance with the obligations imposed by the Agreement will first be submitted to the mediators, retired Magistrate Judge Arthur

Boylan and retired Minnesota Supreme Court Chief Justice Kathleen Blatz, for

resolution. (Dkt. 227-1 § 8.d.)   If resolution by the mediators is unsuccessful, the parties

may bring the dispute to this Court for final resolution. (*Id.*)

Finally, the Agreement does not contain any releases that will be granted by the

Plaintiffs. Rather, upon final approval, the remaining two claims in the Second Amended

Complaint will be dismissed without prejudice. (Dkt. 227-1 § 4.a.)  All of the members of

the Settlement Classes will be bound by the settlement and dismissal. While no releases

are provided, the Named Child Plaintiffs and the members of the Settlement Classes will

not bring the same or substantially similar claims within the four-year settlement period,

unless permitted to do so by the Court after a finding that there has been a material and

unremedied breach of the Agreement. (*Id.* § 4.c.) At the same time, none of the Plaintiffs

or members of the Settlement Classes are prohibited from asserting individual claims

seeking individual, as opposed to systemic, relief for injuries arising from their particular

circumstances. (*Id.*)

The Stipulation and Settlement Agreement, therefore, is largely self-executing,

with no need for ongoing Court monitoring or supervision. Rather, the parties have

established a structure to work together to develop and implement solutions to the

challenges faced by the Hennepin County child welfare and child protection system.

They have also established a robust system for measuring and evaluating progress toward

their agreed-upon goals.

# ARGUMENT

## I.     Confirming Class Certification For Settlement Purposes Is Appropriate

The Court's Preliminary Approval Order conditionally certified two classes for

settlement purposes, as follows:

     a.     **Maltreatment Report Settlement Class**. All children who were the subject of maltreatment reports made or referred to Hennepin County during the Class Period that were or should have been investigated or assessed by Defendants pursuant to Minn. Stat. § 626.556.

     b.     **Special Relationship Settlement Class**. All children for whom Hennepin County had legal responsibility and/or a special relationship in the context of the child protection system during the Class Period.

(Dkt. 233 ¶ 3.) Plaintiffs respectfully request that the Court now grant final certification

to each of the proposed Settlement Classes for purposes of effectuating the settlement.

To qualify for certification, an action must satisfy all of the provisions of Fed. R.

Civ. P. 23(a), plus one of the subdivisions of Fed. R. Civ. P. 23(b).  Fed. R. Civ. P. 23(a)

requires the proponents of certification to establish each of the following: (1) that the

members of the proposed class are so numerous that joinder of the individual claims

would be impracticable; (2) that there are questions of law or fact common to the class;

(3) that the claims of the proposed class representatives are typical of the claims of the

class members; and (4) that the proposed class representatives will adequately represent

the interests of the class.  As relevant here, Fed. R. Civ. P. 23(b)(2) requires that the

defendants have acted or refused to act on grounds that apply generally to the class, so

that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

As discussed in more detail below, all of the certification requirements for settlement purposes are met and Defendants consent to certification. *See* 4 Herbert B. Newberg, *Newberg on Class Actions*, § 13.12 (5th ed. 2019) ("*Newberg*") ("When the court has not yet entered a formal order determining that the action may be maintained as a class action, the parties may stipulate that it be maintained as a class action for the purpose of settlement only.").

### A.     Numerosity Is Satisfied

Each of the proposed Settlement Classes is sufficiently numerous to satisfy Fed. R. Civ. P. 23(a)(1) because there are thousands of class members. As of the time the Second Amended Complaint was filed, the Special Relationship Class consisted of at least 1,600 children who were then in foster care placements or otherwise in the legal and/or physical custody of Hennepin County. (Dkt. 86 ¶ 35.) The membership of that class will have grown as new children entered the system through the time the Stipulation and Settlement Agreement was executed.  The Maltreatment Report Class consists of thousands of children who have contact with the Hennepin County child protection system as the subjects of maltreatment reports. (*Id.*) Hennepin County received over 17,000 maltreatment reports in 2017 alone.

For a class action to be appropriate, the proposed class must be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). Impracticable does

not mean impossible, only difficult or inconvenient to join all members of the class. *See Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995). Courts in this District have determined that putative class sizes of 40 will support a finding of numerosity. *Id.* Each of the proposed Settlement Classes here far exceeds that threshold.

### B.     There Are Common Questions of Law and Fact

A common question, for purposes of Fed. R. Civ. P. 23(a)(2), is a "common contention" that is "of such a nature that it is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011). What matters is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.Rev. 97, 132 (2009)). "Rule 23 does not set forth a mere pleading standard," so a party seeking class certification must "prove that there are *in fact* . . . common questions of law or fact." *Dukes,* 564 U.S. at 350. The existence of a single, common question will satisfy Fed. R. Civ. P/ 23(a)(2). *Id.* at 359.

Here, with respect to the Special Relationship Class, Plaintiffs contend there are common questions relating to the Defendants' alleged failure to protect members from physical, psychological, and emotional harm; the alleged failure to take reasonable steps to make it such that class members who are returned to their parents do not re-enter foster

care; and the alleged failure to make sufficient efforts to place members in a permanent home in a reasonable period of time. With respect to the Maltreatment Report Class, Plaintiffs contend there are common questions regarding the alleged failure to conduct timely and adequate investigations. These issues are all further subject to common questions of law, because they allege systemic failures that violate the class members' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and constitute negligence under Minnesota law. The application of common questions to the alleged violation of rights establishes commonality under Fed. R. Civ. P. 23(a)(2). *See Karsjens v. Jesson*, 283 F.R.D. 514, 518-19 (D. Minn. 2012) (holding commonality is satisfied when common questions have common answers that drive case resolution, such as "[w]hether Defendants violated Plaintiffs' and Class members' Due Process rights").

### C.     Plaintiffs' Claims Are Typical of Each Settlement Class

The typicality prerequisite is satisfied "when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members." *Lockwood Motors*, 162 F.R.D. at 575. "When the claims or defenses of the representatives and the class are based on the same course of conduct or legal theory, it is thought that the representatives will advance the interest of the class members by advancing his or her own interests." *In re Control Data Corp. Sec. Litig.,* 116 F.R.D. 216, 220 (D. Minn. 1986) (citations omitted). Therefore, it has been held that any differences between the class representative and the putative class must be material to the claims and

defenses pled – not merely incidental to the allegations – to defeat typicality. *See Lockwood Motors,* 162 F.R.D. at 575-76. Accordingly, courts have held that the burden of demonstrating typicality is fairly easily met. *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995).

In this case, the legal claims of the Named Child Plaintiffs arise out of the same treatment and experiences in the Hennepin County child welfare and child protection system as the other class members. Thus, with respect to the causes of action alleged, the legal theories underlying the Named Child Plaintiffs' claims are identical to those underlying the claims of all members of each of the proposed Settlement Classes. The claims of all Named Child Plaintiffs and class members arise from Defendants' alleged systemic failures, both with respect to the allegations of inadequate protection and systemic violations of the rights of the members of the Special Relationship Class and with respect to the alleged untimely and inadequate investigations of maltreatment reports for the Maltreatment Report Class. As such, the typicality requirement is satisfied. *See M.B. by Eggemeyer v. Corsi*, 327 F.R.D. 271, 279 (W.D. Mo. 2018) (finding common issues of fact and law for class of children in foster care based on alleged systemic violations of rights).

### D.     The Named Child Plaintiffs and Class Counsel Have Adequately Represented Each Class

Under Fed. R. Civ. P. 23(a)(4), a class representative must also "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Similarly, for a

settlement to be finally approved, the Court must consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). In order to meet this requirement, the Court must find that (1) the representatives and their counsel are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *See Lockwood Motors,* 162 F.R.D. at 576.

In this case, the Named Child Plaintiffs are acting through their Next Friends. The Court previously appointed all of the Next Friends, either permanently or on a temporary basis, pending further discussions between the Next Friends and the Named Child Plaintiffs or other individuals in their lives. (*See* Dkt. 198.) The Court has now, pursuant to the parties' stipulation, appointed all the Next Friends permanently for purposes of the settlement. (Dkt. 218.)

At the hearing on Plaintiffs Motion for Preliminary Approval, the Court inquired regarding the status of Class Counsel's and the Next Friends' efforts to establish direct contact with the Named Child Plaintiffs or adults who have direct contact with them. Class Counsel's efforts to make those contacts have continued following the hearing, and those efforts are described in the Declaration of Dianne Heins, filed under seal herewith.

Following the Preliminary Approval Hearing, the Court also appointed Plaintiffs' undersigned counsel as Class Counsel. (Dkt. 233 ¶ 4.) Class Counsel therefore include attorneys from Faegre Baker Daniels LLP, the largest law firm in the State of Minnesota,

including James L. Volling, who served as a law clerk for Chief Justice Warren E. Burger of the United States Supreme Court, and who has extensive experience and expertise in complex litigation, including class actions, in state and federal courts throughout the United States. Class Counsel also include Marcia Robinson Lowry, an attorney with A Better Childhood, Inc., a non-profit legal advocacy organization, who has extensive experience and expertise in federal child welfare class actions throughout the United States. Finally, Class Counsel include Eric Hecker, an experienced civil rights litigator who has successfully represented plaintiffs in numerous class actions and in children's rights cases.

The Named Child Plaintiffs, acting through these Next Friends and their counsel, have vigorously prosecuted this action on behalf of all the class members. *See* Fed. R. Civ. P. 23(e)(2)(A). They have repeatedly appeared before this Court to pursue their claims and have conducted discovery. They engaged in long and serious negotiations with Defendants. And, under the terms of the Stipulation and Settlement Agreement, they have agreed to remain involved for the four-year settlement period to work with the Defendants to design and implement improvements to the child welfare and child protection system for the benefit of the Settlement Classes. Thus, each proposed Settlement Class has been and is adequately represented for purposes of finally certifying each Settlement Class.

### E.   Certification Under Fed. R. Civ. P. 23(b)(2)

In addition to Fed. R. Civ. P. 23(a), certifying each proposed Settlement Class is appropriate because a class action here satisfies the requirement that the Defendants acted or refused to act on grounds that apply generally to each Settlement Class, so that final injunctive relief would be appropriate respecting each Settlement Class as a whole. "'Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.'" *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 949 (D. Minn. 2018) (*quoting Dukes*, 564 U.S. at 360).   The United States Supreme Court and the Eighth Circuit have recognized that class actions under Fed. R. Civ. P. 23(b)(2) are particularly appropriate in the context of civil-rights litigation. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997); *see also Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980) (reversing denial of certification under Fed. R. Civ. P. 23(b)(2) of a class of inmates confined at the state hospital claiming violation of their constitutional rights); *U.S. Fid. & Guar. Co. v. Lord* , 585 F.2d 860, 875 (8th Cir. 1978) (affirming certification under Fed. R. Civ. P. 23(b)(2) of a class of female employees claiming sex discrimination). Indeed, "[b]ecause one purpose of Rule 23(b)(2) was to enable plaintiffs to bring lawsuits vindicating civil rights, the rule must be read liberally in the context of civil rights suits." *Coley*, 635 F.2d at 1378 (internal quotation marks and citation omitted).

In this case, Plaintiffs sought declaratory and injunctive relief that would apply classwide. The primary forms of relief they sought were declarations that Defendants had

violated Plaintiffs' and class members' rights and injunctions to ensure that appropriate actions were taken to remedy those violations. (Dkt. 86 at 105-106.) The relief in the Stipulation and Settlement Agreement likewise provides a classwide remedy, by implementing a structure to develop, measure, and evaluate improvements to the entire child welfare and child protection system. As a result, the requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. *See Portz*, 297 F. Supp. 3d at 949; *M.G. by Eggemeyer*, 327 F.R.D. at 282.

## II.     The Settlement Is Fair, Reasonable, And Adequate And Should Be Approved By The Court

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for the compromise of claims brought on a class basis.[3] The procedure for review of a proposed class action settlement is a well-established process. *See* Manual for Complex Litigation § 13.14 (4th ed. 2007) (hereinafter "*Manual*"). First, the Court conducts a preliminary hearing to determine whether the proposed settlement falls within the range of possible judicial approval. *Newberg* § 13.12. That preliminary approval has been granted. At this stage, the Court must determine whether the proposed settlement is fair, reasonable, and adequate, under all the circumstances. Plaintiffs submit that the settlement meets these standards.

---

[3] Effective December 1, 2018, Fed. R. Civ. P. 23(e) was amended. The 2018 amendment to Rule 23(e) provides factors for the Court to consider for approval of a proposed class action settlement. The new Rule 23(e)(2) factors overlap with the factors stated by the Eighth Circuit's prior decisions, as discussed below.

As a matter of long-standing public policy, settlement is a strongly favored method for resolving disputes. *See Katun Corp. v. Clarke,* 484 F.3d 972, 975 (8th Cir. 2007) ("Minnesota courts recognize a 'strong public policy favoring the settlement of disputed claims without litigation.'") (citations omitted); *Liddell by Liddell v. Bd. of Educ. of City of St. Louis,* 126 F.3d 1049, 1056 (8th Cir. 1997). It is beyond question that there is an overriding public interest in settling litigation, and this is particularly true in class action suits. *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.,* No. 111-MD-2247 ADM/JJK, 2012 WL 2512750, at *7 (D. Minn. June 29, 2012) ("'The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context."' (quoting *White v. Nat'l Football League,* 822 F. Supp. 1389, 1416 (D. Minn. 1993), *aff'd,* 41 F.3d 402 (8th Cir. 1994), *abrogated by Amchem,* 521 U.S. 591.); *Unitarian Universalist Church of Minnetonka v. City of Wayzata,* 890 F. Supp. 2d 1119 (D. Minn. 2012); *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1148 (8th Cir. 1999) ("[S]trong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor." (internal quotations and citations omitted)).

The Eighth Circuit has established four factors for determining whether a proposed settlement is fair, reasonable, and adequate: (1) the merits of plaintiffs' case, weighed against the terms of the settlement; (2) the defendants' financial conditions; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the

settlement. *In re Uponor, Inc.,* 2012 WL 2512750 at *7; *see also Van Horn v. Trickey,* 840 F.2d 604 (8th Cir 1988); *see also* Fed. R. Civ. P. 23(e)(2).

In evaluating these standards, "courts give 'great weight' to and may 'rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement.'" *In re Uponor*, 2012 WL 2512750 at *7 (quoting *Welsh v. Gardebring*, 667 F. Supp. 1284, 1295 (D. Minn. 1987). As another court in this District has concluded, "[s]ettlement agreements are presumptively valid, particularly where a settlement has been negotiated at arm's length, discovery is sufficient, the settlement proponents are experience in similar matters and there are few objectors." *Id.* (internal quotations and citations omitted).

Here, where experienced counsel negotiated the settlement at arms' length, there are no objectors, and the settlement provides substantial benefits to the members of each class, the settlement should be given final approval.

A.   **The Settlement Is the Result of Arm's-Length Negotiation by Experienced Counsel (Fed. R. Civ. P. 23(e)(2)(A) & (B))**

The terms of the proposed settlement are the product of arm's-length negotiations conducted between counsel who are highly experienced in complex litigation. Fed. R. Civ. P. 23(e)(2)(B); *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.,* 631 F. Supp. 2d 1151, 1158. The proposed settlement was forged in arm's-length negotiations and aided by experienced, independent mediators. While the parties have not fully completed factual or expert discovery, they have exchanged significant information and, because

31

Defendants are public entities, there are significant public records available for review. Thus, the parties are well-informed about the factual background and merits of their claims and defenses. In such situations, where the parties bargained at arm's-length, there is a presumption in favor of the settlement. *In re Xcel Energy, Inc.,* 364 F. Supp. 2d 1013, 1018 (quotations omitted).

During the settlement negotiations, Plaintiffs' counsel zealously advanced the position of Plaintiffs and the putative class members and were fully prepared to continue to litigate rather than accept a settlement that was not in the best interests of the Plaintiffs and the class members. Thus, the class members' interests were adequately protected. Fed. R. Civ. P. 23(e)(2)(A); *see also* Section I.D, *supra.* Magistrate Judge Boylan and Chief Justice Blatz actively supervised and participated in the settlement discussions and greatly assisted the parties where needed. As such, the settlement should be considered "presumptively valid." *In re Uponor*, 2012 WL 2512750 at *7.

### B. The Eighth Circuit's Factors All Support Approval of the Settlement

The proposed settlement also satisfies the fairness criteria articulated by the Eighth Circuit, and the corresponding factors under Fed. R. Civ. P. 23(e)(2).

### 1. The Settlement Terms Provide a Substantial Benefit to the Class Members (Eighth Circuit Factor 1 and Fed. R. Civ. P. 23(e)(2)(C) & (D))

The most important consideration in deciding whether a settlement is fair, reasonable, and adequate is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *Petrovic*, 200 F.3d at 1150 (internal quotations

omitted); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932-33. The

Court "cannot be expected to balance the scales with the nicety of an apothecary. The

very object of compromise 'is to avoid the determination of sharply contested and

dubious issues.'" *White,* 822 F. Supp. at 1417 (internal quotation omitted). Thus, the

Court's determination generally "will not go beyond 'an amalgam of delicate balancing,

gross approximation and rough justice.'" *Id.* (internal quotation omitted). Here, the relief

provided to the class members is adequate and treats class members equitably relative to

each other. Fed. R. Civ. P. 23(e)(2)(C) & (D).[4]

The Court is familiar with the facts of this case from the previous motions to

dismiss and the preliminary approval motion and hearing. (*E.g.*, Dkt. 63; Dkt. 226.) As

the Court previously explained, "all parties acknowledge that a 2015 report by Casey

Family Services found serious and systemic problems" in Hennepin County's child

welfare and child protection system. (Dkt. 74 at 2.) Plaintiffs alleged in their Complaints

that "Defendants ignored the dangers and harms the systemic failures created for children

in their care," and their "allegations include a description of the unspeakable things that

have happened to each of them during their time in the Hennepin County foster-care

---

[4] Under Fed. R. Civ. P. 23(e)(2)(C)(ii), the Court is to consider "the effectiveness of any
proposed method of distributing relief to the class, including the method of processing
class-member claims." This factor does not directly apply to this matter, where the relief
is entirely injunctive and directed at improving the overall Hennepin County child
protection and child welfare system. But because the relief is systemic, it does provide
relief to all class members on an equitable basis.

system." (*Id.* at 9.) While the Defendants disputed that they violated the children's rights, no one disputes that there is an ongoing need for improvement. As set forth in the Stipulation and Settlement Agreement, the Hennepin County-commissioned Casey Report recognized the need for improvement and recommended various actions that could be taken. (Dkt. 227-1 § 2.)

The Stipulation and Settlement Agreement in this case establishes a structure that will significantly improve the Hennepin County child welfare and child protection system to the benefit of all class members. As described in detail above, the Agreement requires creation of a Settlement Subcommittee. The Plaintiffs and the Hennepin County Defendants will appoint two members each to that Subcommittee, and it will be chaired by an independent Neutral, highly respected former Hennepin County District Court Judge John Stanoch.

Through the Settlement Subcommittee, the parties have agreed to work together to develop specific policies, protocols, and practices to improve various aspects of the child welfare and child protection system. Specific targets for improvement include:

- Maltreatment Reports and Investigations.  The Agreement provides for developing improved screening of maltreatment reports, to improve the response to reports of maltreatment and reduce the number of reports that are inappropriately "screened out" of the system. The Agreement focuses in particular on maltreatment re-reports, emphasizing the need to make services available to families where multiple maltreatment reports are made and to

34

reassess the risk where such services are refused. The Agreement further

provides for making improvements to the interview process for children,

including conducting interviews outside the presence of alleged perpetrators,

unless limited exceptions apply. These improvements are all designed to

reduce the risk that children will be left in situations where they will suffer

abuse and neglect.

- Foster Care. The Agreement provides that Hennepin County will commission a

  third party to complete a comprehensive foster care needs analysis and make

  recommendations to address current and projected needs for foster care

  resources. The Settlement Subcommittee will then work with the Child Well-

  Being Advisory Committee to develop a plan with specific, measurable goals

  to achieve the recommended improvements. The Agreement also provides for

  other improvements in foster care, including ensuring that foster parents are

  fully informed of the child's needs, that children be interviewed outside the

  presence of the foster parents during caseworker visits (with limited

  exceptions), and establishing a review team to provide quarterly reviews of

  children who have been in foster care for more than 24 months.

- Adoption. The Agreement provides that procedures will be put in place to

  improve pre-adoptive placements, including ensuring that no pre-adoptive

  placement is made until the potential adoptive parents have received all

  information known to Hennepin County about the child and have been given

certain information in writing. The Agreement further provides for use of the

Minnesota Public-Private Adoption Initiative to manage recruitment of

adoptive resources for state wards for whom adoptive resources have not been

identified within 12 months of termination of parental rights.

- Shelter Care. The Agreement provides for quarterly reporting on trends in

    shelter care use and to develop, among other things, protocols and practice

    standards to address limitations on the use of shelter care and the use of

    institutional shelter care for young children.

- Additional areas. The Parties also agreed that the Settlement Subcommittee

    and the Child Well-Being Advisory Committee will develop protocols and

    practice standards for case plans and trial home visits. They also committed to

    making good-faith efforts to work on a timely basis to address other issues or

    areas of concern identified by the Settlement Subcommittee and/or the Child

    Well-Being Advisory Committee.

These provisions address many of the key areas of need identified by Plaintiffs in

this lawsuit. Moreover, the Agreement does not simply set out generic goals, but it

includes specific timelines for developing the plans. It also includes robust provisions for

reporting data, reviewing data, providing information, and other ongoing monitoring of

issues. For example, the Defendants have agreed to provide a data dashboard that will

include detailed information, reported on a monthly basis, that the Settlement

Subcommittee can use to monitor the system. The Agreement provides for regular audits

by the State, and it provides that Hennepin County's Continuous Quality Improvement Team will review the results of those audits and report to the Settlement Subcommittee. The Settlement Subcommittee has additional rights to conduct its own reviews, and Hennepin County has committed up to 600 hours annually of staff time to assist in those reviews.

These provisions afford a substantial benefit to class members. They supply the opportunity for real, measurable improvement in key areas of the child welfare and child protection system. And these improvements offer the prospect of significantly reducing the risk that class members will be exposed to the type of harm described in Plaintiffs' Second Amended Complaint.

> **2.      Financial Considerations Support the Settlement, Including the Provision of a Reasonable Attorneys' Fee Award (Eighth Circuit Factor 2 and Fed. R. Civ. P. 23(e)(2)(iii))**

The second factor articulated by the Eighth Circuit in evaluating fairness is the defendants' financial condition. Here, although this class action does not seek monetary relief, there remain significant financial benefits to the settlement. As noted above, in the Agreement, the State Defendant agreed to contribute $2,250,000.00 to help Hennepin County fulfill its obligations under the Agreement. There is nothing in the record to indicate that the Defendants could not ultimately fund the full relief sought in the Second Amended Complaint if ordered to do so by the Court. However, as provided in the Agreement, the State Defendant agreed to make this contribution in the current year,

making funds immediately available that can be used over the full four-year settlement period. This weighs in favor of the settlement.[5]

Moreover, the Agreement also provides for a one-time payment of attorneys' fees, payable to Plaintiffs' counsel at A Better Childhood, Inc. and at Cuti Hecker Wang LLP. This payment, which was negotiated at arm's-length by counsel with the assistance of the mediators, will be made within ten (10) days after the State's contribution of funds to the settlement are released to Hennepin County, which release will take place no later than December 31, 2019. (Dkt. 227-1 §§ 4(a) & 5(c)(iv).) Plaintiffs' counsel at Faegre Baker Daniels LLP have waived any fee recovery, and no counsel will seek fees for any future work. Faegre Baker Daniels LLP has also agreed to pay the costs for the members of the Settlement Subcommittee appointed by Plaintiffs and for the independent Neutral chair of the Settlement Subcommittee. As a result, the proposed settlement fully addresses and satisfies any fee award that may have been sought. This payment is appropriate under Fed. R. Civ. P. 23(e)(2)(C)(iii).

For all these reasons, this factor also supports a finding of approval of the settlement.

---

[5] Relatedly, there are no other agreements between the parties that were required to be disclosed under Fed. R. Civ. P. 23(e)(3). Thus, there are no other agreements that might affect whether the relief is adequate to be considered under Fed. R. Civ. P. 23(e)(2)(C)(iv).

### 3. The Complexity and Expense of Continued Litigation Favor the Settlement (Eighth Circuit Factor 3 and Fed. R. Civ. P. 23(e)(2)(C)(i))

The complexity and expense of class action litigation is well-recognized. *See Schmidt v. Fuller Brush Co.,* 527 F.2d 532, 535 (8th Cir. 1975) ("[r]ecognizing that class actions place an enormous burden of costs and expense upon the parties ..."). Moreover, as has been noted in other class action cases, "the various procedural and substantive defenses likely to be argued to the hilt by the…Defendants, the expense of proving class members' claims, the certainty of resolution under this Settlement forecloses any subsequent appeals, and the fear that the 'ultimate resolution of the action ... could well extend into the distant future,' all weigh in favor of the Settlement's approval." *In re Uponor,* 2012 WL 2512750, at *8 (quoting *Snell v. Allianz Life Ins. Co. of N. Am.,* No. CIV. 97-2784 RLE, 2000 WL 1336640 at *16 (D. Minn. Sept. 8, 2000)). Under this factor, the settlement is adequate in light of "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i).

Plaintiffs continue to believe that their case has merit and that the issues and concerns identified in their pleadings must be remedied. At the same time, they have considered the challenges they would face in continuing to litigate compared with the remedies provided by this settlement. The Defendants deny having violated any Plaintiff's rights, that they are liable, or that the declaratory and injunctive relief Plaintiffs seek is warranted. Defendants have raised numerous contentions of fact and law with Plaintiffs' case, which are summarized in part in the Agreement, that they believe provide

strong defenses, including the actions Hennepin County has already taken to address the issues identified in the Casey Report. In addition, the Court has already dismissed two of the claims Plaintiffs originally brought.  There are complexities to this action and continued litigation carries substantial risks, including (a) the significant expense required to conduct the remaining necessary factual and expert discovery, (b) the risk and expense of pursuing a contested motion for class certification, (c) the challenges of pursuing Plaintiffs' claims against Defendants to trial and subsequent appeals, and (d) the inherent difficulties and delays that complex litigation entails. Given all of this, Plaintiffs' counsel believe that the proposed settlement represents an excellent result and eliminates the risk that the putative classes might not otherwise receive the desired classwide declaratory and injunctive relief if the litigation were to continue. In light of the exceptional benefits afforded through the proposed settlement to the Settlement Classes and to avoid the uncertainties of continued litigation, approval of the settlement is appropriate.

This assessment was made based on a detailed analysis. Prior to entering into the Stipulation and Settlement Agreement, Plaintiffs, through their counsel, conducted discovery, obtaining and reviewing records related to the Named Child Plaintiffs and data regarding the Hennepin County child welfare and child protection system. They also engaged in significant discussions with Defendants and their counsel regarding the status of the Hennepin County child welfare and child protection system, including attending

Child Well-Being Advisory Committee meetings and being granted access to review detailed data regarding the system.

Plaintiffs' counsel, having many years of experience in complex class action litigation and having negotiated several substantial settlements, took all of this into account. Plaintiffs' counsel also included attorneys who have litigated similar cases regarding child welfare and child protection systems around the country. Counsel carefully considered and evaluated relevant legal authority and evidence to support the claims asserted against Defendants; the likelihood of prevailing on these claims; the risk, expense, and duration of continued litigation; and the appeals and subsequent proceedings that would likely have occurred in any event. Were the litigation to continue, the amount of time and expense necessary to take this case through trial would be significant, without any assurance that any relief, let alone relief that would provide more significant benefits than those afforded by the proposed settlement, could be achieved. A lengthy trial and the inevitable appeals would not serve the interests of the proposed Settlement Classes, especially in light of the substantial benefits that the proposed settlement furnishes.

Based on this experience and these considerations, Plaintiffs' counsel concluded that the settlement is fair, reasonable, and adequate, and in the best interests of the proposed Settlement Classes, and they so advised the Plaintiff Next Friends. As this Court has previously held: "[t]he Court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *See In re Employee*

*Ben. Plans Sec. Litig.,* No. CIV. 3-92-708, 1993 WL 330595, at *5 (D. Minn. June 2, 1993). *See also In re Uponor*, 2012 WL 2512750, at *7 ("[C]ourts give great weight to and may rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." (quotations omitted)); *Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018.

Moreover, an evaluation of the benefits of a settlement must be tempered by a recognition that any compromise involves concessions on the part of all settling parties. As this Court has noted: "The Court concludes that, at the time of settlement, there remained significant risk of a null recovery. This risk, balanced against the settlement's substantial recovery, favors approval." *In re UnitedHealth Grp. Inc. PSLRA Litig.,* 643 F. Supp. 2d 1094, 1099 (D. Minn. 2009). *See also Officers for Justice v. Civil Serv., Comm'n of City & Cty. of San Francisco,* 688 F.2d 615, 624 (9th Cir. 1982) (noting that "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." (citations omitted)); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (recognizing that a trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained…" (internal quotations and citations omitted).

For all these reasons, the complexity and expense of continuing the litigation favor granting final approval of the proffered settlement.

42

### 4.     The Reaction of the Classes Favor the Settlement (Eighth Circuit Factor 4)

In its Preliminary Approval Order, the Court found that the Notice Plan contemplated by the Settlement Agreement met "the requirements of Fed. R. Civ. P. 23(c)(2)(A) and due process and provides appropriate notice." (Dkt. 233 ¶ 6.) For the same reasons as previously found by the Court, the execution of the Notice Plan justifies final approval of the settlement under Fed. R. Civ. P. 23(e)(1).

The Notice advised members of the Settlement Classes of the case name, docket number, and nature of the action; identified essential terms of the settlement; explained the injunctive relief agreed to by the parties; set forth dates for objecting to the settlement; directed recipients to a website for additional information; and provided specifics on the date, time, and place of the final settlement approval hearing.  (*See* Dkt. 228-1.) The Notice explained that there is no monetary relief for class members associated with the settlement. (*Id.*).

The Notice Plan was completed consistent with the Settlement Agreement and the Court's Preliminary Approval Order. (*See* Declaration of Charles N. Nauen ¶¶ 2-5). It was posted in all Hennepin County Human Service Centers and Satellite Offices that serve child protection clients.  (*Id.* ¶ 5.) This included the Human Service Centers in North Minneapolis, South Minneapolis, Brooklyn Center, Bloomington, and Hopkins, and the Satellite Offices in North Minneapolis, Richfield, Brookdale, Ridgedale, the Sabathani Satellite in Minneapolis, and the Eastside Neighborhood Services Satellite in

Minneapolis. (*Id.*) The Notice was also provided to the shelter providers, group home providers, and residential treatment centers where Hennepin County placed children during the notice period.[6] (*Id.* ¶ 2.)  In addition, the Notice was provided to each judge and clerk of the Hennepin County Juvenile Court.  (*Id.* ¶ 3.) Finally, Hennepin County set up a webpage with information about the settlement. (*Id.* ¶ 4.)

Any objections to the Settlement were due by Tuesday, October 15, 2019.[7] Under the Preliminary Approval Order, any objections were to be mailed to Settlement Class Counsel. (Dkt. 233 ¶ 8.) No objections were received, either before or after the deadline. (Declaration of James Volling ¶ 3; Declaration of Marcia Lowry ¶ 3; Declaration of Eric Hecker ¶ 3.) Where "only a handful" of objections are received, courts recognize that this factor weighs in favor of approving a settlement. *DeBoer*, 64 F.3d at 1178. Where there are no objections, this is all the more true.

---

[6] Hennepin County recently discovered that it inadvertently omitted mailing letters to three facilities with which Hennepin County contracts for the provision of foster care services. (Declaration of Charles Nauen ¶ 2.) However, no children in the County's child protection system were placed at those facilities during the notice period, and those facilities have now received notice. (*Id.*)

[7] The Preliminary Approval Order established the Objection Deadline as 60 days following the Notice Date, which itself was 14 days following the date of preliminary approval. (Dkt. 233 ¶ 10.) This date fell on Sunday, October 13, and because the following Monday was Columbus Day, the deadline moved to the next business day.

## CONCLUSION

Plaintiffs and Defendants have reached a comprehensive settlement following extensive discussions and arm's-length negotiations that were guided by very experienced and respected mediators. For all of the above-stated reasons, Plaintiffs respectfully request that the Court:

1. Grant final approval of the proposed settlement reached by Plaintiffs and Defendants effective January 1, 2020, so that the four-year settlement period will extend through December 31, 2023;

2. Confirm the final certification of the Settlement Classes specified in the Stipulation and Settlement Agreement, pursuant to Fed. R. Civ. P. 23(a) and 23(b), including confirming the adequacy of Named Plaintiffs and their Next Friends as representatives of the Settlement Classes;

3. Confirm that the Notice Program complied in all respects with the requirements of due process and Fed. R. Civ. P. 23 by providing adequate notices to the Settlement Classes;

4. Determine that the Stipulation and Settlement Agreement was entered into in good faith, is reasonable, fair, and adequate, and is in the best interests of the Settlement Classes;

5. Make all appropriate and necessary findings of fact required to enter a final judgment pursuant to Fed. R. Civ. P. 58(b);

6. Dismiss all remaining claims in this suit without prejudice, and bar Plaintiffs

and all members of the Settlement Classes from reasserting these claims or

substantially similar claims against the Defendants for a period of four years

from the Date of Final Approval (January 1, 2020), unless as expressly

permitted by the Court;

7. Order that each party will bear its own fees and costs, except for the payment

   of fees by Defendants to A Better Childhood, Inc. and Cuti Hecker Wang LLP

   set forth in the Stipulation and Settlement Agreement; and

8. Refer any disputes regarding the construction and/or enforcement of the

   Stipulation and Settlement Agreement to retired Magistrate Judge Arthur

   Boylan and former Minnesota Supreme Court Chief Justice Kathleen Blatz (or

   one of them if the other is unable or unwilling to participate) for resolution

   prior to bringing any such disputes to the Court and, in the event the Parties are

   unable to resolve any disputes regarding the construction and/or enforcement

   of the Stipulation and Settlement Agreement, provide for resort to the Court for

   final dispute resolution during the four-year period of the settlement.

Dated:  November 1, 2019

Respectfully submitted,

**FAEGRE BAKER DANIELS LLP**

*s/ James L. Volling*
James L. Volling, MN Atty #113128
 *James.Volling@FaegreBD.com*
Larry E. LaTarte, MN Atty #0397782
 *Larry.LaTarte@FaegreBD.com*
Nathaniel J. Zylstra, MN Atty #0314328
 *Nathaniel.Zylstra@FaegreBD.com*
Nicholas J. Nelson, MN Atty #0391984
 *Nicholas.Nelson@FaegreBD.com*
Jeffrey P. Justman, MN Atty #0390413
 *Jeff.Justman@FaegreBD.com*
Laura Reilly, MN Atty #0397655
 *Laura.Reilly@FaegreBD.com*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone: (612) 766-7000

A BETTER CHILDHOOD, INC.
Marcia Robinson Lowry (admitted *pro hac vice*)
 *mlowry@abetterchildhood.org*
Sarah Jaffe (admitted *pro hac vice*)
 *sjaffe@abetterchildhood.org*
355 Lexington Ave., 16th Floor
New York, New York 10017

CUTI HECKER WANG LLP
Eric Hecker (admitted *pro hac vice*)
 *ehecker@chwllp.com*
305 Broadway
New York, New York 10007

***Attorneys for Plaintiffs/Class Counsel***